No. 21-9001

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

Harvey Miguel Robinson,

*Appellant*,

v.

Secretary, Pennsylvania Department of Corrections;
Superintendent, Phoenix SCI;
Superintendent, Rockview SCI;
Lehigh County District Attorney,

*Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

---

### INITIAL BRIEF FOR APPELLANT
### AND APPENDIX, VOLUME I, PAGES 1a–131a

---

Eric Montroy
James Moreno
Eric Motylinski
Federal Community Defender Office
   for the Eastern District of Pennsylvania
The Curtis, Suite 545
601 Walnut Street
Philadelphia, PA  19106
(215) 928–0520

Dated: March 27, 2023          *Counsel for Appellant Harvey Miguel Robinson*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................i

TABLE OF AUTHORITIES.................................................................................ii

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUE.............................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS .....................2

STATEMENT OF THE CASE................................................................................2

    I.    *Procedural History* ......................................................................2

    II.   *Relevant Facts* ..............................................................................4

SUMMARY OF ARGUMENT .............................................................................8

STANDARD OF REVIEW ....................................................................................8

ARGUMENT ..........................................................................................................10

    I.    *The Prosecutor Placed Mr. Robinson's Future Dangerousness in Issue, Triggering the Requirement for a* Simmons *Instruction, but the Trial Court Failed to Give a Proper* Simmons *Instruction* ................................................10

        A.  The Governing Law ......................................................10

        B.  The Prosecutor's Placement of Future Dangerousness in Issue .....13

        C.  The Trial Court's Instructions Did Not Satisfy *Simmons* .................20

    II.   *The State-Court Opinion Denying Relief Was Based on an Unreasonable Application of* Simmons *and* Kelly*, and Was Unreasonable in Light of the Record* ...........................................24

    III.  Simmons *Error Is Not Susceptible to Harmless-Error Review under* Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Error Here Was Not Harmless, and the Trial Court's Response to the Jury Question Did Not Cure the Error* ...........................................27

        A.  *Simmons* Error Is Not Susceptible to Harmlessness Review ...........27

        B.  The *Simmons* Error Was Not Harmless under *Brecht*.........................32

CONCLUSION........................................................................................................37

# TABLE OF AUTHORITIES

**Federal Cases**

*Allen v. Illinois*, 478 U.S. 364 (1986) ................................................................. 20

*(Antyane) Robinson v. Beard*, 762 F.3d 316 (3d Cir. 2014) ........................... 32

*Arizona v. Fulminante*, 499 U.S. 279 (1991) .................................................. 28

*Blystone v. Horn*, 664 F.3d 397 (3d Cir. 2011) ................................................. 8

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ................................... 4, 27, 33

*Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005) ...................... 15, 16, 17, 18, 32

*Bronshtein v. Horn*, No. CIV. A. 99-2186, 2001 WL 767593 (E.D. Pa. July 5, 2001) ... 32

*Brumfield v. Cain*, 576 U.S. 305 (2015) ........................................................ 10

*Bulova Watch Co. v. United States*, 365 U.S. 753 (1961) ............................ 31

*Carpenter v. Vaughn*, 296 F.3d 138 (3d Cir. 2002) ...................................... 21

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ............................................ 28

*Francis v. Franklin*, 471 U.S. 307 (1985) .............................................. 23, 36

*Grzegorczyk v. United States*, 142 S. Ct. 2580 (2022) ................................. 29

*Harrington v. Richter*, 562 U.S. 86 (2011) ..................................................... 9

*Heller v. Doe*, 509 U.S. 312 (1993) ............................................................... 20

*Hicks v. United States*, 137 S. Ct. 2000 (2017) ........................................... 29

*Johnson v. Gibson*, 254 F.3d 1155 (10th Cir. 2001) ......................... 28, 33, 34

*Johnson v. Texas*, 509 U.S. 350 (1993) ........................................................ 20

*Jurek v. Texas*, 428 U.S. 262 (1976) ............................................................. 20

*Kelly v. South Carolina*, 534 U.S. 246 (2002) ............ 1, 11, 12, 13, 19, 20, 23, 25

*Lynch v. Arizona*, 578 U.S. 613 (2016) (per curiam) ............................... 27–28

*Maslenjak v. United States*, 137 S. Ct. 1918 (2017) ............................. 29, 31–32

*Michelson v. United States*, 335 U.S. 469 (1948) ........................................ 20

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ................................................... 10

*Mollett v. Mullin*, 348 F.3d 902 (10th Cir. 2003) ............................... 27, 28, 34

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ....................... 31

*Nichols v. United States*, 511 U.S. 738 (1994) ............................................. 20

*Richmond v. Polk*, 375 F.3d 309 (4th Cir. 2004) ............................... 11, 28, 35

*Robinson v. Pennsylvania*, 546 U.S. 983 (2005) ............................................ 3

*Rose v. Clark*, 478 U.S. 570 (1986) .............................................................. 28

*Ruan v. United States*, 142 S. Ct. 2370 (2022) ............................................ 29

*Shafer v. South Carolina*, 532 U.S. 36 (2001) ..................................... 11, 35

*Simmons v. South Carolina*, 512 U.S. 154 (1994) ......... 1, 10, 11, 19, 20, 21, 22, 26, 27, 34

*Skipper v. South Carolina*, 476 U.S. 1 (1986) .............................................. 20

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ............................................... 28

*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................... 10

## Federal Statutes

28 U.S.C. § 1291 ................................................................................. 1
28 U.S.C. § 2241 ................................................................................. 1
28 U.S.C. § 2253 ................................................................................. 1
28 U.S.C. § 2254 ................................................................. 1, 3, 9, 10

## State Cases

*Commonwealth v. Robinson*, 82 A.3d 998 (Pa. 2013) ........................... 3
*Commonwealth v. Robinson*, 864 A.2d 460 (Pa. 2004) .......... 3, 4, 5, 6, 24
*State v. Escalante*, 425 P.3d 1078 (Ariz. 2018) ............................... 30
*State v. Escalante-Orozco*, 386 P.3d 798 (Ariz. 2017) .................... 30
*State v. Kelly*, 540 S.E.2d 851 (S.C. 2000) ...................................... 12
*State v. Shafer*, 573 S.E.2d 796 (S.C. 2002) ................................... 30
*Yarbrough v. Commonwealth*, 519 S.E.2d 602 (Va. 1999) ................. 27

## State Statutes

42 Pa. Stat. and Cons. Stat. Ann. § 9711 ...................................... 6, 8
S.C. Code Ann. § 16-3-20 (2003 & Supp. 2004) ............................... 27

## Rules

Fed. R. App. P. 32 ............................................................................. 1
Fed. R. Civ. P. 59 ............................................................................. 3

## Other

Katherine Puzauskas & Kevin Morrow,
    *No Indeterminate Sentencing Without Parole*, 44 Ohio N.U. L. Rev. 263 (2018) ..... 30

## STATEMENT OF JURISDICTION

This is a habeas corpus action brought by an incarcerated person in state custody. The district court issued an order denying habeas relief and declining to issue a certificate of appealability (COA) on September 8, 2020, and a further order denying a motion to alter judgment on June 10, 2021. Appellant filed a timely notice of appeal on July 8, 2021. This Court granted a COA on August 30, 2022. The district court had jurisdiction under 28 U.S.C. § 2241 and 28 U.S.C. § 2254. This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253.

## STATEMENT OF THE ISSUE

*Was the Supreme Court of Pennsylvania's determination that the trial court was under no obligation under the Due Process Clause of the Fourteenth Amendment to instruct the jury on Mr. Robinson's parole ineligibility contrary to or an unreasonable application of* Simmons v. South Carolina*, 512 U.S. 154 (1994), and* Kelly v. South Carolina*, 534 U.S. 246 (2002), or based on an unreasonable determination of the facts?*

This issue was raised in Mr. Robinson's habeas petition (ECF No. 12) at 137–42, in the memorandum of law (ECF No. 33) at 179–93, and in the motion to alter judgment (ECF No. 84) at 12–14.[1] It was ruled on by the district court at 18a–21a and 124a–128a.[2]

---

[1] Page references to documents submitted electronically in the district court are made to the electronic screen page numbers generated by ECF, rather than to numbering at the bottom of the page, where different.

[2] References to the Appendix submitted with this brief are cited as ____a.

1

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously and Appellant is not aware of any related cases or proceedings pending in this Court or any other court.

## STATEMENT OF THE CASE

I.   *Procedural History*

In October 1994, Mr. Robinson was tried by a jury in the Court of Common Pleas for Lehigh County, Pennsylvania, on three separate informations, each of which charged him with criminal homicide. *Commonwealth v. Robinson*, Nos. 55, 56, 58/1994 (Lehigh Cty. Ct. Com. Pl., Crim. Div.) (Young, J., presiding). Mr. Robinson was represented at trial by Carmen Marinelli and James Burke. Over defense objection, the informations were joined for trial, and on November 8, 1994, the jury found Mr. Robinson guilty of three counts of murder in the first degree and related charges.

After being sentenced to death, Mr. Robinson filed post-sentence motions. Because the motions alleged ineffective assistance of trial counsel, new counsel, Phillip Lauer, Esq., and Mary Ennis, Esq., were appointed. Thereafter, Mr. Robinson filed amended and supplemental post-sentencing motions. The Lehigh County Court of Common Pleas held evidentiary hearings on Mr. Robinson's post-sentencing motions in 1998 and 1999.

On June 29, 2001, the trial court vacated two of Mr. Robinson's death sentences, Nos. 55 and 56 of 1994, while affirming the third, No. 58 of 1994. The trial court denied relief in all other respects. Because Mr. Robinson was a juvenile at the time of No. 56,

the court subsequently resentenced him to life without possibility of parole in that case. In No. 55, Mr. Robinson was resentenced to life through a negotiated settlement.

On December 30, 2004, the Pennsylvania Supreme Court affirmed the post-sentencing decision of the lower court, affirming all three first degree murder convictions and related convictions and vacating two of the death sentences. *Commonwealth v. Robinson*, 864 A.2d 460, 471 (Pa. 2004) (235a). Mr. Robinson's petition for a writ of certiorari was denied. *Robinson v. Pennsylvania*, 546 U.S. 983 (2005).

Mr. Robinson filed a pro se petition for postconviction relief, which was subsequently amended by undersigned counsel. An evidentiary hearing on his PCRA petition was held in December 2010. On June 21, 2012, the PCRA court (Hon. Edward D. Reibman) denied his claims and dismissed his PCRA petition.

Mr. Robinson filed a timely notice of appeal. On December 27, 2013, the Supreme Court of Pennsylvania affirmed the lower court's denial of relief. *Commonwealth v. Robinson*, 82 A.3d 998, 1000 (Pa. 2013).

On March 24, 2014, Mr. Robinson timely filed his petition for writ of habeas corpus under 28 U.S.C. § 2254. On September 8, 2020, the district court denied the petition and denied COA on all claims. On October 6, 2020, Mr. Robinson timely moved to alter or amend the judgment under Rule 59(e), but on June 10, 2021, the district court denied the motion.

Mr. Robinson timely filed a notice of appeal. On April 1, 2022, Mr. Robinson filed an application for a COA in this Court. On August 30, 2022, this Court granted

COA on the *Simmons* claim, directed the parties to address whether any failure by the trial court to provide a proper *Simmons* instruction constitutes harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and invited the parties, in addressing the harmlessness question, to examine whether the trial court's reformulated response to the jury question cured any prior lack of a *Simmons* instruction. 130a–131a.

II.    *Relevant Facts*

The Commonwealth presented evidence of Mr. Robinson's repeated attempts to kill Denise Sam-Cali, as well as several other assaults and burglaries, and that Charlotte Schmoyer was brutally killed after being held as a "hostage." The brutal details of the events leading up to Mr. Robinson's arrest are discussed thoroughly in *Commonwealth v. Robinson*, 864 A.2d 460, 471–80 (Pa. 2004) (235a–240a). They include the fact that Ms. Schmoyer, a minor, was found buried beneath some logs, partially unclothed and with multiple stab wounds; DNA and serology evidence showed that she had had intercourse before being killed, and that Mr. Robinson's DNA was found on her vaginal swab and in blood on her clothing and around her body. *Id.* at 472–73 (236a–237a). They also include the fact that Ms. Sam-Cali was attacked after attempting to flee her home upon hearing noises from her walk-in closet; the attack included choking her, punching her at least four times, slashing her lip, and raping her. *Id.* at 473 (237a). A few weeks later, Ms. Sam-Cali heard noises but the alarm went off and the intruder apparently fled. *Id.* at 474 (237a). A few weeks after that, a police officer stationed at Ms. Sam-Cali's home noticed an intruder whom he confronted but who escaped and was later identified by

4

the officer as Mr. Robinson, who bore both fresh, bleeding wounds and healing scars. *Id.* At Mr. Robinson's home, police found a black ski mask, several pairs of gloves, a blood-soaked rugby shirt, additional blood around the home, blood-stained shorts and socks, and a loaded semiautomatic handgun that had belonged to Ms. Sam-Cali and her husband. *Id.* The police officer identified clothing found at Mr. Robinson's home as the clothing of the intruder he observed, and Ms. Sam-Cali identified Mr. Robinson as the person who assaulted and raped her. *Id.* at 474–75 (238a).

As the Commonwealth presented all this and more, Mr. Robinson's jurors heard evidence from which they could conclude that he would be dangerous in the future. At both Mr. Robinson's guilt and penalty phases, the prosecutor argued that Mr. Robinson was a ferocious, devious, and cunning predator. 133a ("predator"); 134a (acted with "ferocity"); 136a ("territorial predator"); 137a ("devious" and "cunning"); 138a ("preditorial [sic] predator"). Furthermore, the prosecutor's cross-examination of a defense expert repeatedly emphasized the idea of Mr. Robinson's future dangerousness. 175a–177a. The prosecutor then used the expert's testimony to support the theme of future dangerousness in his closing arguments. 179a. The prosecutor also argued that Mr. Robinson would be a threat if he was ever allowed out away from his own friends and family: "[W]ithin his own household he may be fine, but *when he gets out*, ladies and gentlemen, watch out if *you* are not in his circle of friends, or in his circle of family; *watch out*." 179a. He further argued that Mr. Robinson's personality disorder made Mr. Robinson inherently dangerous: "An antisocial personality disorder is just somebody who

5

goes out and commits crimes. And he's been doing this for an awful long time." *Id.*

In addition to the prosecutor's arguments concerning Mr. Robinson's future dangerousness, the evidence presented in support of the Commonwealth's aggravating factors also suggested to the jury that Mr. Robinson would be a danger in the future. The Commonwealth sought to prove four aggravating circumstances.[3] Each relied on evidence that invoked Mr. Robinson's alleged future dangerousness.

In support of the (d)(9) aggravator, ("the defendant has a significant history of felony convictions involving the use or threat of violence to the person"), the Commonwealth presented Andrea Naugle, the chief deputy clerk of the Lehigh County Clerk's Office, who detailed a number of crimes of which Mr. Robinson had been convicted. These convictions included aggravated assault of police officer Brian Lewis; burglary, aggravated assault, and rape as to Denise Sam-Cali; an additional burglary conviction; plus a juvenile assault adjudication as to teacher Scott Glidden. After these records were introduced through Naugle, the Commonwealth presented testimony from witnesses in each case. These witnesses included Denise Sam-Cali, Scott Glidden (special education teacher who described assault by Mr. Robinson in classroom), and Police

---

[3] The Commonwealth sought to prove the following aggravating circumstances pursuant to 42 Pa. Stat. and Cons. Stat. Ann. § 9711(d): (6) The defendant committed a killing while in the perpetration of a felony; (9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person; (8) The offense was committed by means of torture; and (10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment.

Officer Brain Lewis (testified that Mr. Robinson fired a gun at him).[4] 141a–174a.

Additionally, the Commonwealth introduced graphic evidence from forensic pathologist Isador Mihalakis in support of the (d)(8) aggravator (the offense was committed by means of torture): that victim Charlotte Schmoyer was brutally and painfully killed after being held in a "terrible hostage" situation. 140a.

But in the course of charging the jury (180a–209a), the court provided no instruction to the jury that a verdict for life would mean that Mr. Robinson would be ineligible for parole and would remain incarcerated for the remainder of his life.

Immediately after being charged, before leaving the courtroom, the jury specifically asked the court about the meaning of a life sentence:

> MR. HAEDRICH: On the life in prison, is that without parole, just so we're sure? Would there be a chance of parole if it was life in prison?

> THE COURT: I don't see how I can guarantee—that's the present law. But what if the legislature changes the law? I can't guarantee that. That's the way the law is now.

> MR. HAEDRICH: Just so we know, Your Honor.

> THE COURT: Who knows two years from now if they'll change the law. I can't tell you.

209a–210a.

The prosecutor immediately asked for a sidebar conference, where both he and

---

[4] Evidence introduced at the guilt phase was incorporated at the penalty phase for the jury's consideration of the aggravating circumstances. Thus, the sentencing jury considered the dramatic evidence presented by Denise Sam-Cali at the guilt phase, including Mr. Robinson's repeated attempts to kill Sam-Cali.

Mr. Robinson's counsel argued to the court that the court's instruction was improper and that the court needed to instruct the jury that "life is life." *Id.* After the lawyers' objections, the court said to the jury, "I'm to tell you, and it's accurate, 'Life is life.' There won't be any parole. Life is life." 211a. When the court said "it's accurate," it was unclear whether the court was referring to its prior statement about a potential change in the law or to something else. The jury then returned a death sentence.

## SUMMARY OF ARGUMENT

The Commonwealth put Mr. Robinson's future dangerousness at issue. The trial court failed to instruct the jury that, under Pennsylvania law, Mr. Robinson was statutorily ineligible for parole if sentenced to life imprisonment. Instead, the court erroneously told the jury that Mr. Robinson, if spared death, would not necessarily be imprisoned for life—an error the court then gestured toward correcting but failed actually to rectify. The Supreme Court of Pennsylvania's rejection of Mr. Robinson's *Simmons* claim is not subject to deference, and *Simmons* error is not subject to harmless-error review, but even if it were, the error here had a substantial and injurious effect on the death verdict. The trial court's half-hearted effort to correct its erroneous statement to the jury did not cure the prior lack of a *Simmons* instruction.

## STANDARD OF REVIEW

Because the district court did not conduct an evidentiary hearing, this Court's review of the district court's decision is plenary. *Blystone v. Horn*, 664 F.3d 397, 416–17 (3d Cir. 2011).

This Court's review of state-court decisions is conducted under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). While AEDPA places certain limitations on a federal court's ability to grant habeas relief, the writ of habeas corpus remains "a safeguard against imprisonment of those held in violation of the law" that requires federal courts to be "vigilant and independent" in reviewing habeas corpus petitions. *Harrington v. Richter*, 562 U.S. 86, 91 (2011).

Title 28 U.S.C. § 2254(d), which provides the standard of review for federal courts reviewing habeas petitions challenging state convictions, states:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For any claim upon which a state court has ruled on the merits, a federal court may nonetheless grant relief under § 2254(d)(1) and/or (d)(2). Under § 2254(d)(1), a federal court may grant relief where the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme

Court's] decisions at the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state-court ruling is "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412–13. Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

A court may grant relief under § 2254(d)(2) where a state-court merits determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," however, and "does not by definition preclude relief." *Id.*; *see also Brumfield v. Cain*, 576 U.S. 305, 314 (2015).

## ARGUMENT

I.    *The Prosecutor Placed Mr. Robinson's Future Dangerousness in Issue, Triggering the Requirement for a* Simmons *Instruction, but the Trial Court Failed to Give a Proper* Simmons *Instruction.*

### A.    The Governing Law

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Supreme Court held that, where a prosecutor puts a defendant's future dangerousness in issue and state law provides for life without parole as the alternative to death, due process requires that the

jury be informed that the defendant would be ineligible for parole if sentenced to life. "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id.* at 171 (plurality opinion); *accord id.* at 177 (O'Connor, J., concurring).[5]

In *Shafer v. South Carolina*, 532 U.S. 36 (2001), the Court described its holding as follows:

> [When] a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant "to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel."

*Id.* at 39 (quoting *Ramdass v. Angelone*, 530 U.S. 156, 165 (2000) (brackets in *Shafer*)).

In *Kelly v. South Carolina*, 534 U.S. 246 (2002), the Court expanded its ruling in *Simmons*. In *Kelly*, the prosecutor asserted at the outset, "I'm not going to argue future dangerous[ness]. So that takes it out of *Simmons* anyhow." *Id.* at 249 (quoting record). Having already introduced evidence that Kelly possessed a shank in jail and had planned to take a female guard hostage, the prosecutor proceeded to call Kelly a "butcher," "Bloody Billy," and "Billy the Kid," and to argue that Kelly was "intelligent" and "cold-blooded." *Id.* at 249–50. On appeal, the Supreme Court of South Carolina held that the

---

[5] Justice O'Connor's concurrence is the controlling opinion because it represents the narrowest grounds the majority agreed on. *See, e.g.*, *Richmond v. Polk*, 375 F.3d 309, 331 (4th Cir. 2004).

evidence and argument "did not implicate future dangerousness." *State v. Kelly*, 540 S.E.2d 851, 857 (S.C. 2000). The United States Supreme Court found that conclusion "insupportable on the record before us," because the "evidence and argument . . . are flatly at odds with the view that 'future dangerousness was not an issue in this case.'" *Kelly*, 534 U.S. at 252–53 (quoting *Kelly*, 540 S.E.2d at 857).

First, the Court ruled that evidence of a propensity for violence or of dangerous "character" tends to show future dangerousness, even if it also has other purposes:

> A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee.
>
> . . . . The [state court's] error . . . lies in failing to recognize that evidence of dangerous "character" may show "characteristic" future dangerousness, as it did here. . . . Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.

*Kelly*, 534 U.S. at 253–54 (footnotes omitted).

Second, the prosecutor's argument "accentuated the clear implication of future dangerousness raised by the evidence." *Kelly*, 534 U.S. at 255. The prosecutor did so by describing Kelly as a "dangerous" "bloody" "butcher." While those arguments called for retribution, they also put future dangerousness in issue:

> Characterizations of butchery did go to retribution, but that did not make them any the less arguments that Kelly would be dangerous down the road. They complemented the prosecutor's submissions that Kelly was "more frightening than a serial killer," and that "murderers will be murderers." Thus was Kelly's jury, like its predecessor in *Simmons,* invited to infer "that petitioner is a vicious predator who would pose a continuing

threat to the community."

*Kelly*, 534 U.S. at 255–56 (footnotes omitted) (quoting record; final quotation to *Simmons*, 512 U.S. at 176 (O'Connor, J., concurring)).

B.    The Prosecutor's Placement of Future Dangerousness in Issue

As described in the Statement of the Case, *supra*, the prosecutor repeatedly placed Mr. Robinson's future dangerousness in issue. The prosecutor continually referred to Mr. Robinson as a devious, cunning, territorial predator who acted with ferocity, and presented the jury with evidence that suggested he would be a danger in the future. The prosecutor also placed Mr. Robinson's future dangerousness in issue in his characterization of antisocial personality disorder (ASPD).

At the start of the prosecutor's cross-examination of Dr. Robert L. Sadoff, the psychiatrist retained by the defense, the prosecutor got Dr. Sadoff to acknowledge that ASPD is not a mental illness but rather "a disorder and a condition" and that he concluded Mr. Robinson was not mentally ill. 175a. He then stated, "A person who has antisocial personality disorder commits crimes," to which Dr. Sadoff replied, "That's true." *Id.* The prosecutor immediately repeated, "He commits crimes." *Id.* He then got Dr. Sadoff to acknowledge that Mr. Robinson's ASPD started at age nine with either theft or burglary. 175a–176a. The prosecutor then stated, "And without going through his record—the jury has heard about aggravated assaults and burglaries—his record continues with other types of offenses, non-felonies and other offenses, from the age of nine until the current situation. Isn't that correct?," to which Dr. Sadoff responded,

13

"That's true. That's the nature, consistent with antisocial personality disorder," to which the prosecutor replied, "Right. Somebody who goes out and commits crime, more and more crimes." 176a. The prosecutor then got Dr. Sadoff to acknowledge that Mr. Robinson had been in "various placements," all of which were "designed to deal with antisocial behavior." 176a–177a. The prosecutor then asked, "And in fact, that antisocial behavior would, when he got out of those institutions, just continue, and continue, and continue, correct?," to which Dr. Sadoff responded, "Apparently it had. Yes." 177a. The prosecutor then asked, "And then he was released [from one of these institutions] in time to murder Charlotte Schmoyer on June the 9th, 1993. Is that correct?," to which Dr. Sadoff responded, "He was released. Yes." *Id.* Finally, the prosecutor asked, "With respect to treatable, Dr. Sadoff, here is an individual, and we've just characterized four separate institutions that he's been in, would you say that in those institutions he has shown the ability or has been treatable?," to which Dr. Sadoff responded, "The answer to the question is, yes, within the institution he has shown that he was treatable. It's when he got out of the institution that he showed that the treatment was not as effective as they had thought." *Id.*

Later, at closing argument, the prosecutor used the ASPD diagnosis to argue that Mr. Robinson presents a future danger:

> You've heard it from the witnesses. *You've even heard it, to some degree, from the defense witnesses; Dr. Sadoff, for example*, who was more a Commonwealth witness by the time he was done than a defense witness.
>
> *An antisocial personality disorder is just somebody who goes out and commits*

14

*crimes.* And he's been doing this for an awful long time.

Yes, within his household he may be fine, but *when he gets out, ladies and gentlemen, watch out* if you are not in his circle of friends, or in his circle of family; *watch out.*

And that's what happened. Within his own circle people survive. Outside of that circle, *all you have is depravity and rape and murder and death.*

179a (emphasis added).

In terms of both the prosecutor's closing argument and the prosecutor's examination of witnesses, this case is on all fours with this Court's decision in *Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005), where this Court held that "the prosecution not only put Bronshtein's future dangerousness 'at issue' but 'argue[d] that the defendant [would] pose a threat to society in the future.'" *Id.* at 716 (quoting *Simmons*, 512 U.S. at 177 (O'Connor, J., concurring in the judgment)). Compare the argument quoted above with the closing argument in *Bronshtein*:

Ladies and gentlemen, the medical testimony in this case was significant because it tells you something about the psyche or persona of this man. *He can't conform to what is required in society. The doctors have told you that he's anti-social.* He's prone to lying. He's prone to stealing. *He's prone to living a life of crime.*

Whatever the seeds were that got him there, they're planted, and that tree has grown. He's grown into a twenty-two-year-old person now regardless of how the seeds were planted.

You have to take a look at what effect that has had and what effect it had at the time he committed these crimes. *The doctors have told you he's a man that can't conform to the needs of society.*

*Id.* at 716–17.

Both here and in *Bronshtein*, the prosecutor emphasized that the defendant was

"antisocial." Both here and in *Bronshtein*, the prosecutor emphasized the doctor's medical testimony in support of that assessment. Both here and in *Bronshtein*, the prosecutor emphasized the certainty of the defendant's future criminality. In *Bronshtein*, it was phrased as an inability to "conform" and as being "prone to living a life of crime"; here, it was phrased as "somebody who goes out and commits crimes" and "all you have is depravity and rape and murder and death" and "when he gets out . . . , watch out." If anything, the prosecutor's argument for future dangerousness is even stronger here than it was in *Bronshtein*, where this Court found:

> The prosecutor's assertion that [Bronshtein] was "prone to living a life of crime," when placed in the context of the stark choice of life in prison or death, would suggest to any juror that petitioner would pose a danger to society if he was released from prison. The none-too-subtle implication of these arguments is that Bronshtien should be put to death because if he were ever released, he could not "conform to the needs of society," and was "going to" continue "living a life of crime" and engaging in dangerous, violent conduct.

*Id.* at 717 (quoting Dist. Ct. Op. at 36–37). Here, the prosecutor did not even engage in "none-too-subtle implication": he directly and repeatedly warned the jurors to "watch out."

In *Bronshtein*, this Court found that "[w]hen the 'the medical testimony' to which the prosecutor referred in the closing is also taken into account, the significance of the prosecutor's statements becomes even clearer." *Id.* at 717. So too here. In *Bronshtein*, the prosecutor cross-examined psychologist Dr. Gerald Cooke at the penalty phase. The prosecutor asked, of the features of ASPD, "It can be anti-social behavior, correct?,"

to which Dr. Cooke responded, "Absolutely." *Id.* The prosecutor then asked, "Including criminal activity; correct?," to which Dr. Cooke responded, "Correct." *Id.* The prosecutor specified, "Stealing?," to which Dr. Cooke responded, "Yes." *Id.* The prosecutor followed up, "Being very aggressive; correct?," to which Dr. Cooke responded, "Yes." *Id.* at 718. The prosecutor then asked, "Repeatedly can perform anti-social acts; correct?," to which Dr. Cooke responded, "Yes...." *Id.* (ellipsis in original). The prosecutor further asked, "[A] lot of people who have anti-social personality disorders can't play by the rules in a civilized society; correct?," to which Dr. Cooke responded, "True." *Id.* In asking about Bronshtein's additional diagnosis of paranoid personality disorder, the prosecutor got Dr. Cooke to acknowledge that "[s]ometimes" persons with the disorder are "[d]evious" and "[s]cheming," and that Bronshtein's "combination of personality disorders" "could be" "a potentially lethal combination." *Id.*

In *Bronshtein*, the prosecution also called its own mental health expert to testify that the defendant had ASPD and that people with that disorder "don't learn from experience," have "ongoing difficulties" even after being incarcerated, "don't follow the rules," don't have remorse for their actions, and thus will be dangerous in the future. *Id.* at 718–19 (emphasis added). This Court found that through this questioning the prosecutor "elicited . . . dangerous tendencies," *id.* at 717, and suggested the defendant was "prone to commit the same crimes 'over again'," *id.* at 719.

This Court held that the prosecutor's closing argument necessarily incorporated these ideas, and that by asking the jury to consider the medical testimony and recall that

17

the presence of an antisocial personality meant a continuing propensity for crime,

> [i]n any realistic sense of the concept, the prosecutor "argue[d] that the defendant [would] pose a threat to society in the future." And it goes without saying that the Bronshtein's future dangerousness was put at issue within the meaning of *Kelly*. In the words of that decision, "[t]he prosecutor accentuated the clear implication of future dangerousness raised by the evidence."

*Id.* (first quoting *Simmons*, 512 U.S. at 177 (O'Connor, J., concurring in the judgment), then quoting *Kelly*, 534 U.S. at 255).

Here too, the prosecutor "elicited . . . dangerous tendencies" through his questioning by eliciting that because Mr. Robinson has ASPD he is a person who "commits crimes." As with the closing argument, the prosecutor's questioning of medical experts in Mr. Robinson's case evoked the idea of future dangerousness even more strongly than in *Bronshtein*. Mr. Robinson's prosecutor repeatedly focused on the idea that Mr. Robinson is just someone who "commits crimes," that he was "[s]omebody who goes out and commits crime, more and more crimes," that in the past "in fact, that antisocial behavior would, when he got out of those institutions, just continue, and continue, and continue." Whereas the prosecutor in *Bronshtein* elicited the vague idea that he would be aggressive and prone to fighting in the future, Mr. Robinson's prosecutor explicitly elicited that in the past, when he was let out, he committed murder: "And then he was released in time to murder Charlotte Schmoyer on June the 9th, 1993." If the prosecution raised the specter of a future threat to society in *Bronshtein*, it certainly did so here.

The prosecutor's placement of Mr. Robinson's future dangerousness in issue was

similar, too, to the circumstances in *Simmons* itself, where the prosecutor

> sought to show that petitioner is a vicious predator who would pose a
> continuing threat to the community. The prosecutor argued that the jury's
> role was to decide "what to do with [petitioner] now that he is in our
> midst," and told the jury: "Your verdict should be a response of society
> to someone who is a threat. Your verdict will be an act of self-defense."

*Simmons*, 512 U.S. at 175–76 (O'Connor, J., concurring). Similarly, Mr. Robinson's pros-

ecutor continually sought to show he would continue to pose a threat: "watch out."

The prosecutor's use of future dangerousness here is also similar to the circum-

stances of *Kelly*. There, the prosecutor argued, "[Kelly] doesn't have any mental illness."

534 U.S. at 250. Mr. Robinson's prosecutor elicited from Dr. Sadoff that ASPD is not

a mental illness. Kelly's prosecutor also argued to the jury that "murderers will be mur-

derers. And he is the cold-blooded one right over there." *Id.* This argument closely

mirrors Mr. Robinson's prosecutor's argument that with Mr. Robinson "all you have is

depravity and rape and murder and death."

In sum, the prosecutor's questioning and arguments here put future danger in

issue here even more starkly than in *Bronshtein*, *Simmons*, and *Kelly*. At the guilt phase,

the prosecutor referred to Mr. Robinson as "wicked" and a "predator" and someone

who was a "threat" to anyone outside his own home. The Commonwealth reinforced

the notion that Mr. Robinson would present a future danger with aggravating evidence

at the penalty phase, including evidence that Mr. Robinson had a significant history of

violent felony convictions[6]—that he fired a pistol at a police officer, assaulted a teacher at his school, and committed multiple murders where the Commonwealth alleged he used "cunning" to avoid arrest.[7] All of this argument and evidence—along with argument and evidence about ASPD, including the prosecutor's repeated warning to "watch out"—led the jury to believe that Mr. Robinson was a serious threat and would remain a serious threat. A *Simmons* instruction was necessary.

C.     The Trial Court's Instructions Did Not Satisfy *Simmons*.

As shown in § I, *supra*, the Commonwealth's evidence and argument put future dangerousness in issue. "Where the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury . . . that he is parole ineligible." *Simmons*, 512 U.S. at 178 (O'Connor, J., concurring);

---

[6] While evidence of Mr. Robinson's history of violent felonies may provide evidence about aggravating circumstances, it also raises the issue of his future dangerousness.

[7] *E.g.*, *Kelly*, 534 U.S. at 253–54 (a "jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior" in the future); *Nichols v. United States*, 511 U.S. 738, 752 (1994) (Souter, J., concurring) (prior crimes "predict the likelihood of recidivism"); *Heller v. Doe*, 509 U.S. 312, 323 (1993) ("Previous instances of violent behavior are an important indicator of future violent tendencies."); *Allen v. Illinois*, 478 U.S. 364, 371 (1986) (prior crimes "predict future behavior"); *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) ("Consideration of a defendant's past conduct as indicative of his probable future behavior is . . . inevitable."); *Johnson v. Texas*, 509 U.S. 350, 355–56 (1993) (future dangerousness shown by prior crimes); *Jurek v. Texas*, 428 U.S. 262, 272–73 (1976) (future dangerousness established through defendant's "significant criminal record" and failure to "rehabilitate himself"); *Michelson v. United States*, 335 U.S. 469, 475–76 (1948) (jurors infer "propensity" for crime from prior crimes).

*see also id.* at 163–64 (plurality). This jury—even though it specifically asked immediately before the commencement of deliberations—was never properly informed that the only alternative to death is life without possibility of parole.

The trial court denied Mr. Robinson his right to due process and reliable sentencing by failing to give a *Simmons* instruction and instead erroneously musing that Mr. Robinson could serve less than a life sentence if spared death. The trial court's response was misleading and erroneous because it urged the jury to speculate that, regardless of current law, if he were sentenced to life in prison, a change in the law could cause his release. *See Carpenter v. Vaughn*, 296 F.3d 138, 157 (3d Cir. 2002) (finding error in trial court's misleading response to jury question concerning parole).

Accordingly, the trial court was required by *Simmons* to instruct the jury about Mr. Robinson's statutory ineligibility for parole if sentenced to life. At the very least, it had a duty not to suggest the opposite of what the law requires.

The trial court's assertion—in response to the jury's question about the meaning of a life sentence, that the Legislature "could change the law" and that a life sentence does not necessarily mean life without parole—misled the jury into choosing death. The court's speculation that even if a life sentence is purportedly without parole, a future Legislature could convert that sentence to a life sentence with parole misleadingly invited the jury to indulge in the same speculation. Such an invitation is inconsistent with *Simmons. Cf. Carpenter*, 296 F.3d at 157 ("It is apparent that the jury's concern centered on the availability of a sentence of life imprisonment without parole. And the judge's

initial response—"The answer is that *simply, no absolutely not*"—clearly conveyed the misleading impression that such a sentence was not available. In a case in which it had been proven that the defendant was a homicidal recidivist who had previously been paroled and in which it was apparent that the jury was concerned about the possibility of future parole, this was a potentially devastating message, and there are strong grounds for believing that it had a devastating effect in this case. It was also . . . a plain misstatement of Pennsylvania law, under which a person serving a life sentence that has not been commuted to a term of years may not to be paroled.").

A sentence imposed on the basis of inaccurate information is a violation of due process. Both the trial court's failure to give a *Simmons* instruction and its misinformation concerning the meaning of a life sentence misled the jury. *See Simmons*, 512 U.S. at 166 n.5 (plurality opinion) ("[T]he State may not mislead the jury by concealing accurate information about the defendant's parole ineligibility. The Due Process Clause will not tolerate placing a capital defendant in a straitjacket by barring him from rebutting the prosecution's arguments of future dangerousness with the fact that he is ineligible for parole under state law.").

The court's subsequent gesture towards correcting its error failed. The court did not and could not undo the harm that was caused by the original, flawed instruction. The court's brief, dismissive second instruction that "Life is life" could not unring the bell of its prior statement that Pennsylvania could one day amend the law and allow for Mr. Robinson's release from prison. Because the court did not contradict or remove its

prior instruction that the law could be changed at any time, it failed to cure the error. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985) (even existence of "contradictory instructions" elsewhere in a charge does not cure the error if the contradictory language leaves the jurors equally free to apply and follow the infirm instruction).

In *Kelly*, the Court discussed the effect of purportedly "curative" instructions, similar to those given here, in *Shafer* and *Kelly*. The Court held as follows:

> [In *Shafer*,] we explicitly noted defense counsel's statement to the jury that Shafer would "'die in prison' after 'spend[ing] his natural life there,'" as well as the trial judge's instructions that "'life imprisonment means until the death of the defendant.'" We found these statements inadequate to convey a clear understanding of Shafer's parole ineligibility, and Kelly, no less than Shafer, was entitled to [an accurate] jury instruction.

*Kelly*, 534 U.S. at 257 (quoting *Shafer*, 532 U.S. at 52) (second bracket in *Kelly*) (citation and footnote omitted).

Here, the trial judge's statements were similar to those in *Shafer* and *Kelly*, and likewise "inadequate to convey a clear understanding of Petitioner's parole ineligibility," particularly in light of the court's initial misleading response to the jury question. Accordingly, any reliance by the state court on those instructions was at best an unreasonable application of *Shafer* and *Kelly*.

The jury was presented with erroneous information by the trial court that very likely led it to choose death over life. The trial court's improper instructions to the jury concerning the meaning of a life sentence led the jurors to believe that they had no choice but to impose a death sentence to prevent Mr. Robinson's possible future

release.

II.    *The State-Court Opinion Denying Relief Was Based on an Unreasonable Application of* Simmons *and* Kelly*, and Was Unreasonable in Light of the Record.*

The Pennsylvania Supreme Court found that Mr. Robinson was not entitled to a *Simmons* instruction, reasoning that a defendant is entitled to such an instruction only "where the prosecution makes the future dangerousness of the defendant an issue in the case and the defendant specifically requests such an instruction." *Robinson*, 864 A.2d at 515 (citing *Commonwealth v. Champney*, 832 A.2d 403, 417 (2003)) (265a). The court concluded that the Commonwealth did not raise future dangerousness and Mr. Robinson did not ask for a *Simmons* instruction. *Id.* These rulings are contrary to, or involved an unreasonable application of, clearly established federal law, and are based on an unreasonable determination of the facts in light of the evidence.

As discussed above, the prosecutor put Mr. Robinson's future dangerousness in issue through his argument and evidence at both the penalty and the guilt phases. The United States Supreme Court and this Court, in the numerous decisions cited above, have repeatedly held that arguments and evidence like those presented here raise future dangerousness. The prosecution's evidence that Mr. Robinson had a significant history of violent felonies (including rape, aggravated assault, murder and burglary), was a threat to anyone outside of his home, had a dangerous personality disorder, and was a "cunning" "predator" presented Mr. Robinson as both a present and a future danger. The state court's failure to abide by this authority was at best an unreasonable application of

*Shafer* and *Kelly*.

And the state court's defense-must-request-an-instruction ruling is also contrary to, or at a minimum an unreasonable application of, *Kelly*, where the Court emphasized that the trial judge has the independent "duty to give instructions sufficient to explain the law." *Kelly*, 534 U.S. at 256.

The state court was also unreasonable in determining that counsel did not ask for a life-without-parole instruction. After the jury questioned whether Mr. Robinson would have a chance at parole if given a life sentence, and the trial court erroneously answered that it could not guarantee that he would not get paroled because the Legislature could change the law, both the prosecutor and Mr. Robinson's counsel informed the court that its answer was wrong and that the jury should be instructed that "life means life." 210a. By raising the issue contemporaneously, Mr. Robinson brought the issue to the trial court's attention, thus adequately presenting the objection.

The court's conclusion that Mr. Robinson was not entitled to a *Simmons* instruction because counsel did not request one is thus both an unreasonable finding of fact and an unreasonable application of law. First, by asking for a "life means life" instruction, counsel did, in fact, request a *Simmons* instruction. Second, neither *Simmons* nor its progeny require counsel to request an instruction when future dangerousness is raised. Nor is the trial court absolved of its duty to ensure that the jury is properly charged with the law when counsel fails to ask for such an instruction. Here, the trial court failed to instruct the jury properly, most likely because the court believed that Mr. Robinson

was not entitled to a *Simmons* instruction because the "legislature could change the law."

The Supreme Court of Pennsylvania also erroneously concluded that the trial court's comments on the meaning of life imprisonment were not erroneous. The court found that it was not inappropriate for the trial court to suggest to the jury that the Legislature could change the law and that Mr. Robinson could one day be granted parole. This is contrary to, or involves an unreasonable application of, clearly established federal law.

By informing the jury that the law precludes release, a *Simmons* instruction negates or mitigates a prosecutor's suggestions that a defendant would be dangerous if ever released. But here, by telling the jury that the law might change—and that Mr. Robinson might one day be released—the court provided the opposite of a life-without-parole instruction. As Justice O'Connor stated in her controlling opinion in *Simmons*, "the State may . . . (though it need not) inform the jury of any *truthful* information regarding the availability of commutation, pardon, and the like." 512 U.S. at 177 (O'Connor, J., concurring) (emphasis added). Here, the judge invited the jury to apply the law not as it *truthfully* is but as it *counterfactually* could be. That invitation runs afoul of *Simmons*.

*Simmons* was decided June 17, 1994. The penalty phase of Mr. Robinson's trial took place less than five months later, in early November, 1994. At the time the Supreme Court decided *Simmons*, and at the time of Mr. Robinson's trial, only Pennsylvania, South Carolina, and Virginia "ha[d] a life-without-parole sentencing alternative to capital punishment for some or all convicted murderers but refuse[d] to inform

sentencing juries of th[at] fact." *Simmons*, 512 U.S. at 168 n.8. Since then, Virginia has abandoned the practice by judicial decision, *Yarbrough v. Commonwealth*, 519 S.E.2d 602, 616 (Va. 1999), and has subsequently abolished capital punishment, and South Carolina has abandoned it by statute, S.C. Code Ann. § 16-3-20(A) (2003 & Supp. 2004) (effective May 28, 2002). Had Pennsylvania law simply required the trial court to instruct the jury of the simple legal truth that a life sentence meant life without the possibility of parole, the jury would not have needed to seek clarification and the trial court would not have had the opportunity to extemporize, flub the law, and confuse the jury.

The district court's conclusion that the state court's adjudication of this claim was not contrary to or an unreasonable application of established Supreme Court precedent was erroneous.

III.    Simmons *Error Is Not Susceptible to Harmless-Error Review under* Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Error Here Was Not Harmless, and the Trial Court's Response to the Jury Question Did Not Cure the Error.*

A.    *Simmons* Error Is Not Susceptible to Harmlessness Review.

There is some confusion among the federal circuit courts of appeals as to whether *Simmons* error is properly subject to harmless-error review. For the reasons that follow, the better view is that it is not. As the Tenth Circuit has observed, the Supreme Court did not apply harmless error review in *Simmons*, *Shafer* or *Kelly*. *Mollett v. Mullin*, 348 F.3d 902, 921 (10th Cir. 2003). The Court has since continued to abide by its practice of not engaging in harmless-error analysis for *Simmons* violations. *See Lynch v. Arizona*, 578 U.S. 613, 613–17 (2016) (per curiam) (finding *Simmons* error and not engaging

in harmless-error review).

The Tenth Circuit did not ultimately "reach the merits of the harmless error issue" in *Mollett*, 348 F.3d at 922, but it did conduct harmless-error review for a *Simmons* violation in an earlier, pre-*Kelly* case. *See Johnson v. Gibson*, 254 F.3d 1155, 1165–67 (10th Cir. 2001). The Fourth Circuit also applied harmless-error review to *Simmons* error in *Richmond v. Polk*, 375 F.3d 309, 335 (4th Cir. 2004), after acknowledging the Tenth Circuit's hesitation in *Mollett*. The Fourth Circuit justified applying harmless-error review in the *Simmons* context by noting that "the Supreme Court has recognized that 'most constitutional errors can be harmless,'" and that "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis," *id.* at 334–35 (quoting *Neder v. United States,* 527 U.S. 1, 8 (1999)).

The Supreme Court has held some errors are susceptible to harmless-error analysis and others are not. *See, e.g.*, *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (jurist's failure to recuse not subject to harmlessness analysis); *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (harmless-error analysis applies to coerced confessions); *Rose v. Clark*, 478 U.S. 570, 582 (1986) (harmless error applies to erroneous jury instruction); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (Confrontation Clause error subject to harmlessness analysis). The Court makes no secret of holding an error susceptible to review for harmlessness, and it would make no sense for the Court to believe that an error is susceptible to harmlessness review but not conduct the review itself or direct the lower

court to do so on remand.[8] A lower court that insists harmlessness review is necessary

---

[8] As Justice Kavanaugh recently observed, "this Court frequently reverses or vacates a lower court's judgment on one ground, but remands for consideration of alternative grounds, such as harmlessness, that may ultimately support the lower court's original judgment." *Grzegorczyk v. United States*, 142 S. Ct. 2580, 2586 n.6 (2022) (statement of Kavanaugh, J., with whom Roberts, C.J., & Thomas, Alito, & Barrett, JJ., join, respecting denial of certiorari); *see, e.g.*, *Ruan v. United States*, 142 S. Ct. 2370, 2382 (2022) ("We leave . . . any harmlessness questions for the courts to address on remand."); *Hicks v. United States*, 137 S. Ct. 2000 (2017) (Gorsuch, J., concurring) ("When this Court identifies a legal error, it routinely remands the case so the court of appeals may resolve whether the error was harmless . . . ."); *Maslenjak v. United States*, 137 S. Ct. 1918, 1931 (2017) ("The Government asserts that any instructional error in this case was harmless. . . . In keeping with our usual practice, we leave that dispute for resolution on remand." (citing *Skilling v. United States*, 561 U.S. 358, 414 (2010)); *McFadden v. United States*, 576 U.S. 186, 189 (2015) ("[W]e . . . remand for that court to determine whether the error was harmless."); *Black v. United States*, 561 U.S. 465, 474 (2010) ("[W]e express no opinion on the question whether the error was ultimately harmless, but leave that matter for consideration on remand."); *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 847 n.2 (2009) ("[T]he question whether the instructional error was nevertheless harmless remains open to review on remand by the Tennessee Court of Appeals."); *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 172 (2007) ("Sorrell maintains that even if the instructions improperly contained different causation standards we should nonetheless affirm because any error was harmless. . . . This argument is better addressed by the Missouri Court of Appeals, and we leave it to that court on remand to determine whether a new trial is required in this case."); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 162 (2006) (Alito, J., joined by Roberts, C.J., & Kennedy & Thomas, JJ., dissenting) ("I would then vacate and remand to let the Court of Appeals determine whether the error was harmless in this case."); *United States v. Vonn*, 535 U.S. 55, 80 (2002) (Stevens, J., concurring in part & dissenting in part) ("I would remand to the Court of Appeals to determine whether, taking account of the entire record, the Government has met its burden of establishing that the District Court's failure to inform the respondent of his right to counsel at trial was harmless."); *Richardson v. United States*, 526 U.S. 813, 824 (1999) ("We leave to the Court of Appeals the question whether to engage in harmless-error analysis, and if so, whether the error was harmless in this case."); *Tuggle v. Netherland*, 516 U.S. 10, 15 (1995) (Scalia, J., concurring) ("[A] remand is appropriate to allow the Fourth Circuit to review the case under the harmless-error standard appropriate to collateral review." (citing *Brecht*, 507 U.S. at 637–38)).

where the Court itself has declined to conduct such review or direct the lower court to do so effectively overrules the higher court, implicitly ruling that the Court overlooked a crucial step. In neither *Simmons*, *Shafer*, *Kelly*, nor *Lynch* did the Supreme Court ever suggest to lower courts that they could on remand conduct a harmlessness analysis for the *Simmons* error—or mention harmless error at all. Mr. Robinson's counsel cannot find the lower court's disposition on remand in *Simmons* or *Kelly*—perhaps they are unreported—but in *Shafer*, the Supreme Court of South Carolina, on remand, found that a parole-ineligibility instruction was warranted because the prosecution put future dangerousness in issue, did not mention or conduct harmless-error review, and remanded to the trial court for resentencing. *See State v. Shafer*, 573 S.E.2d 796, 801 (S.C. 2002).[9]

It is true that constitutional errors are ordinarily susceptible to harmlessness review. But that is a *general* rule; in *specific* instances where the Supreme Court handled

---

[9] As for the Arizona Supreme Court's handling of *Lynch* on remand, "Lynch's case went again before the Arizona Supreme Court on two issues: (1) whether a *Simmons* error is subject to harmless-error analysis and, if so, (2) whether the *Simmons* error was harmless. However, the court dismissed the case after Lynch died in prison on November 4, 2017." Katherine Puzauskas & Kevin Morrow, *No Indeterminate Sentencing Without Parole*, 44 Ohio N.U. L. Rev. 263, 287 (2018) (footnotes omitted) (citing Dismissal Order, *Lynch IV* (Ariz. Nov. 13, 2017) (No. CR-12-0359-AP) (on file at the Arizona Supreme Court)). But the Arizona Supreme Court has acknowledged that the Court did not perform or mention harmless error in *Lynch*, *Kelly*, *Shafer*, or *Simmons*: "It is not clear whether *Simmons* error is subject to harmless error review. The Supreme Court has stated that 'most constitutional errors can be harmless.' But it did not perform a harmless error analysis or mention harmless error in any of its cases considering a *Simmons* error." *State v. Escalante-Orozco*, 386 P.3d 798, 830 (Ariz. 2017) (footnote omitted) (internal citation omitted) (citing *Lynch*, *Kelly*, *Shafer*, and *Simmons*), *abrogated in irrelevant part by State v. Escalante*, 425 P.3d 1078 (Ariz. 2018).

*Simmons* error, it declined to conduct such review. The specific ordinarily controls over the general. *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general . . . ."); *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) ("[I]t is familiar law that a specific statute controls over a general one without regard to priority of enactment." (internal quotation omitted)). Besides, the Court as good as ruled that *Simmons* error is not susceptible to harmlessness review by not conducting it, or directing the lower court to conduct it, in four instances where it could have if the Court believed such analysis would be proper. It is not the place of lower courts to graft harmless-error analysis onto a *Simmons*-error analysis where the Supreme Court has clearly chosen not to. The Supreme Court's steadfast refusal to apply harmless-error analysis to *Simmons* error overcomes any presumption that constitutional error is generally subject to such analysis.

*Simmons* error is an exception to any presumption that errors can be harmless. Future dangerousness is a critical, sui generis sentencing factor, and *Simmons* error infects the jury's future-dangerousness calculus. (Most jurisdictions recognize this—as noted above, Pennsylvania is an outlier in terms of its refusal to tell the jury about the availability of a life sentence without the possibility of parole.) It is therefore impossible to assess whether any particular *Simmons* error had a substantial or injurious effect or influence on a jury's verdict. Thus, *Simmons* error is structural, because "the effects of the error are simply too hard to measure" and "the precise 'effect of the violation cannot be ascertained.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) (citing *United States*

*v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986))).

In *Bronshtein*, this Court wrote, "Having considered and rejected the Commonwealth's arguments regarding *Simmons* and its progeny, we have before us no ground for reversing the order of the District Court insofar as it held that Bronshtein's death sentence is unconstitutional under those precedents." 404 F.3d at 719. In its *Simmons* analysis, the district court had reasoned as follows: "[U]nder similar circumstances in *Simmons . . . ,* the Supreme Court of the United States . . . sent the case[] back for new sentencing[] without conducting a harmless error review, thus indicating that an instructional error under these circumstances is never harmless." *Bronshtein v. Horn*, No. CIV. A. 99-2186, 2001 WL 767593, at *21 (E.D. Pa. July 5, 2001), *aff'd in part, rev'd in part and remanded*, 404 F.3d 700 (3d Cir. 2005). In finding "no ground" to reverse the district court on the *Simmons* issue, this Court implicitly approved the district court's finding that *Simmons* error is not susceptible to harmlessness review. And this Court did not conduct such review de novo.[10] In sum, this Court has never applied harmless-error review to a *Simmons* violation. For the reasons above, it should not begin to do so here.

B.     The *Simmons* Error Was Not Harmless under *Brecht*.

If we assume arguendo that *Simmons* error is susceptible to harmlessness analysis,

---

[10] In *(Antyane) Robinson v. Beard*, 762 F.3d 316 (3d Cir. 2014), this Court ordered the parties to brief harmlessness, *id.* at 323, but ultimately did not reach this question because it found there was no *Simmons* error in that case, *id.* at 328.

such error cannot be harmless where the jury asks about the meaning of life imprisonment. This is because such a question proves that the fear that the defendant might one day leave prison if sentenced to life is actually, not merely hypothetically, on at least one juror's mind, and that such a fear could lead that juror to vote for death. Where a juror asks a question, the risk that a juror who has been presented with evidence and argument about future dangerousness might sentence someone to death solely to prevent the possibility of release is not theoretical. It is real. The *Simmons* error here therefore satisfies the *Brecht* standard: it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

In *Johnson*, the jury asked a similar question to the one at issue here: "'We need to know! Is life without parole firm—Does it mean he can *never* be paroled [?]' Trial Court's Ex. # 2 (emphasis in original)," 254 F.3d at 1164. The Tenth Circuit held "that the state appellate court's determination that the instruction was harmless error constitutes an unreasonable application of federal law." *Id.* at 1166. In so holding, the Tenth Circuit observed that it is permissible for a trial court to refer back to the instructions as given when faced with a jury's question as to the meaning of life without parole, but that in this instance, "instead of simply referring the jury back to the court's original instructions, 'the trial court told the jury it was not appropriate for it to consider whether the defendant could "*never* be paroled."'" *Id.* at 1165 (quoting *Johnson v. State*, 928 P.2d 309, 320 (Okla. Crim. App. 1996)). And in so holding, the Tenth Circuit also noted that

33

"*Simmons* rests upon eliminating a jury's misunderstanding so the jury will not perceive a 'false choice' between sentencing to death or a limited period of incarceration when future dangerousness is at issue." *Id.* at 1166 (citing *Simmons*, 512 U.S. at 161–62). It further noted in so holding that in *Shafer*, "[t]he Court recognized that the jury was confused by the absence of such instruction as evidenced by its further question about parole eligibility." *Id.* And it added:

> The same is true here. Contrary to the state appellate court's harmless error analysis, the trial court's instruction that it was inappropriate for the jury to consider parole eligibility did not refer the jury back to the instructions; rather, it plainly contradicted those instructions. The trial court did more than give a non-responsive answer—it told the jury that parole eligibility could not be considered when plainly it could be.

*Id.* (internal citation omitted). Thus, the jury's question was a key factor in the Tenth Circuit's AEDPA ruling.

In *Mollett*, where the Tenth Circuit declined to reach the merits of the harmless-error issue, 348 F.3d at 922, the court noted among its reasons for providing *Simmons* relief the fact that "the jury request[ed] an explanation of the definition of life imprisonment," *id.* In *Simmons* itself, "[a]fter deliberating on petitioner's sentence for 90 minutes, the jury sent a note to the judge asking a single question: 'Does the imposition of a life sentence carry with it the possibility of parole?'" 512 U.S. at 160. And in *Shafer*, "[t]hree hours and twenty-five minutes into its sentencing deliberations, the jury sent a note to the trial judge containing two questions: '1) Is there any remote chance for someone convicted of murder to become elig[i]ble for parole? []2) Under what

conditions would someone convicted for murder be elig[i]ble.'" 532 U.S. at 44; *cf. Richmond v. Polk*, 375 F.3d 309, 331–35 (4th Cir. 2004)) (finding *Simmons* error harmless in case where there was no jury question). In sum, where the jury asks about the meaning of life imprisonment or parole eligibility and a *Simmons* instruction is not given, federal appellate courts have found that the defendant is entitled to relief regardless of whether they conduct harmless-error analysis.

In this case, one juror asked about the meaning of a life sentence. The vote of only one juror for a life sentence is necessary in Pennsylvania to prevent a sentence of death. The harm caused by the absence of a *Simmons* instruction is clear.

As explained in the Statement of the Case and Part I.C, *supra*, the trial court's follow-up response the jury's question—"I'm to tell you, and it's accurate, 'Life is life.' There won't be any parole. Life is life."—did not cure the trial court's misleading response to the jury's question or render that response harmless. First, the referent of "it" is unclear: "it" could be "Life is life" or it could be the court's prior speculation that the Legislature could change the law ("I don't see how I can guarantee—that's the present law. But what if the legislature changes the law? I can't guarantee that. That's the way the law is now. . . . Who knows two years from now if they'll change the law. I can't tell you."). Second, as soon as the judge offered his spontaneous speculation about future legislative behavior, the jury witnessed the prosecutor ask for a sidebar conference, watched counsel for both sides converse with the judge, and then heard the judge's reformulated response. The judge's prefatory use of "I'm to tell you" shows that what

35

followed was half-hearted and begrudging—that he was saying it only because he was forced to by counsel for both sides, not because he believed it to be true. Under those circumstances, and in light of the judge's statements immediately prior, it is not beyond reasonable doubt that the jury believed it to be true, either. As the Supreme Court has stated: "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Franklin*, 471 U.S. at 322. The trial court's reformulated response to the jury's question at best merely contradicted and did not explain its initial misleading response. The absence of a proper *Simmons* instruction was not harmless error.

## CONCLUSION

For all these reasons, the Court should vacate the district court's denial of the

petition for writ of habeas corpus and remand for the grant of relief.

Respectfully submitted,

/s/ Eric Montroy
Eric Montroy
James Moreno
Eric Motylinski
Federal Community Defender Office
   for the Eastern District of Pennsylvania
The Curtis, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

Dated: March 27, 2023       *Counsel for Appellant Harvey Miguel Robinson*

## CERTIFICATE OF BAR MEMBERSHIP

I, Eric Montroy, hereby certify that I am a member in good standing of the Bar of this Court.

/s/ Eric Montroy
Eric Montroy

Dated: March 27, 2023

# CERTIFICATE OF COMPLIANCE

I, Eric Montroy, hereby certify that this Initial Brief for Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,359 words, as calculated by the word count software in Word for Microsoft 365, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in size 14 Garamond.

I further certify that the text of the electronic copy of the brief is identical to the text of the paper copies of the brief filed with the Court and that the electronic copy of this brief was scanned using TrendMicro Apex One software, and found to contain no known viruses.

/s/ Eric Montroy
Eric Montroy

Dated: March 27, 2023

**CERTIFICATE OF SERVICE**

I, Eric Montroy, hereby certify that I have filed electronically the Initial Brief for

Appellant and Appendix and served copies upon filing user Heather F. Gallagher, Esq.,

through the Court's Electronic Case Filing system.

/s/ Eric Montroy
Eric Montroy

Dated: March 27, 2023

# APPENDIX TABLE OF CONTENTS

## Volume 1

Notice of Appeal (July 8, 2021) .................................................................. 1a–2a

District Court Order Denying Petitioner's Motion to Alter Judgment Pursuant to Rule 59(e) (June 10, 2021) ....................................................................................3a

District Court Opinion Denying Petitioner's Motion to Alter Judgment Pursuant to Rule 59(e) (June 10, 2021) ......................................................... 4a–21a

District Court Order Denying and Dismissing Petitioner for Writ of Habeas Corpus (Sept. 8, 2020) ......................................................................................22a

District Court Opinion (Sept. 8, 2020) .................................................. 23a–129a

This Court's Order Granting Certificate of Appealability (Aug. 30, 2022)..... 130a–131a

## Volume 2

Transcript Excerpts (Oct. 24, 1994).................................................... 132a–134a

Transcript Excerpts (Nov. 8, 1994).................................................... 135a–138a

Transcript Excerpts (Nov. 9, 1994).................................................... 139a–177a

Transcript Excerpts (Nov. 10, 1994) .................................................. 178a–211a

District Court Docket Entries ........................................................... 212a–223a

Supreme Court of Pennsylvania Direct Appeal Opinion (Dec. 30, 2004) ...... 195a–253a

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                          :
HARVEY MIGUEL ROBINSON,                   :
                                          :
        Petitioner,                       :      No. 2:06-cv-00829
                                          :
    v.                                    :      Hon. Joseph F. Lesson, Jr.
                                          :
JOHN WETZEL, Sec'y,                       :
    Pa. Dep't of Corr., et al.,           :      **CAPITAL CASE**
                                          :
        Respondents.                      :
_____:

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that Petitioner Harvey Miguel Robinson, through counsel, hereby appeals to the United States Court of Appeals for the Third Circuit from this Court's September 8, 2020 Opinion (ECF No. 82) and Order (ECF No. 83) denying the Petitioner's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 12) and denying certificate of appealability; from this Court's June 10, 2021 Opinion (ECF No. 87) denying Petitioner's Motion to Alter and Amend Judgment Pursuant to Rule 59(e) (ECF No. 84); and from each and every subsidiary adverse ruling and finding forming the basis for the Court's decision denying relief.

Respectfully submitted,

/s/ Ayanna Williams
AYANNA WILLIAMS
Federal Community Defender for the
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545W
Philadelphia, PA 19106
(215) 928-0520
ayanna_williams@fd.org

Counsel for Petitioner

Dated:     July 8, 2021

## CERTIFICATE OF SERVICE

I, Ayanna Williams, Esq., hereby certify that on this date I caused the foregoing *Notice of Appeal* to be filed electronically and served on the following person by the ECF system:

Heather Gallagher
Chief Deputy District Attorney
Office of the District Attorney of Lehigh County
455 West Hamilton Street
Allentown, PA 18101

/s/ Ayanna Williams
Ayanna Williams

Dated:     July 8, 2021

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

_____

HARVEY MIGUEL ROBINSON,                   :
       Petitioner,                      :
                              :
       v.                               :
                              :       No. 2:06-cv-00829
                              :
JEFFREY BEARD, Commissioner, Pennsylvania :
Department of Corrections; DAVID          :
DIGUGLIELMO, Superintendent of the State  :
Correctional Institution at Graterford; FRANK :
TENNIS, Superintendent of the State Correctional :
Institution at Rockview; and LEHIGH COUNTY :
DISTRICT ATTORNEY,                        :
             Respondents.              :

_____

# O R D E R

    **AND NOW**, this 10th day of June, 2021, upon consideration of Petitioner's Motion to Alter Judgment Pursuant to Rule 59(e), ECF No. 84, the Lehigh County District Attorney's response thereto, ECF No. 86, and for the reasons set forth in the Court's Opinion issued this date, **IT IS ORDERED THAT:**

    Petitioner's Motion to Alter Judgment Pursuant to Rule 59(e), ECF No. 84, is **DENIED**.

                               BY THE COURT:

                               _/s/ Joseph F. Leeson, Jr._____
                               JOSEPH F. LEESON, JR.
                               United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————

|  |  |  |
|---|---|---|
| HARVEY MIGUEL ROBINSON, | : | |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | No. 2:06-cv-00829 |
| | : | |
| JEFFREY BEARD, Commissioner, Pennsylvania | : | |
| Department of Corrections; DAVID | : | |
| DIGUGLIELMO, Superintendent of the State | : | |
| Correctional Institution at Graterford; FRANK | : | |
| TENNIS, Superintendent of the State Correctional | : | |
| Institution at Rockview; and LEHIGH COUNTY | : | |
| DISTRICT ATTORNEY, | : | |
| Respondents. | : | |

———————————————————————

**O P I N I O N**
**Motion to Alter Judgment Pursuant to Rule 59(e), ECF No. 84 — Denied**

**Joseph F. Leeson, Jr.**                                                  **June 10, 2021**
**United States District Judge**

## I.    INTRODUCTION

This matter involves Petitioner Harvey Robinson, a prisoner under sentence of death in Pennsylvania, who seeks a writ of habeas corpus from this Court. In his petition, Robinson challenged his sentence of death as to the murder of Jessica Jean Fortney. In an Opinion dated September 8, 2020, this Court fully reviewed Robinson's petition and denied it in its entirety. Robinson now files the present Motion to Alter Judgment Pursuant to Rule 59(e). Therein, Robinson alleges error in this Court's analysis of three of the claims in his petition.

After review of Robinson's motion, this Court's Opinion dated September 8, 2020, and the underlying record in this case, this Court denies Robinson's motion to alter judgment.

## II.    BACKGROUND

As the facts are set out in full in this Court's Opinion dated September 8, 2020, only a brief summary is provided here.  *See Robinson v. Beard*, No. 06-cv-829, 2020 WL 5362133, at *1-6 (E.D. Pa. Sept. 8, 2020), ECF No. 82.  Robinson was charged with the first-degree murders of Joan Burghardt, Charlotte Schmoyer, and Jessica Jean Fortney, as well as other crimes that accompanied those murders.  *See id.* at *5.  Following a trial by jury in the Lehigh County Court of Common Pleas, Robinson was found guilty of three murders of the first degree and all of the other offenses related to the murders of Burghardt, Schmoyer, and Fortney.  *See id.*  In the penalty phase, the jury returned a sentence of death for each of the three murder convictions.[1] *See id.*

Robinson filed a direct appeal to the Pennsylvania Supreme Court, raising issues related to the pretrial phase, guilt phase, and penalty phase.  *See id.* at *6-7.  The Supreme Court rejected Robinson's claims and affirmed the judgment of sentence.  *See id.* at *7.  Thereafter, Robinson filed a petition for a writ of habeas corpus pursuant to the Pennsylvania Post Conviction Relief Act (PCRA).  *See id.*  The PCRA court denied his petition in its entirety, and the Pennsylvania Supreme Court affirmed.  *See id.*

Robinson timely filed a federal habeas petition, asserting fourteen claims that included trial court error, ineffective assistance of counsel, and prosecutorial misconduct.  *See id.* at *7-8.  On September 8, 2020, this Court addressed the petition, denying it in its entirety.  *See id.* at *1.

---

[1]    Robinson was later resentenced for the murders of Burghardt and Schmoyer.  *See Robinson*, 2020 WL 5362133, at *6.  He was resentenced to life without parole for each of those two murders.  *See id.*  Robinson remains under a sentence of death for the murder of Fortney. *See id.*

Robinson timely filed the present Motion to Alter Judgment Pursuant to Rule 59(e).  *See*

Mot., ECF No. 84.  Therein, Robinson asks this Court to reconsider its review of Claims IV,[2]

VI,[3] and XIII[4] from his petition.  *See id.*  The Lehigh County District Attorney responded in

opposition to the motion.  *See* Resp., ECF No. 86.

## III.    LEGAL STANDARD

**Motion to Alter Judgment under Rule 59(e) – Review of Applicable Law**

The purpose of a motion to alter judgment under Rule 59(e) of the Federal Rules of Civil

Procedure is to "correct manifest errors of law or fact, or to present newly discovered evidence."

*See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985); *see also* FED. R. CIV. P. 59(e).

A party seeking alteration of a judgment must show at least one of the following grounds:

"(1) an intervening change in the controlling law;"

"(2) the availability of new evidence that was not available when the court granted the

motion . . . ;" or

---

[2]     In Claim IV, Robinson asserted that
> [t]he Commonwealth's failure to timely disclose that a key Commonwealth witness had been hypnotized prior to her testimony and initially identified someone else as her attacker violated Petitioner's right to due process, right to a fair trial, and right to be free from cruel and unusual punishment; trial counsel rendered ineffective assistance.

*See Robinson*, 2020 WL 5362133, at *8.

[3]     In Claim VI, Robinson asserted that
> [p]etitioner was denied his right to a fair trial, to a fair and impartial jury and to due process in violation of his rights under the Sixth and Fourteenth Amendments because the jury pool from Lehigh County was saturated with highly prejudicial pretrial publicity. All prior counsel were ineffective for failing to properly litigate this issue at trial and on direct appeal.

*See Robinson*, 2020 WL 5362133, at *8.

[4]     In Claim XIII, Robinson asserted that "[t]he trial court violated Petitioner's right to compulsory due process, a fair trial and his right to be free from cruel and unusual punishment by failing to grant a short continuance to allow a critical mitigation witness to arrive in court." *See Robinson*, 2020 WL 5362133, at *8.

"(3) the need to correct a clear error of law or fact or to prevent manifest injustice."

*Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

"Motions under Rule 59(e) should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *Ruscavage v. Zuratt*, 831 F. Supp. 417, 418 (E.D. Pa. 1993). "It is improper on a motion for reconsideration to ask the Court to rethink what [it] had already thought through--rightly or wrongly." *Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993) (internal quotations omitted).

## IV.    DISCUSSION

Robinson does not allege that a change in the controlling law or new evidence warrants reconsideration of his claims. Rather, Robinson exclusively alleges that clear errors of law or fact made by this Court would cause manifest injustice if left uncorrected. Robinson alleges multiple errors of law and fact in this Court's review of Claims IV, VI, and XIII in his petition. Each of the alleged errors are addressed in turn below. In summary, Robinson fails to present any error of law or fact that warrants alteration of this Court's judgment. Accordingly, Robinson's motion is denied.

### A.    Claim IV: Testimony of Denise Sam-Cali

In Claim IV of his petition, Robinson asserted that the Commonwealth failed to disclose the fact that prosecution witness Denise Sam-Cali had been hypnotized and that she initially suggested a different individual, Sal Rosado, as the perpetrator of the attack against her. *See Robinson*, 2020 WL 5362133, at *25. In the September 8, 2020 Opinion, this Court reviewed Claim IV and determined that the Commonwealth had not violated *Brady* in its handling of Sam-Cali and her hypnosis and otherwise found that counsel was not ineffective in failing to object to the testimony. *See id.* at *26-27.

Robinson now challenges this Court's disposition of Claim IV. Robinson alleges four points of error in this Court's analysis. First, Robinson asserts that this Court misapprehended his argument in Claim IV. *See* Mot. 4. Second, Robinson argues that this Court improperly limited its review of the *Brady* violation. *See id.* at 6. Third, Robinson claims that this Court inappropriately placed a burden on him to inform his counsel about the hypnosis. *See id.* at 4-5. Fourth, Robinson asserts that this Court misapplied the law in determining materiality or prejudice under *Brady*.[5] *See id.* at 6. After review, Robinson fails to allege error that would warrant alteration of this Court's judgment as to Claim IV.

### 1. The Court did not misapprehend Robinson's argument in Claim IV.

Robinson first asserts that this Court misapprehended his argument with respect to Claim IV. *See id.* at 4. In his motion, Robinson suggests that this Court incorrectly focused on the Government's disclosure of the *fact* of Sam-Cali's hypnosis rather than disclosure of the *statements* made under hypnosis. *See id.* Notwithstanding, Robinson fails to show clear error that, if left uncorrected, would cause a manifest injustice.

In reviewing Claim IV, this Court responded directly to the claim in Robinson's petition. Therein, Robinson clearly states that the Commonwealth "fail[ed] to timely disclose that a key Commonwealth witness, Ms. Denise Sam-Cali, had been hypnotized and interviewed prior to her trial testimony . . . ." *See* Pet. 61. That allegation strikes directly at the *fact* of Sam-Cali's hypnosis. Accordingly, this Court did not misconstrue Robinson's claim in finding that a letter from the Commonwealth had placed Robinson on notice of the hypnosis.

Moreover, as discussed in Section IV.A.2, *infra*, this Court did review the possibility that the Commonwealth's failure to turn over certain statements from Sam-Cali's hypnosis

---

[5]     *Brady v. Maryland*, 373 U.S. 83 (1963).

represented a *Brady* violation.  Accordingly, this ground does not warrant alteration of this Court's judgment as to Claim IV.

> 2.     **The Court appropriately addressed Robinson's *Brady* violation claim, and the Court declines to review other claims not fairly presented to the state courts.**

Robinson asserts that this Court improperly limited its review of his *Brady* claim to only Sam-Cali's statements regarding Sal Rosado as a potential assailant.  *See* Mot. 6.  He claims that this court ignored his allegations of additional factual inconsistencies between Sam-Cali's statement and her trial testimony.  Notwithstanding, this Court appropriately curtailed its review of Robinson's claims to those that were fairly presented to the state courts.

In his jurisdictional statement to the Pennsylvania Supreme Court, Robinson presented the relevant question for review as follows:

> [w]hether the trial [c]ourt erred in failing to grant a new trial based on [1] after-discovered evidence because the evidence of hypnosis was not available to counsel until after the trial, [2] the <u>Brady</u> violation resulting from the Commonwealth's failure to disclose the evidence of hypnosis fully and to defense counsel, and [3] the <u>Brady</u> violation resulting from the failure to disclose the fact that Sam-Cali had tentatively identified another individual as her assailant.

*See* Appellant's Jurisdictional Stmt. ¶ 5(G).

Thus, Robinson only raised a single factual inconsistency—that Sam-Cali had tentatively identified another individual—before the Pennsylvania Supreme Court.  Robinson now claims that there are additional factual inconsistencies between Sam-Cali's original statement, statement under hypnosis, and her trial testimony that this Court did not address.  *See id.*

On appeal, the Pennsylvania Supreme Court exclusively addressed the three grounds provided in Robinson's jurisdictional statement.  *See Pennsylvania v. Robinson (Robinson I)*, 581 Pa. 154, 217, 219-223 (2004).  The Pennsylvania Supreme Court did not address the possibility of additional inconsistencies between Sam-Cali's testimony and her prior statements

because Robinson did not raise the issue. Moreover, because the issue of Sam-Cali's hypnosis was not raised before the PCRA court or the Pennsylvania Supreme Court on PCRA review, neither addressed that issue in their review of Robinson's PCRA petition. *See Pennsylvania v. Robinson (Robinson II)*, 623 Pa. 345 (2013); *Pennsylvania v. Robinson*, No. CP-39-CR-0058-1994, 2012 WL 10028332 (Pa. Ct. Com. Pl. June 21, 2012).

Consistent with the law governing federal habeas review, this Court addressed those claims that were fairly presented to the state courts. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (state prisoner must "fairly present" federal claims to state courts). Failure to fairly present a claim to a state court results in the procedural default of that claim, absent a showing of cause and prejudice or actual innocence to excuse the default. *See Slutzker v. Johnson*, 393 F.3d 373, 381 (3d Cir. 2004).

Here, Robinson attempts to introduce claims regarding Sam-Cali that were not fairly presented to the state courts. Because the state courts were not afforded an occasion to opine on the possibility of other inconsistencies in Sam-Cali's testimony, beyond the single Rosado matter enumerated by Robinson, that claim is procedurally defaulted. Robinson does not provide any showing of cause and prejudice or actual innocence to excuse the default. Accordingly, this Court did not err in limiting its review of Robinson's claims with respect to Sam-Cali to those claims that were fairly presented to the state courts.

Moreover, even if this Court were to review the defaulted claim, Robinson fails to establish a *Brady* violation. To establish a *Brady* violation, a petitioner must show:

"(1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching;"

"(2) the prosecution withheld it;" and

"(3) the defendant was prejudiced because the evidence was 'material.'"

*Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).

With respect to the first element, the inconsistencies at issue here are not exculpatory, nor do they hold impeachment value.  As the Pennsylvania Supreme Court noted, Sam-Cali's suggestion of Rosado as a suspect is irrelevant for impeachment purposes.  *See Robinson I*, 581 Pa. at 217-18.  The same is true with any minor discrepancies in Sam-Cali's recount of the attack.  Prior to trial, Robinson plead guilty to charges of burglary, aggravated assault, and attempted homicide with respect to Sam-Cali.  *See id.*  Pennsylvania law indicates that a defendant's plea of guilty is his acknowledgement to both the facts and the intent required to commit the charged offense.  *See Commonwealth v. Anthony*, 504 Pa. 551, 475 A.2d 1303 (1984).  Thus, as part of his guilty plea to the offenses involving Sam-Cali, Robinson admitted to all of the salient facts.  Accordingly, any minor discrepancies in Sam-Cali's description of the assailant or the details of the attack against her would not exculpate Robinson or serve as impeachment material because (1) Robinson admitted to being the assailant and (2) Robinson admitted to the salient details of the attack.  *See Robinson I*, 581 Pa. at 217-218.

Moreover, even if this Court were to assume *arguendo* that the statements could be used for impeachment purposes and that the government failed to turn them over, Robinson fails to show the requisite materiality.  Notably, because Robinson had already pled guilty to charges with respect to Sam-Cali, these charges were not before the jury in the trial at issue.  Rather, her testimony was put on by the government to "establish the identity of the perpetrator, his motive, intent, and a common criminal scheme."  *See Robinson I*, 581 Pa. at 215.  Thus, Sam-Cali's testimony was not put on for the purpose of establishing Robinson's guilt with respect to the three homicides at issue.

Justice Nigro, concurring in *Robinson I*, noted that "the evidence of [Robinson's] guilt was clearly overwhelming." *See id.* at 257 (Nigro, J., concurring). Because Sam-Cali's testimony did not involve Robinson's guilt and because the evidence of guilt was "clearly overwhelming," Robinson has not shown a reasonable probability that the outcome of the trial would have been different if the jury had heard the few discrepancies in Sam-Cali's testimony. Therefore, any minor discrepancies in Sam-Cali's testimony are immaterial and Robinson was not prejudiced by any absence of those discrepancies from the trial. Accordingly, this ground does not warrant alteration of this Court's judgment on Claim IV of Robinson's Petition.

### 3.    The Court did not place any unwarranted burden on Robinson.

Next, Robinson asserts that this Court improperly placed a burden on Robinson with respect to *Brady* material. By way of background, the Commonwealth delivered a letter directly to Robinson that notified him of Sam-Cali's hypnosis. Robinson asserts that the letter should have instead been provided to his counsel, and he asserts that direct delivery to Robinson himself was contrary to Supreme Court precedent. *See* Mot. 4-5 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). Notwithstanding, Robinson fails to allege any error that warrants alteration of this Court's judgment.

In reviewing Claim IV, this Court noted that the Commonwealth personally provided Robinson with a letter stating that Sam-Cali had been hypnotized. *See Robinson*, 2020 WL 5362133, at *26. In footnote two of the September 8, 2020 Opinion, this Court explained why the Commonwealth provided the letter to Robinson directly. *See id.* at 26 n.2. The letter was drafted and provided to Robinson the same day that Robinson was interviewed by the police, and Robinson was not yet represented by counsel in the matter. *See id.* Accordingly, in the absence of counsel, the Commonwealth provided the letter to Robinson directly.

Robinson asserts that the Commonwealth's provision of the letter directly to him violated Supreme Court precedent by placing the burden on Robinson to inform his counsel of the letter. *See* Mot. 4-5. Notwithstanding, the case law that Robinson cites is inapposite. Robinson cites case law that indicates "[t]he Commonwealth has a continuing obligation to disclose *Brady* material even if there is no request by the defense." *See id.* (citing *Agurs*, 427 U.S. at 107). However, *Agurs* does *not* indicate that the Commonwealth fails to discharge that ongoing obligation if it provides *Brady* material directly to an unrepresented defendant. Robinson does not assert that he had to request the letter, and accordingly, the Commonwealth complied with the requirements of *Agurs*.

Robinson also suggests that provision of the letter directly to him enforces a system where the "prosecutor may hide, [and] defendant must seek." *See id.* (citing *Banks v. Dretke*, 540 U.S. 668. 696 (2004)). The facts belie this assertion. Far from having to seek out the information himself, the Commonwealth provided the letter directly to Robinson. *See Robinson*, 2020 WL 5362133, at *26. Accordingly, the case law cited by Robinson does not illuminate any clear error of law in this Court's analysis of the Commonwealth's provision of the letter directly to Robinson. Therefore, this ground does not warrant alteration of this Court's judgment on Claim IV.

### 4. Robinson misconstrues this Court's discussion of prejudice.

Last, Robinson now claims that this Court inappropriately suggested that any failure by the Commonwealth to disclose Sam-Cali's statement was without prejudice to Robinson. *See* Mot. 6. Robinson suggests that, in reviewing the *Brady* claim in his Petition, this Court improperly determined that the inconsistencies in Sam-Cali's statements were "not material/prejudicial." *See id.* Moreover, Robinson asserts that this Court should not have

weighed Sam-Cali's statements against other evidence put forth at trial, including DNA evidence. *See id.* However, Robinson's reading of this Court's Opinion misconstrues its discussion of prejudice.

This Court's discussion of the prejudice in its September 8, 2020 Opinion, with respect to Claim IV, was not conducted in the context of a possible *Brady* violation. Rather, a prejudice analysis was conducted in the context of this Court's review of Robinson's ineffective assistance of counsel claim. *See Robinson*, 2020 WL 5362133, at *27. After noting that counsel made a strategic decision to avoid discussing the hypnosis of Sam-Cali in front of the jury, this Court determined that, even if counsel's decision was objectively unreasonable, it did not result in prejudice. *See Strickland*, 466 U.S. at 494 (defining prejudice as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). The *Strickland* prejudice standard required this Court to balance Sam-Cali's statements against the other evidence presented at trial. Accordingly, there was no error of law in this Court's approach to prejudice as it related to Robinson's ineffective assistance of counsel claim on Claim IV.

Moreover, even assuming *arguendo* that this Court engaged in evidence balancing to determine *Brady* materiality, such an analysis was warranted by the governing standards. *Brady*'s materiality analysis, like *Strickland*'s prejudice analysis, provides that evidence is "material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *See Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). Accordingly, in determining whether a *Brady* statement is material, a court must necessarily assess the probability that the introduction of that evidence into the trial would have resulted in a different outcome. In doing so, it would be wholly appropriate for a court to weigh

the alleged *Brady* material against the other evidence presented at trial. Accordingly, Robinson asserts no cognizable error, and this ground does not warrant alteration of this Court's judgment on Claim IV.

Having reviewed all of the proposed grounds for alteration of this Court's judgment on Claim IV and finding none that warrant alteration of this Court's disposition of Claim IV, Robinson's motion to alter judgment is denied with respect to Claim IV.

**B.      Claim VI: Effect of Pretrial Publicity**

In Claim VI, Robinson asserted that he was denied his due process rights, right to a fair trial, and right to effective counsel as a result of the pretrial publicity of his case. *See Robinson*, 2020 WL 5362133, at *30-33. In its September 8, 2020 Opinion, this Court concluded that Robinson had not stated a violation of any of those rights. Accordingly, the claim was denied.

Robinson now seeks reconsideration of this Court's disposition of Claim VI. In his motion, Robinson asserts three grounds for reconsideration. First, Robinson asserts that this Court misconstrued his argument in Claim VI related to trial counsel's ineffectiveness in drafting a sufficient motion to transfer venue. *See* Mot. 8-9. Second, Robinson argues that this Court misread the facts of the record by discounting the prejudicial nature of the publicity. *See id.* at 9-10. Third, Robinson claims that the venire pool was prejudiced by the pretrial publicity of his case. *See id.* at 10-11. After review of each of these grounds, none of them warrant alteration of the Court's judgment as to Claim VI.

**1.      The Court did not misconstrue Robinson's argument regarding trial counsel's ineffectiveness in drafting a motion to transfer.**

First, Robinson asserts that this Court misunderstood his argument regarding his counsel's effort to move for a transfer of venue. Robinson focuses on a single sentence in this

Court's Opinion where it stated that it did not believe "Robinson's argument that, had the brief of the motion been larger, the trial court would have granted the motion to transfer." *See Robinson*, 2020 WL 5362133, at *33. Although this description is an oversimplification of Robinson's underlying concerns with the motion and brief, this Court did not misconstrue, or otherwise fail to address, Robinson's concerns regarding the publicity surrounding his case and the accompanying motion to transfer. Quite the opposite, this Court undertook a thorough review of the publicity, separating out the factual coverage and highlighting articles with inflammatory rhetoric. *See id.* at *32.

Thereafter, this Court noted that, in light of the publicity, the motion that counsel filed was not objectively unreasonable. *See id.* at *33. Moreover, this Court, assuming *arguendo* that the filing was unreasonable, also discussed whether Robinson was prejudiced by any ineffectiveness, finding no such prejudice existed. *See id.* This Court thoroughly and appropriately reviewed Robinson's ineffective assistance of counsel claim with respect to Claim VI and found that trial counsel was not ineffective. Therefore, this ground does not warrant alteration of this Court's judgment as to Claim VI.

> ### 2. The Court's review of Claim VI accurately reflected the facts in the record before it.

Next, Robinson asserts that this Court "misread the trial record when addressing the prejudicial impact of the pretrial publicity." *See* Mot. 9. Specifically, Robinson asserts that this Court inappropriately discounted that a factual article regarding the crimes may still have an inflammatory and prejudicial effect on a venire pool. *See id.* Notwithstanding, this Court's thorough review of the factual record in its Opinion dated September 8, 2020 belies the claim that there is any clear error of fact in this Court's analysis of Claim VI.

Contrary to Robinson's contention, this Court did not discount the effect of pretrial publicity.  Rather, as the law requires, this Court sorted publicity from which prejudice may be presumed from that from which prejudice may not be presumed.  *See Robinson*, 2020 WL 5362133, at \*31-32 (citing, e.g., *Flamer v. Delaware*, 68 F.3d 736, 754 (3d Cir. 1995) (finding no presumption of prejudice where publicity is "factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime")).  As this Court noted in quoting the relevant standards, severe and extensive reporting does not necessarily give rise to prejudice.  *See id.* at \*31 (citing *Pursell v. Horn*, 187 F. Supp. 2d 260, 302 (W.D. Pa. 2002) (noting "lapse in time" between severe and extensive publicity and trial can dissipate prejudicial effect)).

Moreover, this Court performed a detailed review of instances of pretrial reporting in which inflammatory, non-factual language was used.  *See id.* at \*32.  Robinson takes issue with this Court's conclusion that there was a sufficient cool-down period between those instances of inflammatory reporting and the eventual trial so as to quell any concern regarding prejudice.  *See* Mot. 9.  Despite Robinson's objection, inquiry into the cool-down period is required by the governing standards.  *See Pursell*, 187 F. Supp. 2d at 302.  In determining the prejudicial value of those reports, this Court was required to review the probability that sufficient time had lapsed between the reporting and the trial so as to dissipate any prejudicial effect.  *See id.*  Accordingly, this Court's review of the pretrial reporting was consistent with the law and the factual record before it.  Therefore, this ground does not warrant alteration of this Court's judgment on Claim VI.

### 3. Robinson is estopped from relitigating the effect of the publicity on the venire pool.

Robinson next claims that many prospective jurors indicated during voir dire that they had seen, read, or heard about the matters in Robinson's case prior to appearing for jury selection. However, Robinson does not raise any error of law or fact with respect to this ground. Rather, it appears that Robinson wishes to relitigate a matter that has already been decided without pointing to any clear error that would warrant such reconsideration. This Court thoroughly reviewed the standards for prejudice as a result of pretrial publicity. *See id.* at *31-33. In applying those standards to the factual record, this Court determined that the relevant factors indicated a low likelihood of prejudice in the venire pool and therefore weighed against a transfer of venue. *See id.* Robinson is not permitted to seek unbridled reconsideration of an unfavorable conclusion—that is otherwise appropriate in light of the law and facts—simply because it is unfavorable. *See Glendon Energy*, 836 F. Supp. At 1122. Accordingly, this ground does not warrant alteration of the Court's judgment on Claim VI.

Having reviewed all of the proposed grounds for alteration of Claim VI and finding none that warrant alteration of this Court's disposition of Claim VI, Robinson's motion is denied with respect to Claim VI.

### C. Claim XIII: Life without Parole Instruction

In Claim XIII of his petition, Robinson claimed that his Eighth and Fourteenth Amendment rights were violated when the trial court failed to instruct the jury that life imprisonment meant life without parole. *See Robinson*, 2020 WL 5362133, at *59. This instruction is otherwise known as a "*Simmons*" instruction. *See Simmons v. South Carolina*, 512 U.S. 154 (1994). After reviewing Claim XIII in light of the governing standards, this Court

determined (1) that a *Simmons* instruction was not warranted in Robinson's case, and (2)

assuming that it was, the trial court provided a clear and sufficient instruction. *See id.* at *59-61.

In his present motion, Robinson seeks reconsideration of this Court's disposition of

Claim XIII.  Therein, Robinson presents two grounds for reconsideration.  First, Robinson

asserts that this Court applied an incorrect standard for determining whether a *Simmons*

instruction was necessary. *See* Mot. 13.  Second, Robinson asserts that this Court erred in

finding the trial court's instruction sufficient to satisfy the requirements of *Simmons*. *See id.* at

13-14.  After review of both of these grounds, neither warrants alteration of the Court's judgment

as to Claim XIII.

> **1.      The Court applied the appropriate standard for determining whether a *Simmons* instruction was required.**

Robinson first claims that this Court erred in selecting a standard for determining whether

a *Simmons* instruction is required.  However, a review of this Court's Opinion belies this claim.

As this Court noted, a *Simmons* instruction is required when the government places a defendant's

future dangerousness at issue. *See Robinson*, 2020 WL 5362133, at *59 (citing *Simmons*, 512

U.S. at 156).  Robinson seems to suggest that this Court overlooked the Supreme Court's opinion

in *Kelly v. South Carolina*, 534 U.S. 246 (2002). *See* Mot. 13.  Therein, the Supreme Court

noted that "[e]vidence of future dangerousness under *Simmons* is evidence with a tendency to

prove dangerousness in the future; its relevance to that point does not disappear merely because

it might support other inferences or be described in other terms." *See Robinson*, 2020 WL

5362133, at *60 (citing *Kelly*, 534 U.S. at 254).  However, this Court quoted precisely that

language in describing the standard that it was required to follow. *See id.*  Accordingly, despite

Robinson's contention, this Court applied the correct legal standard for determining whether a *Simmons* instruction was required.

After reviewing the factual record in light of the standards set forth in *Simmons* and *Kelly*, this Court concluded that the Commonwealth did not place Robinson's future dangerousness at issue. As instructed by *Kelly*, this Court reviewed the transcript not only for statements that explicitly mentioned future dangerousness but also for statements that addressed future dangerousness by other terms. In his motion, Robinson fails to point to any statements made by the Commonwealth that the Court misread in applying the relevant legal standards to the factual record. Accordingly, this ground does not warrant alteration of this Court's judgment on Claim XIII.

## 2. The Court did not err in finding the trial court's resultant instruction sufficient under *Simmons*.

Next, Robinson argues that this Court erred in finding that the trial court's *Simmons* instruction was sufficient. *See* Mot. 13-14. Robinson asserts that the trial court's eventual instruction of "[l]ife is life" only served to contradict its prior instruction, thereby leaving the jury confused. *See id.* at 14. However, this Court's review of the matter illuminates the opposite. At no time did the trial court say that parole was available. In fact, in its first statement after the jury asked if life meant life without parole, the trial court stated, in part, "that's the present law." *See Robinson*, 2020 WL 5362133, at *59. After a brief sidebar with counsel, the trial court then stated, "[l]ife is life. There won't be any parole. Life is life." *See id.* The trial court's eventual instruction was a clarification of its prior statement, not a contradiction. Moreover, the trial court's eventual instruction was crystal clear regarding the availability of parole. Accordingly, this Court was not in error in finding that the trial court's

eventual instruction to the jury was a clear statement of the law in Pennsylvania regarding life without parole. Therefore, this ground does not warrant alteration of this Court's judgment as to Claim XIII.

Having reviewed the two proposed grounds for alteration of Claim XIII and finding neither warrants alteration of this Court's judgment as to Claim XIII, Robinson's motion is denied with respect to Claim XIII.

## V.    CONCLUSION

Robinson seeks reconsideration of three claims that were reviewed and decided in this Court's Opinion dated September 8, 2020. Robinson claims that errors of law or fact warrant reconsideration of those three claims. However, after a review of all of the proposed grounds for reconsideration, this Court finds no clear error of law or fact that, if left uncorrected, would work a manifest injustice. Therefore, Robinson's arguments do not warrant an alteration of this Court's judgment as to any of the three claims raised in the motion. Accordingly, Robinson's motion is denied.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| HARVEY MIGUEL ROBINSON, | : |
|                 Petitioner, | : |
| | : |
|     v. | :    No. 06-cv-00829 |
| | : |
| JEFFREY BEARD, Commissioner, Pennsylvania | : |
| Department of Corrections; DAVID | : |
| DIGUGLIELMO, Superintendent of the State | : |
| Correctional Institution at Graterford; FRANK | : |
| TENNIS, Superintendent of the State Correctional | : |
| Institution at Rockview; and LEHIGH COUNTY | : |
| DISTRICT ATTORNEY, | : |
|                 Respondents. | : |

_____

### O R D E R

**AND NOW**, this 8th day of September, 2020, for the reasons set forth in the Opinion

issued this date, **IT IS ORDERED THAT**:

1. The Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, ECF No. 12, is

   **DENIED and DISMISSED**.

2. A certificate of appealability is **DENIED**.

3. The Clerk of Court shall **CLOSE** the above-captioned action.


BY THE COURT:


_/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| HARVEY MIGUEL ROBINSON, | : | |
| Petitioner, | : | |
| | : | |
| v. | : | No. 06-cv-00829 |
| | : | |
| JEFFREY BEARD, Commissioner, Pennsylvania | : | |
| Department of Corrections; DAVID | : | |
| DIGUGLIELMO, Superintendent of the State | : | |
| Correctional Institution at Graterford; FRANK | : | |
| TENNIS, Superintendent of the State Correctional | : | |
| Institution at Rockview; and LEHIGH COUNTY | : | |
| DISTRICT ATTORNEY, | : | |
| Respondents. | : | |

---

# **O P I N I O N**

**Joseph F. Leeson, Jr.**                                    **September 8, 2020**
**United States District Judge**

## I.    INTRODUCTION

Harvey Miguel Robinson, a prisoner under sentence of death in the Commonwealth of Pennsylvania, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Robinson alleges due process violations, ineffective assistance of counsel, trial court error, and prosecutorial misconduct. The petition challenges the sentence of death in No. 58, only, for the murder of Jessica Jean Fortney. As for the other two murders, in judgment No. 55, Robinson was resentenced to a term of thirty-five years to life because he was a minor at the time of the offense, and in judgment No. 56, Robinson was resentenced to life without the possibility of parole. Having reviewed the extensive pleadings and the voluminous state court record, the Court denies the petition.

## II.    FACTS – TRIAL EVIDENCE OF THE CRIMES OF CONVICTION

Robinson elected to go to trial. The decision of the Pennsylvania Supreme Court (PSC) affirming Robinson's convictions on direct appeal recited the factual basis of his convictions as follows:

> At about 12:35 a.m. on Wednesday, August 5, 1992, Allentown police were dispatched to a reported burglary at the residence of Joan Burghardt (Burghardt) at 1430 East Gordon Street, on the East Side of the City of Allentown. Burghardt, a twenty-nine-year-old white female, weighing 225 to 240 pounds, resided alone at that address, a one-bedroom, first-floor apartment in a residential neighborhood. She told the police that someone had entered her apartment between 11:00 p.m. Tuesday and 12:30 a.m. Wednesday, when she returned from taking a friend home. Burghardt noticed that a fan, which she left on before leaving the apartment, had been turned off, the patio door she had left open was closed, and the screen on the door, which was locked, had been ripped about six to eight inches, just enough to get a hand through, near the locking mechanism. Burghardt also reported that $40 to $50 was missing from a bank bag in her dresser drawer. In all other respects, Burghardt reported her apartment appeared to have been undisturbed.
>
> At approximately 11:30 a.m. on Sunday, August 9, 1992, Burghardt's neighbor telephoned the police to complain that: (1) Burghardt's stereo had been on for three days and nights; (2) no one answered the doorbell; (3) the screen had been out of the window for three nights; and (4) during one of those nights it had sounded like somebody was beating Burghardt up, hitting the walls, and screaming. When the police arrived at Burghardt's apartment they noticed the screen for the front of the apartment was on the ground leaning upright next to the front window, the window was open, and the screen for the rear window was pushed out and lying on the ground beneath that window, which was also open. The screen on the patio door was cut about six inches long next to the door handle. The television was blaring loudly and the front door and the patio door were locked. The patio screen door was closed but not locked.
>
> Upon entering the apartment, the police found Burghardt dead, lying on her stomach on the living room floor in front of her couch. There was a large amount of blood on the couch, walls, and floor. She was beaten severely about the head. Aside from where the body was found, the apartment appeared to be neat and orderly. With the exception of the screens, there were no pry marks on the doors or windows or other evidence of forced entry. The police concluded that the perpetrator entered the residence through the front window and exited through the rear window.
>
> At the time of her death, Burghardt was wearing a sleep shirt and a pair of jockey shorts that were ripped at the crotch and pulled up. She was unclothed from her hips

down. A dresser drawer in the bedroom was open and a pair of black shorts was on the floor. There were blood spots and white stains on the back of the shorts. A peach-colored shirt was located on the closet door. It contained a lot of blood in distinctive patterns that appeared to have been made by swipe marks from whatever was used as the murder weapon.

The subsequent autopsy revealed that Burghardt had been sexually assaulted and bludgeoned to death by thirty-seven individual blunt force injuries to her scalp, causing extensive skull fractures and damage to the brain. The weapon was a circular, cylindrical instrument about one-half to three-quarter inches in diameter with a smooth surface and about ten to twenty inches long. The force of the blows was so deliberate and tremendous that, as the instrument came down, it embedded hair between the fracture and skull.

Burghardt also had defensive injuries on both hands, evidencing that she was alive and attempting to protect herself from her assailant. Serology tests established that all of the blood and hair found at the scene, including those samples found on the black shorts and peach colored shirt, were consistent with those of the victim. However, the shorts had seminal stains on the outside, as though someone had ejaculated onto them. Tests of the semen stains on the shorts showed the deoxyribonucleic (DNA) profiles that were later matched to the DNA profiles obtained from Appellant's blood. An analysis of the blood spattering at the crime scene indicated the perpetrator was approximately 5'10" tall and stood over the victim during the attack.

Approximately ten months later, at about 6:45 a.m. on Wednesday, June 9, 1993, Allentown police responded to a call of a reported missing person at 1058 East Gordon Street, a residential neighborhood, also on the East Side of Allentown. A resident became suspicious when the normally punctual newspaper delivery girl, Charlotte Schmoyer (Schmoyer), failed to deliver the newspaper. Her newspaper cart was left unattended for approximately thirty minutes in front of a neighbor's house and the newspaper had been delivered to another neighbor. Upon their arrival, the police found the unattended newspaper cart half-filled with the day's newspapers in front of the house; a separate copy of the newspaper; a Walkman radio and its headset separated from each other on the ground between two houses; and finger streaks on the windowpane of the door to the nearby garage of one of the houses. Police concluded that a struggle had ensued and Schmoyer, a fifteen-year-old white female, weighing 180 pounds, had been abducted.

Later that day, while searching a heavily wooded area at Allentown's nearby East Side Reservoir (Reservoir), the police found a bloody trail that led them to the body of Schmoyer, which was buried beneath some logs. Her sweatshirt was slightly pulled up; her sweatpants and underpants had been pulled down toward her knees. She had a large, gaping wound in her throat, separate stab wounds below that gash, multiple stab wounds on her back, and a patterned bruise on the right side of her cheek. An autopsy revealed twenty-two stab wounds, sixteen in the back (including

seven that were fatal), and six in the front area of the neck (of which any combination of one or three would have been fatal). In addition, there were cutting and scraping wounds in the neck area, indicating they were inflicted while the victim was conscious and her neck bent down as a protective measure, and seven more cuts to the back of the sweatshirt, indicating that some struggle occurred in that the sweatshirt was cut but the body was not penetrated. The weapon was a single-edged knife about four inches long. At least two of the wounds were up to the hilt of the blade.

Subsequent serology and DNA tests indicated that Schmoyer had intercourse shortly before death. Appellant's DNA was found on her vaginal swab and blood consistent with that of Appellant and inconsistent with that of Schmoyer's blood, was found on her sweatshirt and sweatpants, along the trail leading to her body, and on leaves at the crime scene near her head. All of the blood found on or about Schmoyer was consistent with that of either Schmoyer or Appellant; none of the blood was inconsistent with one of their profiles. A comparison of a hair found on the right knee of Schmoyer was consistent with hair from Appellant's head and inconsistent with Schmoyer's own hair; and a comparison of a hair found on the sweatshirt of Schmoyer was consistent with Appellant's pubic hair and, again, inconsistent with Schmoyer's own hair.

On June 28, 1993, Denise Sam–Cali (Sam–Cali), a thirty-eight-year-old white female weighing 160 to 165 pounds, and her husband resided at 1141 East Highland Street, on Allentown's East Side. That evening she was home alone; her husband was out of town. She awoke during the night to noises from within a walk-in closet near her bedroom door. As Sam–Cali attempted to flee the house, an assailant grabbed her. She exited the house, but the assailant grabbed her again on the front walk, flipped her on her back, and got on top of her using his knees to hold her down.

As Sam–Cali and the assailant began to fight, he pushed down on her mouth, choked her, and punched her face at least four times. She tried to punch him and bit him on the inside of his upper right arm. He raped her and then ran through the house to escape by way of the back patio-door. Afterwards, Sam–Cali called the police. She had been beaten severely about the head, her neck had strangulation marks, and her lip was slashed. A large butcher knife wrapped in a paper napkin from her kitchen was found lying on the floor outside of her bathroom door. Following this incident, Sam–Cali and her husband left their East Allentown residence for a few days.

Approximately two weeks later, shortly after 7:00 a.m. on July 14, 1993, Jessica Jean Fortney (Fortney), a forty-seven-year-old white female, weighing 235 pounds, who resided with other members of her family at 407 North Bryan Street, on Allentown's East Side, was found dead in her bed. Fortney was half-naked; her shorts and underpants were pulled down mid-way between her knee and groin area and around only one thigh. Her face was swollen and black. She had dried blood

about her lips, eye, nose, nostrils, and neck. There was blood spatter on the wall directly behind the sofa and on the lampshade next to the sofa. The window on the first floor was open; there was no screen in it.

The autopsy revealed that Fortney died in the early morning hours as a result of suffocation by strangulation (probably manual) and blunt trauma. There were in excess of fifty different injury patterns, many of them compatible with being beaten by a closed fist about the face. Some of them indicated an object, such as a ring, on her assailant's hands. Other injury patterns revealed that Fortney's attacker placed his knees on her during the beating, causing her blood to spatter on the wall, lampshade, and him. Serology tests established that Fortney had sexual intercourse within a few hours of her death. It was later determined that Fortney and Appellant had different blood profiles. Blood and body fluids from Fortney's vaginal swabs were consistent with Appellant's profile and seminal fluid from Fortney's vaginal swabs matched Appellant's DNA.

Four days after the Fortney homicide, on the evening of July 18, 1993, Sam–Cali and her husband returned home. At about 4:00 a.m. the next morning, Sam–Cali heard a noise in the house and then the back door opened. Thereafter, the alarm went off. The intruder apparently fled. From that night on, an Allentown police officer stayed at the Sam–Cali residence.

At approximately 1:25 a.m. on July 31, 1993, Officer Brian Lewis (Officer Lewis), who was at the Sam–Cali home, heard the doors being jarred and noticed someone at the front window. The officer saw the fingertips of a black-gloved hand removing the screen to the window. He then saw a head, and then the rest of the body, enter the home. When the intruder was fully inside the home, the officer challenged him. The intruder went to the kitchen and shots were exchanged. The officer retreated to the bedroom, where he heard banging and ripping at the kitchen door. Upon returning to the kitchen, the officer found the kitchen empty. The intruder escaped by breaking through several glass panels on a wooden door and pushing out the rear storm door.

At about 3:30 or 3:45 a.m., Officer Lewis was called to a local hospital where he identified Appellant as the intruder at the Sam–Cali home earlier that evening. Appellant had fresh, bleeding wounds to both of his arms and legs. He also had a healing scar of a bite mark several weeks old on his upper right arm. Later that day, the police obtained blood and hair samples from Appellant and searched his residence, where they found: (1) a black ski mask and a pair of gloves under the sofa cushions; (2) several drops of blood and a soaked, green-and-purple striped rugby-type shirt in the laundry; (3) additional blood in the bathroom; (4) additional pairs of gloves, including a pair of large black rubber gloves; (5) blood stained shorts and socks; (6) a pair of black high-tech sneakers in Appellant's bedroom; and (7) a loaded .380 semi-automatic handgun in the bedroom closet, which used to belong to the Sam–Calis prior to its disappearance some time before July 31, 1993.

The head stamp on the upper most cartridge in the handgun was identical with that on the empty cartridge casings found at the Sam–Cali house earlier that morning. Officer Lewis identified the horizontal striped shirt, shorts, sneakers, black knit cap, and rubber gloves found at Appellant's house, as those worn by the intruder at the Sam–Cali residence. Further, Sam–Cali identified Appellant as the person who assaulted and raped her.

It was later established that the patterned design of the bruise on Schmoyer's cheek was consistent with the size, design, and wear characteristics of the high-tech sneaker seized from Appellant's bedroom. There was no evidence found to exclude the possibility that the injury on her face was caused by Appellant's sneaker. Similarly, chevron patterns found on the Walkman radio that belonged to Schmoyer and found at the scene of her disappearance corresponded with the shape and spacing of Appellant's sneaker.

The police interviewed Appellant on August 4, 1993. At that time, Appellant told the officers that he drove his two-door Chrysler Laser automobile, and that he never drove his mother's four-door blue Ford Tempo automobile, license plate number ZGP260, except to look for jobs. In fact, at approximately 3:45 a.m. on September 7, 1992, a little less than one month after Burghardt's death, an Allentown police officer made a traffic stop of the blue Ford Tempo that Appellant was operating. On June 3, 1993, another Allentown police officer stopped the blue Ford Tempo at 2:40 a.m. and Appellant, its operator, was cited for driving the wrong way on a one-way street. At about 6:25 a.m. on the day of Schmoyer's abduction and death, June 9, 1993, James Stengel, an Allentown City employee at the Reservoir, saw a blue, four-door automobile (which he later identified as a Ford Tempo) with damage to its right side in the Reservoir parking lot. At about 6:40 a.m. on that day, a carpenter on his way to work identified Appellant as operating a blue automobile and acting strangely only three blocks from the Reservoir. Finally, at about 3:30 a.m. on July 31, 1993, when he sought treatment at the hospital after the last Sam–Cali incident, Appellant was in possession of the blue Ford Tempo automobile, license plate ZGP260, with right side body damage. This automobile was owned by Appellant's mother and was registered to 709 North Kearney Street. Blood patterns subsequently found in the vehicle were later determined to be from Appellant.

Additional evidence also established that Appellant resided at 709 North Kearney Street, Allentown, in August of 1992, when Joan Burghardt was murdered, until September 23, 1992, and again from May 14, 1993, until his arrest on July 31, 1993, during which time Schmoyer and Fortney were murdered and Sam–Cali assaulted. Appellant did not reside in, or visit, Lehigh County between September 23, 1992, and May 14, 1993, because, during this period of time, he was detained in a juvenile placement facility on an unrelated charge. Appellant's residence at 709 North Kearney Street is about: (1) four blocks from 1057 East Gordon Street, where Schmoyer was abducted, and about one mile from the Reservoir where her body was found; (2) five blocks from 1430 East Gordon Street, where Burghardt lived

and was murdered; (3) five or six blocks from 1141 East Highland Street, where Sam–Cali resided and was assaulted; and (4) two miles from 407 North Bryan Street, where Fortney lived and was murdered. It was also established that from 1984 until 1986, Appellant resided at 310 North Second Street, in Allentown, which is less than one block from the place of Fortney's murder.

On October 12, 1993, relating to the three incidents involving Sam–Cali, Appellant was charged with Information Nos. 2450/1993, 2451/1993, and 2452/1993, which included three counts of burglary and related offenses, two counts of attempted homicide, one count of rape and related offenses, multiple counts of aggravated indecent assault, and one count of firearms not to be carried without a license. On the same day, the Commonwealth informed Appellant that it intended to try these Informations together. Subsequently, on February 8, 1994, the Commonwealth filed additional Informations against Appellant in the following order: (1) as related to the Schmoyer homicide, No. 0055/1994, which included charges of criminal homicide, kidnapping, rape, aggravated indecent assault, and indecent assault; (2) as related to the Burghardt homicide, No. 0056/1994, which included charges of criminal homicide, burglary, criminal trespass, rape, aggravated indecent assault, and indecent assault; and (3) as related to the Fortney homicide, No. 0058/1994, which included charges of criminal homicide, burglary, criminal trespass, rape, aggravated indecent assault, and indecent assault. Similar to the charges filed on October 12, 1993, the Commonwealth notified Appellant that it intended to try Information Nos. 0055/1994, 0056/1994, and 0058/1994 together.

On February 28, 1994, Appellant entered guilty pleas to: (1) burglary, attempted criminal homicide, and firearms not to be carried without a license in Information No. 2450/1993, in relation to the attack on Sam–Cali on June 29, 1993; (2) burglary in Information No. 2451/1993, in relation to the break-in at the Sam–Cali residence on July 19, 1993; and (3) burglary, attempted criminal homicide, and firearms not to be carried without a license in Information No. 2452/1993, in relation to the events at the Sam–Cali residence on July 31, 1993. Subsequently, the trial court sentenced Appellant to a forty-and-one-half to eighty-one year prison sentence in connection with his guilty pleas.

The parties proceeded on Information Nos. 0055/1994, 0056/1994, and 0058/1994, and, after a trial that lasted from October 10 through November 8, 1994, a jury found Appellant guilty of three murders of the first degree and all of the other offenses relating to the Burghardt, Schmoyer, and Fortney homicides. Following the penalty phase of the trial, on November 10, 1994, the jury sentenced Appellant to death for each of the three first-degree murder convictions. The jury found the following aggravating circumstances in each case: (1) the killing was committed during the perpetration of a felony; (2) Appellant had a significant history of felony convictions involving the use or threat of violence; and (3) Appellant "has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." The jury found the additional aggravating circumstance of "torture" in the Burghardt and Schmoyer homicides.

The jury also found the following as mitigating circumstances pursuant to the "catch-all" provision of 42 Pa.C.S. § 9711: (1) "family background and environment;" (2) "use of alcohol and drugs;" and (3) "school history." *See* Sentencing Verdict Sheets. On November 29, 1994, the trial court imposed additional sentences for the non-capital offenses.

Thereafter, Appellant filed a post-sentence motion on December 8, 1994, alleging various pre-trial and trial errors. On March 28, 1996, he filed a pro se "Clarification Motion for the Appointment of New Counsel," expressing his preference to raise trial counsel's ineffectiveness on direct appeal. On May 6, 1996, Appellant filed a pro se "Motion for Notes of Testimony and for Post Trial Discovery." By order dated May 17, 1996, and filed on May 21, 1996, the trial court relieved Appellant's trial counsel of further representation and appointed new counsel.

Appellant was given until December 9, 1996, to amend his post-sentence motions or file new post-sentence motions. On April 23, 1997, Appellant filed a pro se Supplemental Motion for Relief pursuant to Pa.R.Crim.P. 720, which was dismissed without prejudice to Appellant's right to incorporate it into motions filed by appointed counsel. Thereafter, counsel filed amended post-sentence motions on July 28, 1997, supplemental post-sentence motions on September 15, 1997, and second supplemental post-sentence motions on September 10, 1999. Several evidentiary hearings were held before the trial court during 1998 and 1999. By Order of June 29, 2001, the trial court denied the motions in all respects, except that Appellant's sentences of death for murder of the first degree in the Burghardt and Schmoyer homicides were vacated and a re-sentence proceeding was ordered in accordance with 42 Pa.C.S. § 9711.

*Commonwealth v. Robinson (Robinson I)*, 581 Pa. 154, 174-85 (Pa. 2004).

As the trial court ordered Robinson be resentenced in No. 55, for the murder of Schmoyer and No. 56, for the murder of Burghardt, the trial court resentenced Robinson to a term of thirty-five years to life because he was a minor at the time of the offense in No. 55, and in judgment No. 56, Robinson was resentenced to life without the possibility of parole. Thus, only Robinson's sentence of death for the murder of Fortney, in No. 58, remains.

### III. DIRECT APPEAL PROCEEDINGS

Following his conviction, Robinson filed a direct appeal to the PSC in which he raised approximately sixty substantively independent issues. The PSC separated its opinion into four sections: Pre-trial, Guilt Phase, Penalty Phase, and Prosecutorial Misconduct.

In his Pre-trial Phase, Robinson raised the following issues for review: (1) failure of the trial court to sever the charges involving the different victims, (2) failure of the trial court to grant his motion for change of venue, (3) ineffective assistance of counsel for failure to ask the trial court to modify the procedures employed in Lehigh County to select members of the pool of jurors available to try this case, and (4) ineffective assistance of counsel for failing to pose "life qualification" questions to potential jurors.

In his Guilt Phase, Robinson raised the following issues for review: (1) ineffective assistance of counsel with respect to the DNA testimony of Commonwealth experts by not introducing evidence or cross-examining them with respect to the existence and acceptance of alternative statistical models; (2) that the trial court erred by permitting Denise Sam-Cali to testify because it allowed evidence of prior bad acts and uncharged criminal conduct to be heard by the jury; (3) ineffective assistance of counsel with regard to alleged hypnosis of witnesses Sam–Cali and James Stengel; (4) ineffective assistance of counsel and trial court error for the admission of select photographic, audio, video, and physical evidence at trial; (5) trial court error for the testimony of Karen Schmoyer when she discussed her feelings and thoughts regarding her missing daughter; (6) trial court error for the testimony of Jean Vas describing the scene of the murders; (7) trial court error for the testimony of Lieutenant Dennis Steckel describing that he was familiar with Robinson, knew what school Robinson attended, and where Robinson resided

in 1984 and 1986; and (8) the trial court's statements in front of the jury regarding the testimony of potential witness Latanio Fraticeli.

In his Penalty Phase, Robinson raised the following issues for review: (1) ineffective assistance of counsel for failing to introduce mitigation evidence during the penalty phase of the proceedings; (2) trial court error for allowing the jurors to see photographs of the victims for thirty seconds; (3) trial court error by not granting a continuance to permit Robert Burns to testify; (4) ineffective assistance of counsel for failing to call Robinson as a witness; (5) the jury's determination that the killings of Burghardt and Schmoyer implicated the aggravating circumstance of "torture"; (6) the trial court, the Commonwealth, and both defense attorneys incorrectly referenced to the aggravator expressed in 42 Pa.C.S. § 9711(d)(11), as the "multiple victim" or "multiple killings" aggravating circumstance; (7) the trial court improperly instructed the jury in relation to the aggravator embodied in 42 Pa.C.S. § 9711(d)(11); (8) the trial court erred in response to a jury question regarding the possibility of a life sentence without parole; and (9) ineffective assistance of counsel for failing to move to bar Commonwealth from seeking the death penalty in this case pursuant to various provisions of the United States and Pennsylvania Constitutions.

Lastly, for Prosecutorial Misconduct, Robinson raised the following issues for review: (1) the Commonwealth called Robinson a "predator" in its opening statement, (2) the Commonwealth called Robinson a "territorial predator" in its closing argument, and (3) ineffective assistance of counsel for failing to object to the Commonwealth's statement in its closing argument that Robinson had not expressed remorse for his crimes.

The PSC rejected Robinson's direct appeal issues and affirmed the judgment of sentence.

## IV.    POST-CONVICTION PROCEEDINGS

Robinson filed his Amended Petition for Writ of Habeas Corpus and for Collateral Relief

from Criminal Conviction pursuant to the Post Conviction Relief Act (PCRA) on August 2,

2010. The Amended Petition raised the following issues:

I.    Trial counsel rendered ineffective assistance by failing to adequately investigate and prepare for Petitioner's capital sentencing hearing.

II.    Because of the Petitioner's profound brain damage and young age at the time of the offense, his execution would violate the Eighth Amendment.

III.    Petitioner was denied his right to a fair trial, effective assistance of counsel, and due process in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I Sections 1, 6, 9, 13, and 26 of the Pennsylvania Constitution because of the cumulative effect of the errors described in this amended petition.

After three evidentiary hearings, the PCRA court denied Robinson's petition on June 21,

2012. Following the PCRA court's denial, Robinson appealed to the PSC and presented three

issues for review:

I.    Trial counsel rendered ineffective assistance by failing to investigate and present evidence of Mr. Robinson's severe brain damage, and post-sentence/appellate counsel were ineffective for failing to investigate and raise this issue.

II.    Counsel rendered ineffective assistance by presenting a diagnosis of anti-social personality disorder, supporting the Commonwealth's case for death, and post-sentence/appellate counsel were also ineffective for failing to raise the issue on post-sentence motion and appeal.

III.    Because of Appellant's profound brain damage, his execution would violate the Eighth Amendment.

The PSC rejected these claims. Robinson now brings forth this federal habeas petition,

filed on March 24, 2014. In his federal habeas petition, Robinson presents the following issues

for review:

I. Trial counsel rendered ineffective assistance by failing to adequately investigate and prepare for Petitioner's capital sentencing hearing; post-verdict counsel rendered ineffective assistance by failing to adequately investigate and raise the issue.

II. Counsel rendered ineffective assistance by presenting a diagnosis of antisocial personality disorder, supporting the Commonwealth's case for death, and post-sentence/appellate counsel were also ineffective for failing to raise this issue on post-sentence motion and appeal.

III. Because of Petitioner's profound brain damage, his execution would violate the Eighth Amendment.

IV. The Commonwealth's failure to timely disclose that a key Commonwealth witness had been hypnotized prior to her testimony and initially identified someone else as her attacker violated Petitioner's right to due process, right to a fair trial, and right to be free from cruel and unusual punishment; trial counsel rendered ineffective assistance.

V. The Court's failure to hold a hearing on the impact of hypnosis on the testimony of Ms. Sam-Cali and Mr. Stengel violated Petitioner's right to due process and a fair trial; trial counsel rendered ineffective assistance.

VI. The trial court erred in denying Petitioner's motion to sever; prior counsel ineffectively failed to litigate this claim at trial and on appeal.

VII. Petitioner was denied his right to a fair trial, to a fair and impartial jury and to due process in violation of his rights under the Sixth and Fourteenth Amendments because the jury pool from Lehigh County was saturated with highly prejudicial pretrial publicity. All prior counsel were ineffective for failing to properly litigate this issue at trial and on direct appeal.

VIII. Petitioner should be granted relief from his death sentence because he was deprived of his Sixth, Eighth, and Fourteenth Amendment rights as the result of multiple errors during the voir dire proceedings.

IX. Petitioner is entitled to relief because the trial court's failure to remove several jurors for cause deprived Petitioner of his rights to due process and a fair and impartial jury.

X. Petitioner was denied a fair and impartial jury in violation of his Sixth, Eighth, and Fourteenth Amendment rights where Lehigh County jury selection procedures systematically excluded minorities; prior counsel were ineffective.

XI.   Petitioner was denied his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution where the Commonwealth introduced evidence of other bad acts allegedly committed by Petitioner as well as evidence of Petitioner's propensity for violence and bad character.

XII.   Petitioner was denied his right to due process and the effective assistance of counsel because the Commonwealth repeatedly engaged in prosecutorial misconduct during both the guilty and penalty phases of the trial without objection by trial counsel. The trial court erred by permitting the introduction of this inadmissible and prejudicial evidence.

XIII.   The trial court violated Petitioner's right to compulsory due process, a fair trial and his right to be free from cruel and unusual punishment by failing to grant a short continuance to allow a critical mitigation witness to arrive in court.

XIV.   The trial court's instructions on the meaning of life imprisonment violated the due process clause of the Fourteenth Amendment and the Eighth Amendment of the United States Constitution. Prior counsel were ineffective.

## V.   STANDARDS OF REVIEW

### A. Habeas Standards

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "'limits the power of a federal court to grant habeas relief to a person in custody pursuant to a state court judgment' to when the person's custody is 'in violation of the Constitution or laws or treaties of the United States.'" *Abdul-Salaam v. Sec'y of Pa. Dep't of Corr.*, 895 F.3d 254, 265 (3d Cir. 2018) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 402 (3d Cir. 2012) quoting 28 U.S.C. § 2254(a)). Where a state court adjudicates the merits of a federal claim, a district court may grant habeas relief on that claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

13
090820

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained the two components of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13. To determine whether a state court's application of federal law is "unreasonable," the Court must apply an objective standard, such that the relevant application "may be incorrect but still not unreasonable." *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (citing *Williams*, 529 U.S. at 409-10). The test is whether the state court decision "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc).

With respect to § 2254(d)(2), "[f]actual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." *Dellavecchia v. Sec'y Pa. Dep't of Corr.*, 819 F.3d 682, 692 (3d Cir. 2016) (alteration in original) (quoting *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000)). State court factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams*, 529 U.S. at 411). Rather, "§ 2254(d)(2) requires that we accord the state trial court substantial deference." *Brumfield v. Cain*, 135 S .Ct. 2269, 2277 (2015). If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (alteration in original)).

However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Brumfield*, 135 S .Ct. at 2277 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

If the state court did not address the merits of a federal claim, "'the deferential standards provided by AEDPA . . . do not apply,' and the Court 'must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA.'" *Johnson v. Folino*, 705 F.3d 117, 127 (3d Cir. 2013) (quoting *Taylor v. Horn*, 504 F.3d 416, 429 (3d Cir. 2007); and *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)). A state court decision is "an unreasonable application" of Supreme Court case law only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Abdul-Salaam*, 895 F.3d at 265-66 (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

**B.  Exhaustion of Remedies and Procedural Default**

A habeas petitioner must "exhaust [] the remedies available in the courts of the State" before obtaining habeas relief. 28 U.S.C. § 2254(b)(1)(A). If the state courts have declined to review the merits of a petitioner's claim based on his failure to comply with an independent and adequate state rule of procedure, the claim is procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 262-63 (1989). Although "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion[, as] there are no state remedies any longer 'available' to him," *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), procedurally

defaulted claims cannot be reviewed unless "the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id*. at 750.

For a claim to be exhausted, "[b]oth the legal theory and the facts underpinning the federal claim must have been presented to the state courts, and the same method of legal analysis must be available to the state court as will be employed in the federal court." *Tome v. Stickman*, 167 F. App'x 320, 322-23 (3d Cir. 2006) (quoting *Evans v. Court of Common Pleas, De. Cty., Pa.*, 959 F.2d 1227, 1231 (3d Cir. 1992)). A state prisoner must "fairly present" his federal claims to the state courts before seeking federal habeas relief by invoking "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) ("'Fair presentation' of a claim means that the petitioner 'must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.'")). The habeas petitioner bears the burden of proving exhaustion of all state remedies. *Boyd v. Waymart*, 579 F.3d 330, 367 (3d Cir. 2009) (quoting *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997)).

"Exhaustion is not a jurisdictional requirement, but rather a rule of comity, and a federal court may in certain circumstances decide the merits of a claim despite non-exhaustion." *Evans*, 959 F.2d at 1231. A district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim." *Id*. (quoting *Granberry v. Greer*, 481 U.S. 129, 135 (1987)). Like the exhaustion requirement, the doctrine of procedural default is grounded in principles of comity and federalism. As the Supreme Court has explained:

In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

*Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (quoting *Coleman*, 501 U.S. at 732). To demonstrate cause and prejudice, the petitioner must show some objective factor external to the defense that impeded counsel's efforts to comply with some state procedural rule. *Slutzker v. Johnson*, 393 F.3d 373, 381 (3d Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To demonstrate a fundamental miscarriage of justice, a habeas petitioner must typically demonstrate actual innocence. *Schlup v. Delo*, 513 U.S. 298, 324-26 (1995).

## C. Ineffective Assistance of Counsel Standards

A claim for ineffective assistance of counsel is grounded in the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). To prevail on a claim for ineffective assistance of counsel, a habeas petitioner must demonstrate both that (1) his attorney's performance was deficient, i.e., that the performance was unreasonable under prevailing professional standards, and (2) that he was prejudiced by his attorney's performance. *Strickland*, 466 U.S. 668, 687-88, 690-92. Counsel's deficiencies must be "so serious" that he "was not functioning as the 'counsel' guaranteed" to petitioner by the Sixth Amendment. *Id*. at 687. This standard is "highly deferential" to defense counsel, as "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 689-90. It is presumed that "counsel's conduct might have been part of a sound strategy," and "if the Commonwealth can show that counsel actually pursued an informed strategy (one decided upon after a thorough investigation of the

relevant law and facts), the 'weak' presumption becomes a 'strong' presumption, which is 'virtually unchallengeable.'" *Thomas v. Varner*, 428 F.3d 491, 499-500 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).

The Court "may address the prejudice prong first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014) (alteration in original) (quoting *Strickland*, 466 U.S. at 697). Prejudice is proven if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Consequently, counsel cannot be found to be ineffective for failing to pursue a meritless claim. *See United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015) ("[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") (quoting *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999)).

In reviewing Robinson's ineffective assistance of counsel claims for post-conviction relief, the PSC applied Pennsylvania's ineffectiveness standard, *see Commonwealth v. Pierce*, 527 A.2d 973, 974-75 (Pa. 1987), which requires a defendant to establish that: (1) his underlying claim has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) resulting prejudice. The United States Court of Appeals for the Third Circuit has held that the *Pierce* standard comports with the clearly established federal *Strickland* standard. *Werts*, 228 F.3d at 203-04. As a result, Robinson must establish that the Pennsylvania courts' application of *Pierce* was "not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citations omitted). However, the Supreme Court has instructed that "[s]urmounting *Strickland*'s high bar is never an easy task." *Nguyen v. Attorney Gen. of N.J.*, 832 F.3d 455, 465

(3d Cir. 2016) (alteration in original) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Thus, the *Strickland* standard must be applied "'with scrupulous care,'" which makes it "all the more difficult" to "[e]stablish[ ] that a state court's application of *Strickland* was unreasonable under § 2254(d)." *Id.* (quoting *Premo v. Moore*, 562 U.S. 115, 122 (2011)).

## V.   ANALYSIS

### A.  Issue One

In Issue One, Robinson argues both his trial counsel and PCRA counsel were ineffective by failing to produce evidence of his brain damage throughout his life. Robinson argues his trial counsel was ineffective for failing to provide evidence of his brain damage to the jury during the penalty phase, which potentially could have mitigated his sentence. Additionally, Robinson objects to the factual determination issued by the PSC in light of the conflicting testimony regarding the records production. Furthermore, Robinson avers his post-verdict counsel was ineffective for failing to conduct an investigation into failure to investigation Robinson's juvenile records for evidence of neurological impairment. Lastly, Robinson asserts the PSA ruling was incorrect based upon the evidence presented of his brain damage throughout the PCRA litigation.

The United States Supreme Court's application of the *Strickland* standard with regard to defense counsel's duty to investigate mitigating evidence provides relevant guidance in this case. In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court concluded that trial counsel was ineffective because his representation of the petitioner during the penalty phase of the trial did not meet professional standards and prejudiced the petitioner. *Williams*, 529 U.S. at 395–97.

The record in *Williams* established that trial counsel did not begin to prepare for the penalty phase until a week before the trial. *Id.* at 395. The record also demonstrated that trial

counsel presented the testimony of three witnesses during the penalty phase: petitioner's mother, two neighbors who briefly described the petitioner as a "nice boy" and not violent, and a taped excerpt of a psychiatrist who explained that, during an earlier robbery, the petitioner removed the bullets from a gun to ensure no one was physically injured. *Id.* at 369.

However, the United States Supreme Court held that trial counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395. The Court also explained that trial counsel failed to introduce available evidence that petitioner was "borderline mentally retarded" or to seek prison records, which demonstrated petitioner's commendable acts and nonviolent behavior. *Id.* at 396.

Furthermore, the United States Supreme Court in *Williams* explained that although not all of the additional evidence was favorable, "the failure to introduce the comparatively voluminous amount of evidence that did speak in [petitioner's] favor was not justified by a tactical decision to focus on [petitioner's] voluntary confession." *Id.* The Supreme Court held that these omissions "clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the [petitioner's] background." *Id.*

Finally, the Supreme Court determined that the state supreme court's determination that petitioner was not prejudiced was unreasonable because it failed to evaluate all of the mitigation evidence available to trial defense counsel. *Id.* at 397–98.

In *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), the United States Supreme Court emphasized that the focus of the inquiry regarding whether counsel exercised reasonable professional judgment, "is not whether counsel should have presented a mitigation case," but,

rather, "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background was itself reasonable." The Court further explained that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Wiggins*, 539 U.S. at 527.

Based on this rationale, the United States Supreme Court in *Wiggins* concluded that trial counsel were ineffective for "abandon[ing] their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" and "in light of what counsel actually discovered" in the records they did obtain. *Id*. at 524–25.

Specifically, the record in *Wiggins* demonstrated that trial counsels' investigation drew from three sources: (1) the results of a psychological testing, which revealed that petitioner had difficulty coping with demanding situations and exhibited features of personality disorder; (2) the presentence investigation report; and (3) records from Baltimore County Department of Social Services detailing petitioner's placements in multiple foster homes. *Id*. at 523.

Finally, after reweighing the evidence in aggravation against the totality of available mitigating evidence, the United States Supreme Court concluded that the petitioner was prejudiced by counsel's ineffectiveness. The Supreme Court reasoned that the petitioner's sentencing jury only heard one significant mitigating factor, and "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference [sic] balance." *Id.* at 537.

Furthermore, counsel's duty to investigate mitigating evidence persists even in the absence of support from petitioner. In *Rompilla v. Beard*, 545 U.S. 374, 377 (2005), the United States Supreme Court held "that even when a capital defendant's family members and the

defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."

Similarly, in *Porter v. McCollum*, 558 U.S. 30 (2009), the United States Supreme Court held that although the petitioner was fatalistic and uncooperative in trial counsel's investigation, counsel still must "conduct some sort of mitigation investigation." *Id.* at 40.

In *Rompilla*, trial counsel interviewed petitioner and five family members and consulted with three mental health experts in an effort to uncover mitigation evidence. *Rompilla*, 545 U.S. at 381–82. The petitioner's contributions were minimal and he "was even actively obstructive by sending counsel on false leads." *Id.* at 381. The state postconviction court characterized trial counsel's interviews of family members as "detailed." *Id.* at 381–82.

Defense trial counsel in *Rompilla* did not seek petitioner's education records, medical records, records of his adult and juvenile incarcerations, or the record of petitioner's prior conviction. *Id.* at 382. However, had trial counsel obtained the record of petitioner's prior conviction, "[t]he accumulated entries would have destroyed the benign conception of [petitioner's] upbringing and mental capacity" that trial counsel gleaned from only talking with the petitioner and his family members. *Id.* at 391.

The United States Supreme Court in *Rompilla* held that this ineffective assistance of trial counsel prejudiced the petitioner because "the undiscovered evidence, taken as a whole, might well have influenced the jury's appraisal' of [petitioner's] culpability." *Id.* at 393.

The United States Supreme Court has subsequently confirmed that *Williams*, *Wiggins*, and *Rompilla* present the appropriate standards for evaluating whether counsel's performance was deficient at the penalty phase. *Cullen v. Pinholster*, 532 U.S. 170 (2011). The Supreme

Court additionally confirmed that *Strickland* requires a case-by-case analysis of the evidence available and the circumstances faced by defense counsel when evaluating the reasonableness of counsel's investigation into mitigating circumstances. *Cullen*, 563 U.S. at 194-96.

In *Cullen*, the United States Supreme Court concluded that defense counsel was not ineffective in presenting sparse mitigating evidence because his client was so unsympathetic that counsel's decision to only call his client's mother at the penalty phase, in an attempt to create sympathy for his client's family, was a reasonable strategy in light of the circumstances. *Id*. at 195-96.

The Supreme Court in *Cullen* held that because of defendant's extensive criminal past and lack of remorse, counsel's reasonable decision to focus on creating sympathy for defendant's family made "particular investigations unnecessary," such as seeking mitigating evidence to "humaniz[e] the defendant." *Id*. Further, the Supreme Court explained that the state court reasoning that defendant was not prejudiced was entitled to deference because the additional available mitigation evidence largely duplicated the evidence already presented during the proceedings and, further, was of questionable mitigating value. *Id.* at 200.

The basis of Robinson's argument is premised upon the allegedly inconsistent testimony submitted by the parties during the PCRA phase of the litigation and the PCRA and PSA courts determination of those factual disputes. The Commonwealth asserts the school records were provided to Robinson while Robinson asserts he did not receive the records.

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a

determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations; the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

### i. Failure to provide records

Robinson first argues his trial attorneys, Carmen Marinelli and James Burke, failed to provide his school records to the defense expert, Dr. Robert Sadoff, which could have established brain damage evidence to be presented to the jury as mitigating evidence. The Commonwealth counters on the basis that the PCRA and PSA court correctly determined the factual dispute in favor of the Commonwealth because Burke testified he crossed the street from the Lehigh County Court of Common Pleas to the Allentown School District building to procure Robinson's records for expert review. The PSC credited trial counsel's testimony over Dr. Sadoff as follows:

> This case is unlike many other capital PCRA matters involving allegations of an ineffective failure to investigate, because here there is no doubt that penalty phase counsel obtained the school records. Counsel so testified at the PCRA hearing, and his account was consistent with his post-trial testimony more than ten years earlier. Counsel specifically remembered walking across the street to obtain the Allentown School District records and expressed a similarly clear recollection with regard to obtaining the other school records, including the records from Harbor Creek. N.T., 11/13/98, at 7–8. The critical factual inquiry before the PCRA court was whether counsel provided the records to Dr. Sadoff.
>
> The PCRA court, which had the opportunity to hear both penalty phase counsel and Dr. Sadoff testify, and observe their respective demeanors, specifically credited the testimony of penalty phase counsel over that of Dr. Sadoff. The PCRA court further explained that counsel's recollection was more specific and was supported by his testimony regarding his strategy at the penalty phase. The PCRA court noted that counsel's belief that Dr. Sadoff's role as an impartial expert was critical to

mitigation lent credibility to counsel's statement that there was no reason why he would have obtained the records and not provided them to Dr. Sadoff. The PCRA court also found that penalty phase counsel "convincingly" testified that if Dr. Sadoff had suggested further testing, he would have pursued it since this was precisely the type of guidance he was seeking from his expert. But, no person, including Dr. Sadoff, ever suggested that further testing was warranted. In contrast to counsel's testimony, the PCRA court noted that Dr. Sadoff "had no independent recollection" of whether he had received the school records, but instead relied solely on the absence of a reference to school records in his report. The PCRA court also emphasized that Dr. Sadoff's report stated that he had reviewed records, "including the following," which left open the possibility that he had reviewed additional records that were not listed in his report. Although Dr. Sadoff attempted to explain that notation, the PCRA court was not obliged to credit the explanation. Finally, the PCRA court noted that Dr. Sadoff testified that he normally requested all relevant records and it seemed likely "that he would have requested" the school records at issue here, "or at least made a note regarding any gaps or omissions." PCRA court opinion at 10. To the PCRA court's specific explanation may be added the fact that guilt phase counsel corroborated that the defense had given all of the records they had to Dr. Sadoff.

*Commonwealth v. Robinson* (*Robinson II*), 623 Pa. 345, 368-70 (Pa. 2013).

Here, after review of the relevant transcripts, the PCRA and PSA courts did not issue an unreasonable credibility determination regarding the conflicting testimony of Burke and Dr. Sadoff. Robinson failed to establish the PCRA and PSA courts issued an unreasonable credibility determination by clear and convincing evidence. Indeed, the testimony by Burke, shows his specific testimony compared to Dr. Sadoff as follows:

And when I say I served the subpoenas, too, I actually personally picked up the documentation, whether it was at St. Gabe's Hall, and driving down to Audubon, or whether it was walking across the street, which as I said was the most convenient of all, to the Allentown School District, but physically, physically, went out of my way to acquire these documents.

N.T. 12/17/2020, at 56. Conversely, Dr. Sadoff, testified he did not remember the facts of the case other than what his reports stated. N.T. 12/20/2010, at 30-31. The PCRA and PSA courts were faced with the arduous task of compiling testimony of an event that occurred approximately

sixteen years prior. In this arduous task, they elected to support the testimony of the more specific Burke rather than the generalized Dr. Sadoff. This was not an unreasonable decision.

Robinson attempts to argue the alleged inconsistent testimony of Burke should warrant a reversal of the ruling of the PCRA and PSC courts. The PSC court addressed the alleged inconsistency as follows:

> As with his first argument, this theory was one for appellant to pose to the PCRA court, in the hope that the court would credit Dr. Sadoff's account over that of trial counsel, an account which itself was corroborated by co-counsel. It is no basis upon which this Court can set aside the PCRA court's credibility determination. Moreover, we are disinclined to credit the suggestion that a member of the bar should be deemed to have misrepresented the facts, under oath, when the accusation, as here, is based entirely upon speculation. The fact that penalty phase counsel wanted to limit the damaging information that was presented to the penalty phase jury does not ineluctably mean that he limited Dr. Sadoff's access to this information, much less that he falsified testimony under oath by testifying that he had provided the records.

*Robinson II*, 623 Pa. at 371. The PSC court's analysis on this alleged inconsistent testimony is not unreasonable. Both the PCRA and PSC courts needed to make a credibility determination. It is unlikely Burke and Marinelli would perjure themselves, and risk disbarment, by lying. As discussed, the courts elected for the more specific testimony. Robinson has merely restated this argument at all three levels. After review, the credibility determination was not unreasonable, and Robinson failed to meet his burden of clear and convincing evidence.

### ii. Burke's alleged failure to review Robinson's school records

Robinson argues Burke was ineffective because he failed to properly review the school records, assuming he provided the school records to Dr. Sadoff, and inquire of Dr. Sadoff about potential "red flags" in the documents. The Commonwealth counters that Burke did review the records, did not notice any "red flags," and presented such documents to Dr. Sadoff for expert review. The PSC addressed this issue as follows:

Appellant's alternative argument that trial counsel was ineffective for failing to independently recognize possible mental health issues arising from the decrease in appellant's scores on the two IQ tests, as well as the competency evaluation by Dr. Gross also fails. In light of the PCRA court's supported credibility determination that the records were provided to Dr. Sadoff, and Dr. Sadoff's unquestioned expertise, the Court would be hard pressed to fault trial counsel for failing to perceive a mental health "red flag" when the same information did not raise a red flag with the expert hired specifically for that purpose. This Court has made clear that in applying *Strickland*, courts must be careful not to conflate the roles and professional obligations of lawyers and experts, and cannot demand that counsel, who otherwise act reasonably (as, for example, by hiring a mental health expert), recognize psychological "red flags." *See* [*Commonwealth v. Lesko*, 15 A.3d 345, 382 (Pa. 2011)]. Appellant makes a bald assertion that counsel should have pointed out the decrease in the childhood IQ scores to his expert, but never explains why this should have raised a "red flag" to a lawyer, who is unschooled in mental health matters.

*Robinson II*, 623 Pa. at 373.

Indeed, Burke's own testimony supports that he analyzed all of Robinson's documents, including school and juvenile placements. N.T. 12/17/10, at 60. However, Robinson asserts this is insufficient and cites to *Winston v. Kelly*, 784 F. Supp. 2d 623 (W.D. Va. 2011) to support his theory. *Winston* was a capital case in which the defendant presented evidence that he was mentally retarded, a fact not presented to his state's post-conviction relief court. *Winston*, 784 F. Supp. 2d at 625-26. The defendant's counsel did not review his records which could show mental retardation; rather, he submitted those documents to an expert for review. *Id*. at 628. Consequently, the defendant's counsel failed to argue the defendant is mentally retarded and not subject to a sentence of death. *Id*. at 632. Thus, the court found the defendant's performance insufficient because:

> Winston's trial counsel essentially testified that had they seen Winston's 1997 mental retardation classification, evidence that they had gathered, they would have claimed that Winston was mentally retarded and not eligible for the death penalty under *Atkins* and that they had no strategic reason not to pursue such a defense. But they did not review the records because they simply shipped them to their expert, Dr. Nelson, and expected him to tell them what they needed to know. As the court views it, Dr. Nelson was not responsible for telling counsel what they needed to

know. Rather, they were responsible for knowing what evidence they had and for asking him searching questions raised by that evidence.

*Id*. Here, the Court finds *Winston* inapposite because in *Winston*, counsel admitted to not reviewing his client's records. In this instance, Burke testified, and the PCRA and PSA courts credited, that Burke reviewed the records of Robinson. As Dr. Sadoff did not recognize any "red flags," Dr. Sadoff and Burke appear to have an implicit agreement that there are no "red flags" in the record of Robinson. Burke did not blindly send the documents to Dr. Sadoff for review like the counsel in *Winston*. Rather, he reviewed them as well.

Thus, the PCRA and PSA did not unreasonably rule that Burke reviewed the records of Robinson. Similar to issuing a credibility determination regarding whether Burke acquired Robinson's school records, the PCRA and PSA needed to issue a determination on the review of records. The determination that Burke reviewed the records was not unreasonable. Accordingly, the PCRA and PSA courts did not unreasonably rule Burke reviewed Robinson's school records.

### iii. Evidence of brain damage

Robinson asserts his trial counsel should have presented evidence of brain damage as mitigating evidence. He asserts this evidence would have explained his conduct, showing he was incapable of making his own decisions and help further explain his anti-social personality disorder. Lastly, he asserts this evidence would have persuaded at least one juror not to find for the death penalty. The PSC addressed the issue as follows:

> In this case, even assuming that the evidence of brain damage (whether mild or severe) that appellant marshaled for PCRA review would have led his jury to find a second mitigating circumstance, *see* 42 Pa.C.S. § 9711(e)(3) (ability of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired), appellant must still establish, within a reasonable probability, that at least one juror would have found that the mitigating circumstances outweighed the aggravating circumstances. We agree with the PCRA court that appellant has not proven *Strickland* prejudice.

This was an extremely difficult case for any attorney. Appellant brutally raped and murdered three women. The jury also heard from the surviving fourth victim, Denise Sam–Cali, who identified appellant as the man who raped and attempted to kill her in the month-long period between appellant's second and third rapes and murders. All of the crimes occurred within a year, and in the same general area of Allentown. One of the murders involved a fifteen-year-old girl. The jury found appellant guilty of all charges, including the three murders. Thus, before the penalty phase began, the jury knew that appellant was a serial rapist and killer, a member of one of the most dreaded and notorious classes of killers in today's society.

During the penalty phase that followed, the jury had available to it not only the grisly facts surrounding the serial rapes and murders and the assault on Denise Sam–Cali, but was also presented with evidence related to appellant's assault on a school teacher, which was introduced to establish the separate significant felony history aggravator. Thus, the evidence of the murders of Ms. Burghardt and Ms. Schmoyer, as well as the two assaults, provided evidence supporting the jury's determination that appellant had a significant history of violent felonies. Additionally, the jury was presented with evidence, and ultimately found, that two of the murders involved the aggravating circumstance of torture.

On the other side of the equation is the mitigator the jury already found, while still returning three death sentences, now supplemented by appellant's proffer respecting brain damage. Notably, however, any defense expert testimony as to brain damage would have been subject to cross-examination and rebuttal, which may have undermined or diminished the force of the mitigation, as demonstrated by the counter-testimony offered by the Commonwealth at the PCRA hearing. Within this context, we see no error in the PCRA court's finding that there was not a reasonable probability that expert opinion evidence respecting appellant's brain damage would have resulted in a different weighing and a different penalty verdict. The aggravating circumstances related to the murder of Jessica Jean Fortney were grievously serious, and embraced the other two rapes and murders and the attack on Ms. Sam–Cali. *See, e.g.*, *Lesko*, 15 A.3d at 383–84 (discussing *Smith v. Spisak*, 558 U.S. 139, 154–55 (2010) and expressing that where there is substantial aggravating evidence it may be particularly difficult to prove *Strickland* prejudice based on potential mitigation evidence submitted on collateral review); *see also Gibson*, 19 A.3d at 531. This is not a case where a verdict of death was only sufficiently supported by the record; the death sentence for murdering Ms. Fortney was imposed with "overwhelming record support." *See Lesko*, *supra*. Accordingly, appellant has not established that he was prejudiced by any alleged failure of trial counsel in this regard. For this independent reason, his derivative Sixth Amendment claim as to appellate counsel also fails.

*Robinson II*, 623 Pa. at 375-76.

Here, the PSC did not unreasonably apply clearly established federal law in determining the status of Robinson's brain damage evidence. Robinson asserts this evidence would convince at least one juror to not seek the death penalty because he could not control his emotions; however, the evidence produced at trial shows Robinson possessed the ability to plan, stalk, and murder numerous victims. As the PSC correctly noted, the jurors heard strong evidence of Robinson's actions, and found in favor of the aggravating circumstances. Moreover, Dr. Sadoff, the person who personally analyzed Robinson at the time of trial, did not see Robinson's IQ or mental health as an issue. *See* PCRA Opinion, p. 17. Moreover, Robinson's own expert, Dr. Martell, admitted Robinson was still capable of performing some very complex tasks and his impairments did not directly mitigate the offenses for which he was convicted. Thus, the jury would have seen this whole picture, and Robinson's assertion that this evidence would have been a cure-all would have been belied by the record, especially when his own experts admit he was capable of making his own decisions.

Furthermore, Robinson's reliance on cases such as *Winston* are inapposite. Unlike in *Winston*, Robinson's defense counsel did argue Robinson's mental handicap of anti-social personality disorder. The attorneys in *Winston* failed to broach the subject of their client's mental illness. Robinson's own expert stated he did not notice any mental health issues. The PSC correctly credited such testimony. Accordingly, the PSC did not unreasonably apply federal law in determining Robinson's brain health evidence.

### iv.  Finding regarding neurological testing

Robinson asserts because his trial counsel did not provide his school records to Dr. Sadoff that Dr. Sadoff did not see the twenty-six-point drop in Robinson's IQ score. Robinson's IQ score dropped from 126 to 100. Robinson argues if Dr. Sadoff saw this drop, he would have

recommended neurological testing. However, this Court previously stated that it was not unreasonable for the PSC to rule that Robinson's trial counsel did provide the relevant documents to Dr. Sadoff for review. This was a credibility determination made by the PSC and it was not unreasonable. Nonetheless, the PSC addressed the issue of neurological testing as follows:

> The PCRA court's tangential observation respecting the availability of neuroimaging in 1994 indeed did not consider whether neuropsychological testing was available, as appellant notes. Given that the court's primary finding respecting the delivery of the records to Dr. Sadoff was supported, however, that error is of no moment.

> In any event, we note that, as frequently seems to be the case with mental health experts, the experts expressed disagreement over the significance of a decrease in IQ testing scores as a "red flag" that would have placed an expert on notice that further neuropsychological testing was warranted. Drs. Sadoff and Martell suggested that the decrease in performance in the second IQ test would have indicated further testing, but the Commonwealth's experts explained that such a decrease could be attributed to external factors, such as appellant's educational experience, given that he was inattentive in school and placed in special classes because of his behavior, and his desire to perform on the test. Additionally, all of the experts generally agreed that IQ is not necessarily an indicator of brain damage. Given its mistaken focus on neuroimaging, the court below did not resolve this dispute; but, as noted, that error is of no moment given that the predicate fact necessary to make this second step relevant was not established.

*Robinson II*, 623 Pa. at 374, n. 8.

Here, the PSC did not unreasonably apply federal law. Though Robinson's IQ dropped from 126 to 100, but both of these scores are within the normal range. While Robinson focuses on the drop, he avoids the argument that it is still within the normal range. Additionally, the PSC needed to make a determination amongst competing experts. Dr. Sadoff, who Robinson relies upon heavily in his argument, did not remember analyzing Robinson at the time of his trial; thus, he needed to utilize his records from the years prior at Robinson's trial. However, the PSC correctly noted all of the experts generally agreed that IQ is not necessarily an indicator of brain

damage. In any event, Robinson's IQ is normal. Moreover, this Court noted earlier that

Robinson's brain damage would not be cure-all because there was strong evidence that Robinson

planned and performed numerous murders. The jurors heard this evidence and elected for

aggravating factors as a result. Accordingly, the PSC did not unreasonably apply federal law in

its ruling regarding the neurological testing of Robinson.

### v. Natural drop in IQ

Robinson asserts the PSC incorrectly ruled his IQ drop was due to external factors. The

PSC addressed the issue as follows:

> Furthermore, the PCRA court explained there was some dispute among the
> proffered experts as to whether the drop in IQ reflected in the two test scores was
> indicative of possible brain damage, or whether the decrease was attributable to
> external factors other than brain damage. In any event, the PCRA court was
> ultimately persuaded that appellant could not establish that the outcome of the
> penalty proceeding would have been altered given the magnitude of his crimes. The
> PCRA court summarized its rejection of this ineffectiveness issue as follows:

> In sum, [appellant]'s claim for relief hinges on the drop in his IQ scores between
> 1981, when he was six years old, and 1989, when he was fourteen years old.
> Although all experts agree to some extent that this diminution is "significant," the
> "low" score of 100 may have been caused by external factors, such as a poor
> education, during the intervening period as opposed to some cognitive impairment
> of [appellant]'s brain. In any event, even the score of 100 indicates a "normal"
> brain. Under those circumstances, it cannot be said that Dr. Sadoff, an experienced
> clinical psychiatrist, should have referred [appellant] for additional testing, much
> less that trial counsel was somehow ineffective for relying on Dr. Sadoff. Nor has
> it been established that the brain imaging studies subsequently used by [appellant's
> expert] in his evaluation of [appellant], would have been available to test and
> diagnose [appellant] in 1994 even if a consensus regarding a diagnosis does exist
> under present day standards. More to the point, in view of the overwhelming weight
> of the aggravating circumstances in this case, in the form of brutal serial rape and
> murder, and in light of the credible expert witness testimony presented by the
> Commonwealth regarding [appellant]'s manifest ability to utilize executive brain
> function to carefully plan and execute these crimes, there is no probability that the
> calculus of any reasonable juror would have been altered by the claims of front lobe
> impairment upon which [appellant] now bottoms his argument.

> PCRA court opinion, 6/21/12, at 17–18.

*Robinson II*, 623 Pa. at 355-56.

Here, the PSC did not unreasonably rule on Robinson's IQ score, which is in the normal range. The PSC utilized the term "may," not "shall." The PSC issued this determination because the of inconclusive expert testimony and legal arguments regarding this IQ drop. Nonetheless, this drop in IQ is 100, a normal score. This is indicative of a normal brain. As the experts were inconclusive, the PSC could not issue a firm decision on the IQ drop. But, the drop is not as catastrophic as Robinson asserts. His IQ level still remained at normal levels. The expert testimony showed he was capable of making his own decisions. This was established as Robinson planned the multiple murders of which he was accused. Furthermore, in light of the strong aggravating testimony, the jurors would have heard a drop in IQ, then realize through rebuttal evidence that the score was still in the normal range. Robinson's theory relies upon the hypothetical that his counsel should have further inquired as to the status of Robinson's brain and that status update would have persuaded the jury. This hypothetical is belied by the record, and Robinson's own expert Dr. Sadoff. Accordingly, the PSC correctly ruled regarding the drop of Robinson's IQ score, which remained in the normal range.

### vi. The testimony of Dr. Martell and Dr. Gur

Robinson asserts the PSC incorrectly credited the testimony of the Commonwealth's experts over his experts, Dr. Martell and Dr. Gur merely because the Commonwealth presented contrary testimony. However, it is squarely within the role of the PCRA court and PSC to rectify conflicting testimony and issue a determination. Issue One is laden with factual determinations the PCRA court and PSC needed to determine; this issue is no different. Robinson's brain damage is not as egregious as he claims, and his IQ score is within the normal range as the expert who analyzed him at the time of trial found no issues worthy of his brain damage. Accordingly,

the PSC did not unreasonably rule by crediting the testimony of the Commonwealth's expert over Dr. Martell and Dr. Gur.

### vii. Ineffectiveness of post-verdict counsel

Robinson asserts that post-verdict counsel was also ineffective for: (1) failing to conduct an investigation into Robinson's mental health, (2) failing to speak with Dr. Sadoff, (3) failing to gather Robinson's records besides his probation documents, (4) being unaware of Robinson's IQ drop, and (5) failing to present mitigating evidence contained in the Allentown School District and Harbor Creek records during the post-verdict evidentiary hearings. Robinson argues that but for these omissions, post-verdict counsel would have argued that trial counsel was ineffective for failing to investigate and present evidence of Robinson's alleged brain damage.

As is discussed above, the Court agrees with the state court's decision that there was no merit to Robinson's argument that trial counsel was ineffective for failing to pursue this course. Post-verdict counsel cannot be ineffective for failing to pursue this meritless claim. Given the conclusion that trial counsel provided Dr. Sadoff with the records indicating the IQ drop discussed above, Robinson's own expert, Dr. Sadoff, failed to identify "red flags," thus creating an implicit agreement amongst Dr. Sadoff, trial counsel, and post-verdict counsel that there were not any "red flags." Besides a conclusory remark on this claim, Robinson presents no additional evidence to support his claim against post-verdict counsel. The state court's ruling was not unreasonable in light of the facts presented.

### B. Issue Two

In Issue Two, Robinson argues his trial counsel rendered ineffective assistance of counsel by introducing evidence of his antisocial personality disorder (APSD) because this type of evidence actually contains aggravating value and not mitigating value. The Commonwealth

argues Robinson's trial counsel pursued every option, including APSD, because the

Commonwealth would have used it against Robinson. The PSC addressed the issued as follows:

> Appellant's argument, conveniently enough, completely ignores penalty phase counsel's explanation for presenting Dr. Sadoff's testimony. Counsel was aware of the potentially damaging nature of the testimony, but counsel also believed that if he did not provide Dr. Sadoff's diagnosis to the jury, the Commonwealth would have. Counsel further explained that he wanted Dr. Sadoff to testify so the jury would hear an "outside, impartial voice:" "[Dr. Sadoff] was going to synthesize much of the background of [appellant]'s life, and also explain it to the jury." Additionally, counsel believed the diagnosis would explain appellant's life circumstances and his reaction to those circumstances, which made it one part of the broader picture that was appellant's life. In counsel's view, the diagnosis was only one facet of appellant's life history, which also included his impoverished background, his lack of appropriate role models, and his drug and alcohol abuse. N.T., 12/17/10, at 36, 42, 46–47.

> The PCRA court, which did not address the claim at length, credited counsel's explanation, noting that trial counsel was aware that the diagnosis would be revealed on cross-examination, and so he determined to deal with it "proactively in the full context of Dr. Sadoff's professional medical explanation," and attempt to use it as best he could. *See* PCRA court opinion, 6/21/12, at 7–8.

> As in all matters where counsel's effectiveness is being challenged, this Court must be careful to assess counsel's performance without the distortion of hindsight, and must instead reconstruct the actual circumstances under which counsel's decisions were made. *Commonwealth v. Birdsong*, 24 A.3d 319, 333 (2011).

> Penalty phase counsel offered reasoned explanations for his strategy, which are supported by the record, and were credited by the PCRA court. Counsel believed that Dr. Sadoff's testimony would give jurors a perspective that appellant's family members and friends could not offer. However, he also knew that if he presented Dr. Sadoff's affirmatively helpful testimony, he necessarily had to address the antisocial personality disorder diagnosis. This was not a circumstance created by counsel, but a practical reality arising from the truth of the type of being his client is. Thus, counsel was left with a difficult choice of presenting no "impartial and objective" expert evidence through the testimony of Dr. Sadoff, and therefore limiting the jury's understanding of the family and historical testimony that was presented, or presenting Dr. Sadoff's testimony, including the diagnosis, to present a full human picture of his client, while attempting to make use of the antisocial personality disorder diagnosis as best he could. He chose the latter course of action, which falls in the realm of strategy.

> Now, with the aid of hindsight, appellant suggests that trial counsel was constitutionally obliged to proceed differently, and pursue a half-truth and an

incomplete picture. That is indeed one possible strategy. But, in assailing penalty phase counsel, appellant proceeds upon the questionable and simplistic assumption that mental health diagnoses may, indeed must, be categorized as a matter of law: they either provide aggravating evidence or mitigating evidence. The reality obviously is more complex, and counsel was not precluded from assessing the situation in light of the complexity. The Commonwealth in the penalty phase seeks death; a strategy that seeks to secure life in prison by presenting a full picture of the subject of the proceeding, with an explanation for his behavior, is not inherently unreasonable.

Appellant complains that the evidence was prejudicial because a person with antisocial personality disorder commits crimes, and the evidence may have reinforced in the minds of the jurors that appellant was an out of control individual who was dangerous. But, surely the jury had enough before it from the facts presented to them concerning appellant's three rapes and murders, and his fourth rape and attempted murder, to already draw that conclusion.

In any event, even with the aid of hindsight, any court would be hard pressed to find counsel ineffective based upon his chosen course of action in these circumstances, and no reasonable court could suggest that counsel's chosen course establishes Strickland prejudice. Without the testimony of Dr. Sadoff, appellant's case in mitigation would have been paltry, especially in the face of the mountain of aggravating circumstances. Had counsel acted as appellant now says he should have, counsel no doubt would be faulted for failing to present Dr. Sadoff's expert testimony. Penalty phase counsel appreciated, and best expressed, the dilemma himself when he said, "We didn't retain [Dr. Sadoff] for purposes of having him opining [sic] that he was an anti-social personality disorder, thanks for the diagnosis, I can't wait to run with this to the jury," but the diagnosis "came out. It had to be explained." N.T., 12/17/13, at 51–52. Accordingly, appellant has not established that counsel was ineffective for presenting the testimony of Dr. Sadoff, which necessarily included the antisocial personality disorder diagnosis.

*Robinson II*, 623 Pa. at 378-81.

Here, counsel was not ineffective in presenting testimony of Robinson's APSD. Burke's expert, Dr, Sadoff, testified at Robinson's PCRA hearing as follows addressing APSD as a potential mitigating factor at the time of Robinson's trial: "Usually today, however, it's not. Although people are still writing about it as a mitigating factor in death penalty cases." N.T. 12/20/10, at 29-30. Burke testified on his strategy at Robinson's PCRA hearing for discussing the APSD as follows:

> I had to address it, it was coming out. And I felt that I could – I could ameliorate it, and I could explain it better by broaching it . . . . [Dr. Sadoff], found [the APSD], by the way, and it's in the initial report, as a mitigating factor . . . . I was clear to say statutorily, it's not an aggravator, and you have to take it for what it's being offered.

N.T. 12/17/10, at 36-38. Thus, Burke was not ineffective for electing to broach the subject of Robinson's APSD in order to lessen the Commonwealth's attack. The Commonwealth would have utilized Robinson's APSD against him, and it would be incumbent upon Burke to counter the Commonwealth's attack. He countered their attack by electing to discuss the APSD with Dr. Sadoff.

Moreover, an attorney who discusses their client's potentially negative information is not ineffective. It is a trial strategy utilized to lessen the damage of opposing counsel's argument using that information. Law schools throughout the country teach this tactic to trial advocacy students. By discussing the client's potentially negative information, an attorney helps to control the narrative of that information and shows to the jury that no information is being concealed. Accordingly, Burke was not ineffective by discussing Robinson's APSD nor were the PCRA and PSA courts unreasonable in ruling Burke was not ineffective.

## C. Issue Three

In Issue Three, Robinson asserts he cannot be sentenced to death because of his brain damage. Robinson acknowledges that he is not mentally retarded, and thus ineligible for the death penalty under *Atkins v.* Virginia, 536 U.S. 304 (2002), and that he was not under the age of 18, and thus ineligible under *Roper v. Simmons,* 543 U.S. 551 (2005). However, he urges the Court to extend the reasoning of these cases to him because he belongs to a class of individuals who suffer from severe brain damage. The PSC addressed the issue as follows:

> This Court has broadly stated that questions relating to the legality of sentencing are not waivable. *Commonwealth v. Aponte*, 855 A.2d 800, 802 n. 1 (2004).

Additionally, the *Atkins* Court explained that "the [United States] Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender," 536 U.S. at 321, 122 S.Ct. 2242, leaving little doubt that actual *Atkins* claims implicate the legality of sentencing. The fallacy of appellant's argument, of course, is that he does not have an *Atkins* claim or a *Roper* claim. Appellant acknowledges that the U.S. Supreme Court has not expanded the decision in *Atkins* to encompass, as a class, murderers proven to be brain damaged by a preponderance of the evidence, and exempt them from the death penalty. Nor has there been a trending consensus in state legislatures to exempt murderers like him from capital punishment. The right he speaks of is not embraced by *Atkins*, and indeed, has not been recognized by any governing authority. Thus, under the current state of Eighth Amendment jurisprudence; appellant's judgment of sentence was not illegal on the ground he specifies.

*Atkins* is a controlling decision of the U.S. Supreme Court on a federal question. This Court has rejected requests to extend the reach of *Atkins* beyond the necessary commands of the decision. For example, in *Commonwealth v. Baumhammers*, 599 Pa. 1, (2008), the defendant asked this Court on direct appeal to expand the *Atkins* decision to encompass mentally ill defendants. The Court rejected the request, noting that we had twice before rejected similar arguments, *see Commonwealth v. Faulkner*, 595 A.2d 28, 38 (1991) and *Commonwealth v. Fahy*, 516 A.2d 689 (1986), and that *Baumhammers* did not advance a "compelling argument" to reconsider those decisions. *Id.* at 96–97. We have also declined to extend other aspects of *Atkins* beyond the necessary commands of the decision, when presented with preserved claims on direct appeal. *See Commonwealth v. Sanchez*, 36 A.3d 24, 54–59 (2011) (nothing in *Atkins* requires mental retardation determination to be made pre-trial by judge and Court will not implement such requirement). Likewise, in passing upon corollary questions arising from the retroactive application of *Atkins* on PCRA review, we have declined to recognize derivative, cognate federal constitutional rights. *Commonwealth v. Bracey*, 986 A.2d 128, 145 (2009) (no right to jury trial on *Atkins* claim presented on post-conviction review); *accord Commonwealth v. Cunningham*, —— Pa. ——, 81 A.3d 1, 10–11 (2013) (PCRA appeal; holding that U.S. Supreme Court's decision in *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) does not apply retroactively to defendants whose judgments of sentence were final at time of *Miller* decision; noting this Court's practice of proceeding no farther than required by extant, governing federal precedent).

Appellant's argument in this case goes beyond the argument made in *Faulkner* and *Baumhammers* because this is a collateral attack upon his conviction. In essence, appellant asks that his collateral appeal be made the vehicle by which to establish a new federal constitutional right that retroactively makes his sentencing claim both viable and non-waivable.

In general, the proper way to seek to secure innovations in constitutional law is upon direct review, not via the PCRA. At any time before he was tried or on post-

38
090820

verdict motions, appellant could have claimed that the Eighth Amendment should be expanded to exempt murderers in his particular circumstances from capital punishment. That would raise and preserve a federal claim he could seek to litigate through this Court as of right, and to the U.S. Supreme Court, in its discretion. He did not do so.

Instead, appellant is left with raising the issue on collateral review under the PCRA. But, the PCRA's eligibility provisions provide no easy harbor for the recognition, or creation, of new constitutional rights. The PCRA provides a mechanism for vindicating existing constitutional rights, and it also provides a mechanism for implementing new constitutional rules of retroactive application, no matter when the new rule is established. See 42 Pa.C.S. § 9545. But, the new rule has to exist already. Simply stated, by its terms, the PCRA does not deem cognizable claims such as appellant's that seek to innovate the new substantive federal constitutional rule that the prisoner would then have applied to himself retroactively. In short, his claim, even if deemed nonwaivable, is not cognizable under the PCRA. Appellant's theory never comes to terms with the requirements of the PCRA.

Accordingly, we conclude that this Court has no authority under the PCRA to create and apply the new federal constitutional right appellant seeks to innovate and have retroactively applied to him to undo his lawful, statutory penalty. If such a right is someday recognized and made retroactive, and appellant's death sentence has yet to be executed, he can file a serial PCRA petition and avail himself of Section 9545 of the Act, as defendants actually affected by the new death eligibility rules in *Atkins* and *Roper* have done.

*Robinson II*, 623 Pa. at 381-85.

No legitimate penological purpose is served by executing a person with an intellectual disability. *Atkins v. Virginia*, 536 U.S. 304, 317, 320 (2002). To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. "[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). Rehabilitation, it is evident, is not an applicable rationale for the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Those with an intellectual disability have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses . . .

[which] make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U.S. at 320. Retributive values are also ill-served by executing those with intellectual disability. The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment. *See id.*, at 319, 122 S.Ct. 2242 ("If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution").

In *Atkins*, the Supreme Court twice cited definitions of intellectual disability which, by their express terms, rejected a strict IQ test score cutoff of 70. That is not the issue here, contrary to what Robinson asserts. Nonetheless, *Atkins* first cited the definition provided in the DSM–IV: "'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." *Atkins*, 536 U.S., at 308, n. 3 (citing Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). The Supreme Court later noted that "'an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'" *Atkins*, 536 U.S., at 309, n. 5. Furthermore, immediately after the Court declared that it left "to the States the task of developing appropriate ways to enforce the constitutional restriction," *id.*, at 317, the Court stated in an accompanying footnote that "[t]he [state] statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions." *Id.*

*Atkins* further states, those persons who meet the "clinical definitions" of intellectual disability "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318. Thus, they

bear "diminish[ed] . . . personal culpability." *Id.* The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins*. And those clinical definitions have long included the SEM. *See* Diagnostic and Statistical Manual of Mental Disorders 28 (rev. 3d ed. 1987) ("Since any measurement is fallible, an IQ score is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75. Treating the IQ with some flexibility permits inclusion in the Mental Retardation category of people with IQs somewhat higher than 70 who exhibit significant deficits in adaptive behavior").

Here, though Robinson has argued extensively about the 26 point drop in is IQ, from 126 to 100, does not place him in the class of individuals captured under *Atkins*. This drop, while unfortunate, is still within the normal range. The Supreme Court in *Atkins* addressed IQ scores of the mild mental retardation stage. Robinson's score of 100 does not come close to this stage. If Robinson's score was close to the beginning of being considered mild mental retardation, then his argument citing to *Atkins* could contain merit; however, it does not. Thus, Robinson's reliance upon *Atkins* is inapposite as his IQ is normal.

Similarly, the Supreme Court's holding in *Roper*, which barred the execution of juveniles, does not apply to Robinson. Robinson was over eighteen when he murdered Jessica Jean Fortney. Indeed, Robinson already received the benefit of *Roper*. Robinson was under eighteen when he murdered Joan Burghardt. Though he was initially sentenced to death for the murder of Burghardt, that sentence was vacated and the state court resentenced him to life in prison.

Robinson acknowledges, as he must, that none of these cases is directly on point. Rather he asks this Court to extend the reasoning of those cases to apply to him, relying on a 2006 statement from the American Bar Association:

> Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law.

Even if we were to apply this standard, Robinson has not persuaded us that the reasoning should apply to him. The expert testimony presented establishes Robinson was still capable of performing very complex tasks. Indeed, the testimony at trial establishes that, Robinson stalked numerous victims before murdering them. This shows the ability to put a plan into action. Accordingly, Robinson has not established he has sufficient brain damage to warrant the relief he seeks.

### D. Issue Four

In Issue Four, Robinson argues the Commonwealth's failure to timely disclose that Commonwealth witness Sam-Cali had been hypnotized and provided inconsistent statements is a *Brady*[1] violation and Robinson's counsel was ineffective for failing to object to this testimony.

#### i. Alleged *Brady* violation

Under *Brady v. Maryland*, the prosecution must produce to the defendant evidence that is material to either guilt or punishment, irrespective of good or bad faith. 373 U.S. 83, 87 (1963); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (extending *Brady* to impeachment and exculpatory evidence); *Giglio v. United States*, 405 U.S. 150, 154 (1972). "A *Brady* violation occurs if: (1) the evidence at issue is favorable to the accused, because either

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).

"Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). "A 'reasonable probability' of a different result is shown when the government's suppression of evidence 'undermines confidence in the outcome of the trial.'" *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). The Third Circuit has further explained that "evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination." *Johnson v. Folino*, 705 F.3d 117, 129-30 (3d Cir. 2013). To that end, the Third Circuit has instructed district courts to consider not only the content of the evidence at issue but also "where it might have led the defense in its efforts to undermine [a particular witness]" when determining whether evidence is "material." *Id*. at 131.

Once a court has determined that the evidence is *Brady* material, the next inquiry in assessing whether there is a *Brady* violation is "whether suppression of that evidence undermines confidence in the outcome of a criminal trial, i.e., whether the evidentiary suppression constitutes a *Brady* violation." *Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (explaining that nondisclosure of *Brady* material only evolves into a *Brady* violation where the nondisclosure is "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"). The Third Circuit has explained that "[t]o constitute a *Brady* violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant." *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984).

As a general matter, *Brady* material must be disclosed in time for its effective use by the defendant at trial. *See United States v. Higgs*, 713 F.2d 39, 43-44 (3d Cir. 1983). To that end, the Third Circuit has explained that "[w]here the government makes Brady evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened." *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987).

In *Higgs*, the Third Circuit addressed when *Brady* material used for impeachment purposes must be provided to the defendant. There, the district court ordered the government to provide the defendant with information before trial about any witnesses who had received immunity or leniency in exchange for their cooperation with the government. *Id*. at 40. The government objected, citing threats to the witnesses' lives. *Id*. In determining when this material had to be disclosed, the Third Circuit focused its inquiry on "what information ha[d] been requested and how it [would] be used by [the defendant]." *Id*. at 43-44. The Third Circuit held that there is "[n]o denial of due process . . . if *Brady* material is disclosed to [the defendant] in time for its effective use at trial." *Id*. at 44. For impeachment purposes, the Third Circuit held that a defendant's "right to a fair trial will be fully protected if disclosure is made the day that the witness testifies." *Id*.

More recently, the Third Circuit found that there was no *Brady* violation where the jury had heard additional cross-examination in light of belatedly disclosed evidence. *United States v. Claxton*, 766 F.3d 280, 304 (3d Cir. 2014). There, the Government did not disclose certain letters that allegedly constituted *Brady* material to the defendant until trial. *Id*. at 303-04. In that case, the district court had allowed additional cross-examination of the relevant witnesses and provided defense counsel with extra time to prepare for additional cross-examination. *Id*. at 304.

Under those circumstances, the Third Circuit concluded that due process had not been

contravened. *Id.*

The PSC addressed the alleged *Brady* violation as follows:

Moreover, prior to this trial, Appellant had already pled guilty to multiple crimes (including burglary, aggravated assault, and attempted homicide) in relation to the incidents at the Sam–Cali residence in June and July of 1993. Accordingly, Appellant admitted to perpetrating these crimes. *See*, *e.g.*, *Commonwealth v. Anthony*, 504 Pa. 551 (1984) (observing that "[a] guilty plea is an acknowledgement by a defendant that he participated in the commission of certain acts with a criminal intent . . . [and, thus, h]e acknowledges the existence of the facts and the intent"); *Commonwealth v. Papy*, 436 Pa. 560 (1970) (noting that the circumstances of the case fell within a rule of law that "a [defendant's] plea constitutes an admission of his guilt and all of the facts averred in the indictment"); *see also Commonwealth ex rel. Walls v. Rundle*, 198 A.2d 528, 529 n. 1 (1964). Therefore, Appellant could not impeach Sam–Cali on the basis that she gave the police the name of another possible suspect during her initial interviews. Hence, because the evidence at issue was neither exculpatory nor tended to impeach another, there was no *Brady* violation.

. . . .

We will initially address the Commonwealth's purported failure to disclose the hypnosis of the witnesses at issue. Following his arrest, on August 4, 1993, a letter from the Commonwealth notified Appellant that Sam–Cali underwent hypnosis during the investigation. Appellant signed for the letter and admitted receiving it. 49 N.T., 11/24/98, pp. 76–77. As it relates to the hypnosis of Stengel, during the post-sentencing hearing, Appellant's counsel, Carmen Marinelli, explicitly testified that during the pre-trial stages of this case, he was informed that Stengel was hypnotized. N.T., 11/13/1998, pp. 36–37. Given these facts, it is clear that, prior to trial, the Commonwealth indeed disclosed to the defense that two of its potential witnesses were hypnotized and there was no *Brady* violation.

*Robinson I*, 581 Pa. at 220-23.

Here, no *Brady* violation occurred. Robinson received, and acknowledged, receipt of the

Commonwealth's document regarding the hypnosis. It was incumbent upon Robinson to provide

documents to his counsel for his defense. At the time the document was produced, Robinson was

unrepresented.[2] Notwithstanding the proper production of the document, and before Sam-Cali testified, the Commonwealth notified Robinson of her testimony and offered to provide transcripts. Thus, Robinson should have had ample opportunity to cross-examine Sam-Cali. The Commonwealth offered such transcripts before Sam-Cali took the stand. The Third Circuit has noted due process is not violated if disclosure is made the day the witness testifies. *Higgs*, 713 F.2d at 44. The Commonwealth disclosed such evidence before Sam-Cali took the stand.

Robinson further argues that the Commonwealth withheld Sam-Cali's statement to police that named Sal Rosado as a person of interest. The evidence presented at trial shows, however, that Sam-Cali notified police Sal Rosado could be her attacker, but it was determined Rosado could not be her attacker because he did not fit the description. As the Commonwealth explained in their response, "Sam-Cali never identified Mr. Rosado as her attacker. In fact, she identified him as *not* being the attacker. She merely suggested his name to the police." *See* ECF No. 44 at 32. Additionally, the jury would have seen physical evidence of Robinson's DNA at the scene at the crime. Accordingly, the PSC correctly ruled no *Brady* violation occurred as Robinson received the document and he had an opportunity to cross-examine Sam-Cali.

### ii. Ineffective assistance for failing to object

Robinson argues that if counsel was aware of this information, then he was ineffective for failing to object to the admission of the hypnotized testimony without demanding that the

---

[2]     In the present pleadings, Robinson asserts that he was represented at the time that this letter was sent. *See* ECF No. 33 at 99-100. The Commonwealth has specifically explained that Robinson was not represented at the time that the letter was sent. *See* ECF No. 31. If Robinson had wanted to challenge this point, the time for such challenge was during direct appeal when he presented this claim. But he made no effort to raise this argument at the time, preferring instead to argue that it did not matter if he was represented. The Court must evaluate the state court's determination based on the record before it. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Commonwealth comply with all of the *Smoyer* factors. Upon review, the PSC thoroughly analyzed the *Smoyer* factors in Sam-Cali's testimony and concluded that the prosecutor complied with the state requirements on this point. Additionally, as the state court explained, trial counsel affirmatively did not want Sam-Cali's hypnosis to be brought to the attention of the jury. Counsel's strategic decisions are virtually unchallengeable on appeal. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009).

Assuming arguendo that Robinson's trial counsel should have objected, the failure to object was not prejudicial. As discussed in the analysis of Robinson's *Brady* claim, Sam-Cali merely suggested Rosado's name to the police. Sam-Cali sought to provide potential attackers to the police so the police could begin their investigation. The police determined that Rosado would not be a suspect because he did not match the description of the attacker. The jury would have seen these facts as well. Moreover, the jury would also have also seen the additional physical evidence of Robinson's DNA linking him to the scene.

Thus, the facts presented to the jury would have outweighed any prejudice. Sam-Cali would have testified and the physical evidence of Robinson's DNA would have been admitted. If Robinson's trial counsel would have objected, Sam-Cali's statements would have been admitted nonetheless, and the statements show she suggested Rosado as a potential suspect. Rosado was then eliminated as a potential suspect after he did not match Robinson's appearance. Then, the jury would have seen Robinson's DNA evidence. This evidence is strong and outweighs any potential prejudice. Accordingly, there was no ineffective assistance of counsel.

**E. Issue Five[3]**

In Issue Five, Robinson avers the PSC erred by denying his motion to sever the charges of the different victims in his case. The PSC addressed the issue as follows:

> Appellant argues that the trial court erred in denying his motion for severance of the charges involving the different victims.
>
> Pennsylvania Rule of Criminal Procedure 582 provides in relevant part:
>
> Offenses charged in separate indictments or informations may be tried together if . . . the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion . . .
>
> Pa.R.Crim.P. 582(A)(1)(a). "Whether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." *Commonwealth v. Newman*, 528 Pa. 393 (1991); *also see Commonwealth v. Morris*, 493 Pa. 164 (1981).
>
> [While e]vidence of distinct crimes is inadmissible solely to demonstrate a defendant's criminal tendencies[, s]uch evidence is admissible . . . to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others. This will be true when there are shared similarities in the details of each crime.
>
> *Commonwealth v. Keaton*, 556 Pa. 442 (1999) (internal citations omitted), *cert. denied*, 528 U.S. 1163 (2000); *also see Commonwealth v. Natividad*, 565 Pa. 348 (2001) (stating that "[e]vidence of another crime is admissible where the conduct at issue is so closely related that proof of one criminal act tends to prove the other"), *cert. denied*, 535 U.S. 1099 (2002). "To establish similarity, several factors to be considered are the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed." *Commonwealth v. Rush*, 538 Pa. 104 (1994).
>
> Although Appellant admits that "the offenses consolidated in this case were of the same class," he argues that the crimes were not similar enough to be considered a distinctive modus operandi of a single perpetrator. Specifically, Appellant points out that: (1) Fortney lived two miles away from Burghardt and Schmoyer; (2) the

---

[3] From this point on, Robinson's brief incorrectly numbers the issues in his brief. For clarity, the Court continues the opinion with the correct numbering.

crimes were not temporally related, but ranged over a period of eleven months; and (3) there is no "real relationship" in the way the victims were killed.

As in *Morris*, however, "[i]t is difficult to conceive of any situation where the propriety of joinder could be clearer." 425 A.2d at 721. First, all of the attacks took place in the same general locale—the East Side of Allentown, within mere blocks from where Appellant lived or, as in Fortney's case, used to live. As previously described, Appellant's residence at the time of his arrest was about: (1) four blocks from where Schmoyer was abducted, and about one mile from the Reservoir where her body was found; (2) five blocks from where Burghardt lived and was murdered; (3) five or six blocks from where Sam–Cali resided and was assaulted; and (4) two miles from where Fortney lived and was murdered.

Second, in relation to the temporal relationship between the crimes, this Court has held in the past that "remoteness in time between . . . offenses" does not render consolidation improper per se, but is simply another factor to be considered in the analysis. *See Newman*, 598 A.2d at 278 (allowing introduction of evidence of another crime in spite of an eighteen-month gap between the two offenses); *Commonwealth v. Hughes*, 521 Pa. 423 (1989) (holding that a ten-month gap between two crimes was not too remote); *Commonwealth v. Donahue*, 519 Pa. 532 (1988) (plurality opinion) (allowing testimony concerning three-year-old acts of child abuse in a case where the victim's death was caused by alleged child abuse). Presently, the attacks at issue span a period of eleven months, with the longest "idle" period (approximately ten months from August of 1992 through June of 1993) taking place between the Burghardt and Schmoyer homicides. Preliminarily, we note that eleven months is not such a long period of time as to render consolidation improper.

We further point out that, as previously explained, during an extended portion of this "idle" period, Appellant did not reside in, or visit, Lehigh County, because he was detained in a juvenile placement facility. In this respect, the present matter is remarkably similar to Rush, where eight years separated commission of two similar assaults. 646 A.2d at 561. In that case, we observed:

Normally such a lengthy interval would cause the occurrences to be considered too remote; however, for most of [these eight years] (with the exception of eighty-four days) appellant was incarcerated. Excluding this imprisonment, a time span of eighty-four days is within the acceptable remoteness standard.

*Id*. This rationale is equally applicable to the matter at hand—excluding the period of Appellant's detention at a juvenile placement facility, the crimes spanned approximately four months, which is well within "acceptable remoteness standards" set forth in our decisions. *See Newman*, *supra*; *Hughes*, *supra*. In sum, these observations only reinforce the trial court's conclusion with regard to the consolidation of the various Informations.

Finally, Appellant complains that joinder was improper, because there is no "real relationship" in the way the victims were killed. Nothing can be further from the truth, however. None of the victims knew or had any prior contact with Appellant. All were savagely beaten and raped within two months of Appellant leaving the Allentown area and two and one-half months of his return to that locale. Each of the victims was brutally murdered at close range by hand or a hand-held instrument. In each case, Appellant left behind virtually no incriminating physical evidence, with the exception of what was subsequently discovered through microscopic, scientific examination. In all three cases, samples of Appellant's DNA were recovered from the crime scenes. Each attack was committed at night or in the early morning hours. Finally, all victims shared the same personal characteristics—they were overweight, white females, who lived in and around the East Allentown area.

Previously, analogous evidence has been held adequate to establish a sufficient logical connection for consolidation of trials. *See Keaton*, 729 A.2d at 537. We have also held that similar evidence was sufficient to allow testimony of a common scheme or plan in the way the crimes were perpetrated. *See Commonwealth v. Elliott*, 549 Pa. 132 (1997) (evidence that defendant targeted other victims of similar race and gender and raped them was admissible to prove common scheme, plan, or design), *cert. denied*, 524 U.S. 955 (1998); *Commonwealth v. Miller*, 541 Pa. 531 (1995) (evidence that defendant lured other victims of similar race, weight, and gender into his car, took them to remote areas to force sex upon them, beat them in a similar manner, and killed or attempted to kill them was admissible to prove common scheme, plan, or design), *cert. denied*, 516 U.S. 1122 (1996); *Hughes*, 555 A.2d at 1282–83 (finding that testimony concerning a subsequent rape was properly admitted at trial for a preceding rape and murder, where: (1) the crimes were committed at approximately the same time of the day, in a similar geographic location, using similar method of attack; and (2) the victims were familiar with the defendant, and were of the same age, ethnicity, and gender); *Rush*, 646 A.2d at 561 (finding "sufficient similarities to warrant the conclusion that one individual committed both crimes," where, inter alia, the crimes were committed in the same geographic locale and the victims "were black, female, and relatively young, had their underclothing or nightclothes pulled from them"). Moreover, the evidence concerning each incident was readily separable by the jury, as each crime was perpetrated against a different victim and there was no overlap in physical evidence. *See Keaton*, 729 A.2d at 538. For these reasons, we find that the trial court did not abuse its discretion in consolidating for trial the Informations relating to the homicides at issue.

There is no Supreme Court precedent holding that the joinder of criminal indictments against a single defendant could be a violation of due process. *See Ashe v. U.S. ex rel. Valotta*, 270 U.S. 424 (1926) (finding that there was "not the shadow of a ground" for habeas relief where trial court had consolidated two felony indictments); *see also Spencer v. Texas*, 385 U.S. 554,

562 (1967) (stating that the "inherent opportunities for unfairness" where a defendant is tried for multiple offenses is not a violation of due process). In the absence of "clearly established Federal law as determined by the Supreme Court," there can be no basis for overturning the state PSC's adjudication of this claim. *See Carey v. Musladin*, 549 U.S. 70 (2006).

This Court notes that there is Supreme Court dicta suggesting that the joinder of multiple indictments against a single defendant could, in some circumstances, violate due process. *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986) (noting, in dicta, that misjoinder in a federal criminal case "would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"). However, "clearly established Federal law" refers only to the holdings, not dicta, of the Supreme Court. *Musladin*, 549 U.S. at 74 (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

Here, in the absence of clearly established federal law, Robinson's severance claim cannot proceed. A district court may grant habeas relief if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Supreme Court dicta is insufficient to rise to the level of clearly established federal law. With there being no clearly established federal law to analyze Robinson's severance claim, his claim fails.

**F. Issue Six**

In Issue Six, Robinson alleges the pretrial publicity, citing to local newspaper articles, prejudiced the jurors and that his trial counsel was ineffective for failing to properly file a motion

to transfer venue based upon the pretrial publicity. The Commonwealth avers there was a sufficient "cooling off" period between the pretrial publicity and the trial.

### i. Pretrial publicity

A criminal defendant has a right to "a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Jurors are not required, however, to be totally unaware of the facts and issues involved in a case. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). "It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *Id*. (quoting *Irvin*, 366 U.S. at 723). A defendant can establish actual prejudice by presenting evidence to show that "those who actually served on his [or her] jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom." *Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir. 1992), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619 (1993). However, "[w]here media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." *Id*. In such cases, a change of venue is required and the failure to grant it deprives the defendant of due process. *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963); *Commonwealth v. Casper*, 392 A.2d 287, 292 (Pa. 1978). However, "[s]uch cases are exceedingly rare." *Rock*, 959 F.2d at 1253. As the United States Supreme Court explained in *Skilling v. United States*, "[i]n each of [the prior] cases, [where the Court applied a presumption of prejudice,] we overturned a 'conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage'; our decisions, however, 'cannot be

made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" *Skilling v. United States*, 561 U.S. 358, 381 (2010) (quoting *Murphy*, 421 U.S. at 798-99). For a court to presume prejudice based on pretrial publicity, "[t]he community and media reaction . . . must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury." *Rock*, 959 F.2d at 1252.

To determine whether pretrial publicity meets that standard, courts consider the following factors:

(i)     the size and characteristics of the community;

(ii)    the general content of the news coverage (including facts such as whether the stories referenced the defendant's confession or other similarly blatantly prejudicial information, whether the news account was factual and objective versus sensational, inflammatory, or slanted toward the prosecution, and whether the stories focus on the defendant personally as opposed to the crime itself);

(iii)   the timing of the media coverage relative to the commencement of the trial; and

(iv)    whether there was any media interference with actual courtroom proceedings.

*United States v. Savage*, No. 07-550-03, 2012 WL 2376680, at *3-4 (E.D. Pa. June 25, 2012) (quoting *United States v. Diehl–Armstrong*, 739 F. Supp. 2d 786, 793 (W.D. Pa. 2010)).

Publicity that is accurate and factual in nature does not justify a finding that prejudice may be presumed. *Hetzel v. Lamas*, 372 F. App'x 280, 284 (3d Cir. 2010). Even when pretrial publicity is "factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime," it does not create a presumption of prejudice. *Flamer v. State of Del.*, 68 F.3d 736, 754 (3d Cir. 1995); *see also Diehl-Armstrong*, 739 F. Supp. 2d at 789 (prejudice not presumed where

publicity "ha[s] focused on factual, albeit salacious, information derived from official sources, court documents and proceedings, or other publicly available records rather than on conjecture, innuendo, or editorial content."). *See*, *e.g.*, *Laird v. Wetzel*, No. CV 11-1916, 2016 WL 4417258, at *9-10 (E.D. Pa. Aug. 19, 2016) (prejudice not presumed despite article prior to retrial mentioning prior conviction and death sentence); *Savage*, 2012 WL 2376680, at *5 (prejudice not presumed despite extensive pretrial publicity containing "disturbing" quotations from telephone intercepts of defendant and descriptions of prior convictions because the reporting was "highly factual"). Moreover, "even when pretrial publicity is extensive and severe, a lapse in time between the publicity and the trial can dissipate any prejudice that may have resulted." *Pursell v. Horn*, 187 F. Supp. 2d 260, 302 (W.D. Pa. 2002) (noting seven-month period between adverse publicity and trial militated against presumption of prejudice); *see also Foy v. Lamas*, No. 2:12-0088, 2013 WL 838191, at *23 (W.D. Pa. Mar. 6, 2013) (extensive media coverage that ended seven months before trial did not justify presumption of prejudice).

Pennsylvania law regarding prejudicial pretrial publicity is consistent with this body of federal law. Pennsylvania law also holds that when pretrial publicity is sufficiently sustained, pervasive, inflammatory and inculpatory, it may present exceptional circumstances under which prejudice will be presumed. *Commonwealth v. Frazier*, 369 A.2d 1224, 1227 (Pa. 1977). To determine whether such exceptional circumstances exist, the Pennsylvania Supreme Court has instructed that the following factors are determinative: "(1) whether the pretrial publicity was inherently prejudicial; (2) whether the pretrial publicity saturated the community; and (3) whether there was a sufficient proximity in time between the publicity and the selection of a jury such that the community from which the jury was drawn did not have an opportunity to 'cool

down' from the effects of the publicity, thus making a fair trial in such community impossible." *Commonwealth v. Counterman*, 719 A.2d 284, 293 (Pa. 1998).

Pretrial publicity is inherently prejudicial if: "(1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." *Commonwealth v. Pursell*, 495 A.2d 183, 187 (Pa. 1985) (post-conviction relief proceeding) (citing *Commonwealth v. Casper*, 392 A.2d 287, 292 (Pa. 1978)). Pennsylvania law, like federal law, holds that even where pretrial publicity would lead to a presumption of prejudice under this standard, the existence of a sufficient "cooling off period" between prejudicial pretrial publicity and trial destroys the presumption of prejudice because it permits the prejudice to dissipate. *Commonwealth v. Paolello*, 665 A.2d 439, 450 (Pa. 1995); *see also Casper*, 392 A.2d at 293 ("The critical factor in the finding of presumptive prejudice . . . is the recent and pervasive presence of 'inherently prejudicial' publicity, the likely effect of which is to render a fair trial impossible."). Pennsylvania law also holds that factual and objective reporting is not inherently prejudicial. *See Commonwealth v. Beasley*, 678 A.2d 773, 782 (Pa. 1996). "It is saturation with 'inherently prejudicial' publicity, and not the possibility of saturation alone, that is important since, as we have noted, '(e)xtensive pretrial publicity . . . does not necessarily preclude a fair trial.'" *Casper*, 392 A.2d at 295 (quoting *Commonwealth v. Powell*, 328 A.2d 507, 510 (Pa. 1974)).

The PSC addressed the issue as follows:

Furthermore, after thoroughly reviewing the record we are not persuaded by the complaints made by Appellant. Any potential bias on the part of the jurors in relation to the media coverage of the case was sufficiently dealt with during the individually-conducted voir dire when the defense counsel, the prosecutor, and the

trial court, asked the potential jurors whether they had heard or read anything about the case. Indeed, unless preliminarily excused for other, unrelated reasons, each of the prospective jurors was questioned about their familiarity with the case and their knowledge concerning the incidents from media outlets. Some jurors stated that they knew about the incidents and they were further questioned about whether their ability to decide the case would be affected. The record reveals that of the jurors who were aware of the case, most gained their knowledge through the media reports circulated at the time of Schmoyer's homicide and Appellant's apprehension, which was more than a year before the trial was set to begin. This clearly indicates the presence of a sufficient "cooling off period" that minimized any potential ill effects of the publicity surrounding the events at issue.

Ultimately, the twelve jurors and four alternates selected for trial all stated that they would be fair and impartial when hearing the case. After undertaking an independent review of the entire transcript of the voir dire proceedings, we are convinced that pretrial publicity did not result in the inability to select a fair and impartial jury in Lehigh County. Therefore, the trial court did not abuse its discretion in denying the motion for a change of venue/venire and Appellant is not entitled to any relief on this claim. For this reason, we find that Appellant is similarly not entitled to relief on his allegation of counsel ineffectiveness in relation to the motion to change venue/venire.

*Robinson I*, 581 Pa. at 196-98.

Here, the PSC did not unreasonably apply federal law by failing to transfer the venue. In addressing the elements for pretrial publicity elicited in *Savage*, as to the first element, the size and characteristics of the community, the estimated population of Lehigh County in 1990 was 291,130. Lehigh County is closely connected with Northampton County, with a population of 247,105 in 1990. Thus, the region contained approximately over 500,000 people at the time of Robinson's murders. As to the second element, the general content of the news coverage, the coverage focused upon the murders, the victims of the murders, and the trial. There are, however, two potential inflammatory remarks contained in the media coverage: (1) an article dated June 13, 1993, in which a parent says the suspect "deserves worse than the death sentence" and a man who states, "the killer should be put to death and a member of Charlotte's family should get to pull the switch," and (2) an article dated April 13, 1994, in which a spectator whispered at

Robinson's sentencing, "I hope he fries, man." As to the third element, the timing of the coverage, there appears to be more intense coverage at the time of the murders which evolves into coverage of the trial. Lastly, the media did not interfere with the trial. While the trial needed to be moved into a bigger courtroom, this is because of the size of the crowd and not because of media interference. Robinson fails to specifically articulate how the media interfered at trial.

Assuming arguendo the two comments are inflammatory, there was a sufficient cooling off period. The first article was dated June 13, 1993. The trial was not until October 1994. Thus, the region had a sixteen-month cooling off period between the remark and the time of trial. Sixteen months is sufficient as a cooling off period. Additionally, the article did not mention Robinson by name, only addressing him generally as he was not arrested yet. The second inflammatory mark was made after the trial, at Robinson's sentencing, which make the remark irrelevant. The remaining articles are not inflammatory and simply inform the public of what occurred, when Robinson was arrested, stories about the victims and survivors, and the trial. Accordingly, the coverage was not of such a nature to require a change of venue.

### ii. Ineffective assistance of counsel

Robinson argues his trial counsel was ineffective for failing to adequately brief Robinson's motion to transfer. Upon review, counsel's performance was not ineffective. Counsel filed the motion, per their duty, and the trial court ruled against Robinson. The trial court was aware of the media publicity at the time, and knew of the rationale behind Robinson's motion. The Court does not believe Robinson's argument that, had the brief of the motion been larger, the trial court would have granted the motion to transfer.

Assuming Robinson's trial attorneys were ineffective, there was no prejudice. As discussed, most of the reporting on Robinson was during the commission of the crimes, and

afterward, focused upon the victims and his trial. The media coverage satisfied the elements elicited in *Savage*. The one inflammatory remark that occurred on June 13, 1993, was approximately sixteen months before the trial, allowing for a sufficient cooling off period. The other inflammatory remark occurred after Robinson's sentencing, making the remark irrelevant to prejudice the jurors. Thus, assuming Robinson's trial attorneys were ineffective, there was no prejudice.

### G. Issue Seven

In Issue Seven, Robinson argues the trial court committed errors and his counsel was ineffective for excluding jurors, such as Lamar Cramsey and Deanna Robinson,[4] without ascertaining their abilities to follow the law. Further, Robinson alleges trial court error because the trial court allegedly did not permit defense counsel to "life qualify" jurors on whether they could return a life sentence, such as Gail Kocher. Robinson then asserts a generalized objection that the jurors were biased. The PSC addressed the issue as follows:

> In relation to the voir dire process, Appellant argues that his counsel were ineffective in failing to pose "life qualification" questions to the potential jurors "in order to prevent the service of a juror who is incapable of returning a verdict of life imprisonment." Brief for Appellant, p. 45.

> In the past, this Court has consistently declared that: (1) there is no requirement for trial counsel to ask "life-qualifying" questions; and (2) trial counsel is not ineffective for failing to make such an inquiry. *See*, *e.g.*, *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 50 (2002); *Commonwealth v. Simmons*, 569 Pa. 405, 804 A.2d 625, 638 (2001) (plurality opinion) ("[t]here is no implication or holding that the choice not to life qualify a jury amounts to advocacy so glaringly substandard as to amount to a deprivation of the Sixth Amendment right to counsel") (emphasis in original); *Commonwealth v. Henry*, 706 A.2d 313, 324–25 (1997), *habeas corpus granted in part*, *Henry v. Horn*, 218 F. Supp. 2d 671 (E.D. Pa. 2002); *Commonwealth v. Lark* (*Lark PCRA*), 698 A.2d 43, 48 (1997); *Commonwealth v. Cox*, 686 A.2d 1279, 1290 (1996) (counsel was not ineffective for failing to "life-

---

[4] As Deanna Robinson shares the same last name as Robinson, this Court will refer to her by her first name.

qualify" jurors where jurors "assured" the court that they would follow the law and the court's instructions), *cert. denied*, 522 U.S. 999 (1997).

Presently, the notes of testimony are replete with examples where both defense counsel and the prosecutor asked the prospective jurors whether they would be able to be fair and impartial in deciding the case and whether they could follow the trial court's instructions in imposing the proper sentence. Additional questions were posed to ensure that the jurors would not automatically impose the death penalty, but would follow the statutory guidelines as explained to them by the trial court. That is all that is legally required of the jury and, therefore, we reject the argument raised by Appellant.

. . . .

Appellant also argues that he was deprived of a fair trial by the improper exclusion "for cause" of Lamar Cramsey (Cramsey), based upon his views with respect to the death penalty. Appellant maintains that although Cramsey expressed conscientious scruples against the death penalty, he ultimately indicated that he could consider the death penalty in an appropriate case.

As we have often recognized, a prospective juror may be excluded "for cause" when his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions given by the trial judge and the juror's oath. *See Bridges*, 757 A.2d at 873; *Commonwealth v. Stevens*, 739 A.2d 507, 521 (1999). Presently, we do not need to delve into the substantive analysis of the trial court's decision, however, for even assuming arguendo that the trial court erred in excluding Cramsey "for cause," such error was harmless in light of the fact that the Commonwealth had several peremptory challenges left after the jury was selected. If Cramsey had not been struck "for cause," the Commonwealth could have peremptorily removed this juror with its remaining challenges. *See Lewis*, 567 A.2d at 1381. For this reason, Appellant is entitled to no relief on this argument.

The Sixth Amendment right to a jury trial guarantees a criminal defendant the right to a

"fair trial by a panel of impartial, indifferent jurors," *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)

(internal quotation marks omitted), and that right is extended to state criminal trials through the

Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 148–49

(1968). "An impartial jury consists of nothing more than jurors who will conscientiously apply

the law and find the facts." *Lockhart v. McCree*, 476 U.S. 162, 163 (1986); *see also United*

*States v. Tindal*, 357 F. App'x 436, 438 (3d Cir. 2009) (explaining that "[j]urors are presumed to

be impartial"). Further, the Supreme Court has explained that "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire[,]" instead, "[j]ury selection, we have repeatedly emphasized, is particularly within the province of the trial judge." *Skilling*, 561 U.S. at 386 (internal citations and quotations omitted). To violate the Sixth Amendment, it does not suffice that the trial court failed to ask questions during voir dire that "might be useful"; rather, the "trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Id*. at 387 n.20.

The Court held in *Witherspoon* that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." 391 U.S. at 522-23. *Witherspoon*'s holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments, and thus veniremen can be excluded based on their views on capital punishment only if they would be biased and lack impartiality in hearing the case.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The Court explained that:

> this standard . . . does not require that a juror's bias be proved with "unmistakable clarity" . . . because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will

react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Id*. at 424-26 (footnote omitted).

The Court explained in *Witt* that "[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." 469 U.S. at 423. Thus, when the state wishes to exclude a prospective juror for cause because of his or her views on the death penalty, it must question that juror to make a record of the bias. *See Gray v. Mississippi*, 481 U.S. 648, 652 n. 3 (1987) ("A motion to excuse a venire member for cause of course must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve.") (citation omitted).

After the state offers its challenge for cause, "[i]t is then the trial judge's duty to determine whether the challenge is proper." *Witt*, 469 U.S. at 423. Thus, before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased. On federal habeas review, that determination of bias is entitled to the presumption of correctness. *Id*. at 428. As the Court emphasized in *Witt*, a trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Id*. at 429; *see also Deputy v. Taylor*, 19 F.3d 1485, 1499 (3d Cir. 1994) ("The trial court is in the best position to observe the demeanor of the prospective jurors.").

The following colloquy was at issue in *Witt*:

[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

[A:] I am afraid personally but not-

[Q]: Speak up, please.

[A]: I am afraid of being a little personal, but definitely not religious.

[Q]: Now, would that interfere with you sitting as a juror in this case?

[A]: I am afraid it would.

[Q]: You are afraid it would?

[A]: Yes, Sir.

[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

[A]: I think so.

[Q]: You think it would.

[A]: I think it would.

[Q]: Your honor, I would move for cause at this point.

[COURT:] All right. Step down.

469 U.S. at 415-16. Based on this exchange, the Supreme Court held that the judge's finding of bias, although not free of ambiguity, was fairly supported and therefore presumptively correct. The Court explained that the judge was not required "to announce for the record that [the prospective juror] was biased, or his reasoning," *id*. at 430, and added that, "[i]n this regard it is noteworthy that in this case the court was given no reason to think that elaboration was necessary; defense counsel did not see fit to object to [the] recusal, or attempt rehabilitation." *Id*. at 430-31. The Court noted that counsel's failure to speak was a circumstance that it would consider when assessing respondent's belated claims that the situation was "so rife with ambiguity . . . as to constitute constitutional error." *Id*. at 431 n. 11.

Under *Witt*, therefore, the proper inquiry on pre-AEDPA habeas review of a *Witherspoon* claim is whether there is fair support in the record for the judge's finding that the prospective juror's views on the death penalty would have prevented or substantially impaired the performance of his or her duties as a juror in accordance with the instructions and oath.

With respect to voir dire-related ineffective assistance of counsel claims, specifically, at least one federal circuit court has stated that an "attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness." *DeLozier v. Sirmons*, 531 F.3d 1306, 1323 (10th Cir. 2008); *accord Morgan* 504 U.S. at 729 (voir dire proceedings are "subject to the essential demands of fairness.") (internal quotation marks and alterations omitted); *see also Lin v. Bartkowski*, No. 2:10-cv-5489 (DMC), 2012 WL 3124493, at *31 (D.N.J. Aug. 1, 2012) (relying on standard set forth in *DeLozier* to resolve habeas petitioner's voir dire-specific ineffective assistance of counsel claims).

### i.    Counsel's performance during voir dire

Here, the decisions made by Robinson's counsel are not ineffective, but trial strategy. As discussed above, the jury panel received questioning about their beliefs and whether they can debate, and issue, a sentence of either life or death. Robinson's counsel participated in this questioning. This Court cannot say that Robinson's counsel trial strategy was so ill chosen that it permeates the entire trial with obvious unfairness. Robinson's trial counsel was faced with the arduous task of defending Robinson in a case with a potential penalty of death. Robinson's trial counsel, unlike this Court and Robinson's current habeas counsel, do not have the luxury of witnessing the jury panel's responses live and being able to observe their body language, tone, and demeanor while being questioned.

This Court has reviewed the voir dire transcripts and determined the jurors that were empaneled were not so ill chosen that it permeates the entire trial with obvious unfairness – there was a fair trial and the jurors were fairly chosen. The PSC's determination was not unreasonable or contrary to federal law. Accordingly, Robinson's trial counsel was not ineffective. Nonetheless, the Court will address the specific individuals Robinson identified.

### ii. Lamar Cramsey Colloquy

The colloquy of Lamar Cramsey is as follows:

[Q. Prosecutor:] Okay. And if you reached that point in terms of passing judgment, and you concluded, after listening to the evidence, the defendant was guilty of these murders, would you be able, then, to pass judgment and come into court and say guilty of murder in the first degree?

[A:] Again, I don't know.

[Q:] And the reason you don't know?

[A:] It's just hard to tell somebody -- to kill somebody.
. . . .

[Q:] Do you believe that you can follow the instructions of the Court as to the law and apply the law to the facts, and this means, no matter what your personal beliefs are as to what the law is, or what the law should be, you would have to follow the instructions of the Court. Do you believe that you could do that or would you have difficulty with that?

[A:] No, I wouldn't have any difficulty with it, because he would explain everything, right?

. . . .

[Q:] Do you believe that you could follow the law with respect to the death penalty or do you believe that it would be difficult for you to pass judgment on that?

[A:] It would be difficult to pass judgment on it.

[Q:] And can you explain why you would find it difficult to pass judgment?

[A:] Because I never had to. It's that simple.

[Q:] Do you believe that because you've never had to you don't believe you could?

[A:] That's right.

N.T. 10/17/1994, at 1939-43.

Here, Cramsey was not wrongfully disqualified because of his views on the death penalty. Robinson attempts to cherry pick Cramsey's statements regarding his ability to "look" at Robinson while issuing the death penalty and fails to view Cramsey's statements as a whole. By cherry picking, Robinson fails to analyze the entire colloquy, especially the sections where Cramsey voices his hesitance in rendering the death penalty numerous times. Cramsey stated at least four times his hesitancy to issue the death penalty to Robinson. The Commonwealth attempted to follow up on this hesitancy and Cramsey reaffirmed his hesitancy. These statements do not pertain to "looking" at Robinson while issuing the death penalty, as Robinson asserts. Cramsey failed to rehabilitate his answers with numerous opportunities to do so. Due to his failure to rehabilitate his answers and establish confidence that he could potentially render a penalty of death if need be, the trial court properly exercised its discretion in excusing Cramsey.

Cramsey's colloquy is similar to the colloquy in *Witt*, where the juror in *Witt* expressed concern over rendering a penalty of death twice before being excused. In this instance, Cramsey expressed concern over rendering the death penalty numerous times. Both colloquies express concern and hesitance over rendering a penalty of death, even being offered a chance to rehabilitate their response and voice a less hesitant answer. In excusing a juror, the trial court is entitled to a "presumption of correctness," and in this instance, the Court believes the trial court acted properly as Cramsey voiced his hesitation in rendering a penalty of death numerous times. The trial court had an opportunity to analyze Cramsey's words and body language live, something this Court does not have the luxury to do so. Thus, dismissing Lamar Cramsey from

serving on Robinson's jury was proper as his views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath. The standard is a presumption of correctness, and the trial court was correct.

### iii.    Deanna Robinson's Colloquy

Deanna's colloquy is as follows:

[Q. Prosecutor:] Okay. As a juror, you would have to deliberate with other jurors to decide guilt or innocence, and, also, possibly the penalty as well.  And let me just move onto that for a moment. Would you, as a juror, and you've indicated some hesitancy about making a decision, would you be able to return a verdict of murder in the first degree if the evidence indicated that that was the appropriate verdict?

[A:] Yes. I think I could do that.

[Q:] Okay. But –

[A:] I don't know if this is another question or not, but the death penalty is something I have a problem with.

[Q:] Okay. Let's explore that for a moment. In Pennsylvania, if a jury returns a verdict of murder in the first degree, they decide the penalty.

[A:] The jury?

[Q:] The jury does.

[A:] All right.

[Q:] Either death or life in prison. Would you be able to do that? And let me just ask it this way.

Do you have any religious, moral or philosophical beliefs that would prevent you from imposing the death penalty?

[A:] Yes.

[Q:] Would you explain what those are?

[A:] From my religious background, I do not believe we, for whatever reason, that we should take a life for a life. However, I believe that something should be done if someone does and there are, I hope, things that you do instead of that.

[Q:] And trust me, I respect your beliefs. I'm going to ask you some questions about that. Would you state these are religious beliefs on your part?

[A:] Yes.

N.T. 10/17/94, at 1634-36.

Here, Deanna was not wrongfully excused from the jury. Deanna established her views in explicit fashion, revealing her disdain for the death penalty. When the Commonwealth questioned her views on the death penalty, she affirmed her disdain and stated it was because of her religious beliefs. Robinson fails to address Deanna's stance on the death penalty. Similar to Robinson's theory on Cramsey, Robinson's theory of Deanna not being able to "look" at Robinson is belied by the record. Deanna's views against the death penalty were reaffirmed by numerous questions by the Commonwealth. Accordingly, the trial court did not err in excusing Deanna for her beliefs on the death penalty.

Similar to *Witt*, the trial court correctly exercised its discretion and excused Deanna. Deanna's views were more explicit than the colloquy in *Witt*. Additionally, Deanna did not otherwise rehabilitate or change her views when the Commonwealth asked additional questions as to her views. Moreover, the trial court had the opportunity to observe Deanna's body language and tone, something this Court cannot do. Deanna was adamant in her views against the death penalty. The standard is a presumption of correctness, and the trial court correctly exercised its discretion in this instance as her views would prevent or substantially impair the performance of her duties in accordance with the instructions and her oath.

### iv.    Gail Kocher Colloquy

Robinson utilizes Gail Kocher to argue jurors did not face proper "life qualification" questions. The colloquy of Gail Kocher is as follows:

[Q. Defense:] The Judge is going to be -- Judge Diefenderfer is going to be instructing you on many different points and facets of the law.

Do you have any moral, religious or other obligations -- strike that -- any other feelings that you feel will get in the way of you following the Judge's instructions?

[A:]: No, I do not.

[Q:] Do you have any preconceived concepts of the innocence or guilt of a person depending on the type of crime they're charged with?

[A:] No.

[Q:] The Judge in this particular instance is going to be instructing you on first degree murder. First degree murder in Pennsylvania carries the possibility of a death sentence or life in prison.

After the fact phase of the trial, you may be required to deliberate regarding life imprisonment or the death of the defendant. Do you feel you will be able to do this?

[A:] Yes, I would.

[Q:] Do you have any moralistic, religious or other feelings regarding the death penalty?

[A:] No, I don't.

N.T. 10/10/1994, at 65-66.

Here, proper "life qualifying" questions were posed to the potential jury members. Robinson attempts to use the following question for Gail Kocher as evidence of improper life qualification questioning, "Do you feel that the death penalty should be imposed in every homicide case?" *Id*. at 66. However, in analyzing the entirety of her questioning, there were questions focused on Kocher's ability to apply the law and render a sentence within the guidelines, which included a life sentence. Specifically, some questions focused on the ability of Kocher to debate and issue either a life sentence or the death penalty. Moreover, in analyzing the colloquies of Cramer and Deanna as well, there were questions regarding the ability to impose a life sentence. The trial court did not exclude questioning on the ability of jurors to debate and

issue a sentence of life in prison. The trial court properly excluded jurors who exhibited a

potential bias in their decision-making process and this bias was revealed through the

questioning. The standard is a presumption of correctness, and the trial court correctly ruled

throughout this process. Thus, there were proper life qualification questions posed to the jury and

the PSC correctly ruled regarding this issue.

### v. The alleged exclusion of a significant percentage of jurors

Here, upon review, there was no significant percentage of jurors excluded for their views

as Robinson alleges. The Court has reviewed the jurors Robinson takes issue with, and

additionally analyzed the entirety of the voir dire records and finds the records are satisfactory.

Proper questioning occurred throughout the voir dire process. Those whose views would

prejudice the process were properly excluded, such as Lamar Cramsey or Deanna Robinson.

Moreover, given the wide latitude trial courts have in the voir dire process, the trial court is in the

best position to make determinations regarding the voir dire process as opposed to the appellate

record. Thus, contrary to Robinson's assertion there was no significant percentage of jurors

excluded for their views. The standard is a presumption of correctness, and the trial court was

correct throughout the voir dire process.

### H. Issue Eight

In Issue Eight, Robinson argues the trial court erred by not excusing two jurors, Lynn

Furr and Susan Rosen, for cause due to their bias against Robinson conveyed through comments

made during the voir dire process. The PSC addressed the matter as follows:

> Appellant additionally maintains that a new trial should be granted because he was
> forced to use peremptory challenges to strike venire persons, who should have been
> excused "for cause," and he exhausted his peremptory challenges before the jury
> was seated. Specifically, Appellant alleges that . . . . Lynn Furr (Furr) was not
> allowed to be excused "for cause," although she had seen media reports concerning
> the case; had a child, who was a carrier for the Morning Call (as was Schmoyer);

knew pastors at the church attended by Schmoyer; and doubted her ability to remain impartial; . . . . Susan Rosen (Rosen) was not allowed to be excused "for cause," although she was a therapist treating rape victims and indicated it would be difficult for her to remain impartial[.]

. . . .

Appellant is correct in pointing out that Furr had seen media reports concerning the case; had a child, who was a carrier for the Morning Call (as was Schmoyer); and knew the pastors at the church attended by Schmoyer. However, none of these observations offers much assistance to his cause.

Initially, we note that mere exposure to media reports does not render a prospective venire person unable to sit on the jury. *See Commonwealth v. McGrew*, 100 A.2d 467, 470 (1953) (observing that "[t]he fact that a juror has read or heard about a case and has an impression or an opinion, or a prejudice is not ground for rejection for cause if he testifies and the Court believes that his opinion is not fixed and that he can and will make up his mind solely from the evidence which will be presented at the trial of the case").

Admittedly, Furr stated that she had an "emotional response" to what happened to Schmoyer, who was a Morning Call carrier, because her son was once a carrier for this paper and she worried about him. N.T., 10/12/1994, pp. 871, 881. However, Furr testified that she did not have a fixed opinion about Appellant's guilt or innocence. *Id*. at 872–73, 883. She also later stated: "I don't think that I have reacted differently or with more of a fixed opinion than any other parent" and further characterized her response to the Schmoyer homicide as a "reaction . . . much the same as any parents would be." *Id*. at 883.

Although Furr acknowledged knowing the pastors at the church attended by Schmoyer, who were also involved in Schmoyer's funeral service, she testified to having "no personal involvement" in the matter. N.T., 10/12/1994, p. 884. We fail to see how this association amounts to "a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses" to provide a basis for disqualification "for cause." *Colson*, 490 A.2d at 818.

Finally, citing to the transcript of the voir dire, Appellant argues that Furr questioned her own ability to remain impartial. *See* Brief for Appellant, p. 50. This is simply not the case. Rather, Appellant is mischaracterizing the record— Furr did not express concerns about her ability to remain impartial; she testified that she "would not react favorably to graphic photographs of murdered persons" and "would [likely] have an emotional response to that." N.T., 10/12/1994, p. 893. As the trial court observed, "[Furr also] stated that [despite the graphic photographs] she would . . . try to focus on the information and weigh it fairly and that she could not imagine that a possible 'emotional reaction to graphic details' of the

photographs would be very uncommon." Trial Court Opinion, p. 24; N.T., 10/12/1994, p. 894.

. . . .

With respect to Rosen, Appellant contends that, because this venire person and her mother worked as therapists, who treated rape victims, she had "situational affinity" that would "cloud her judgment and undermine her impartiality." Brief for Appellant, p. 52. Again, however, Appellant is overly selective in referring to the answers given by Rosen.

It is true that Rosen's immediate reaction to the news accounts was that Appellant was guilty. N.T., 10/18/1994, pp. 1968–70. Rosen also stated that because of her work with women who have been raped and sexually abused, "it might be hard for me to stay impartial." *Id*. at 1972–73 (emphasis supplied). Nonetheless, Rosen also testified that she would be able to follow the judge's instructions regarding burden of proof even through she already had a fixed opinion that Appellant was guilty and that the penalty phase of the trial would not affect her ability to look at and weigh all of the facts and make a determination of guilt or innocence. *Id*. at 1972; 1974–75. After the prosecutor and trial counsel explained the nature of the penalty phase proceedings, Rosen testified that she could impose a life sentence, if the mitigating circumstances outweighed the aggravating circumstances. *Id*. at 1980–81. Finally, when counsel for defense asked Rosen whether she would be able to put aside her fixed opinion about Appellant's guilt and "be able to fair and impartially judge the testimony that's coming in and render a fair and impartial verdict," Rosen responded as follows:

I think in listening to the media, everyone always has a fixed opinion listening to what's on the news. So when we do come in here, I think we would have to realize it would all be different. You would be kind of starting fresh. But, so, see, I think I know what the right thing is to do. So I think I probably would do it. I would do it, I mean.

*Id*. at 1989–90. Hence, a fair reading of the voir dire transcript reveals that Rosen did not indicate a categorical bias as a result of her or her mother's profession and shows that she could put aside her personal views and be an objective juror.

*Robinson I*, 581 Pa. at 203-10.

The applicable federal law guarantees every criminal defendant "the right to a . . . trial [ ] by an impartial jury." U.S. Const. Amend. VI. Complementing this right are the protections afforded by the Due Process Clause, which require "that, if a jury is to be provided [ ], regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the

extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).

Voir dire examination serves to protect the right to an impartial jury by providing the parties a

means of uncovering juror bias. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143–44 (1994).

Bias that emerges in response to voir dire questioning can lead to excusal of a juror for cause or

may facilitate the parties' exercise of peremptory strikes. *McDonough Power Equip., Inc. v.

Greenwood*, 464 U.S. 548, 554 (1984). Courts have distinguished between two types of

challenges for cause: those based on actual bias, and those based on implied bias. *U.S. v.

Mitchell*, 690 F.3d 137, 142 (3rd Cir. 2012).

The doctrine of implied bias is rooted in the recognition that certain narrowly-drawn

classes of jurors are highly unlikely, on average, to be able to render impartial jury service

despite their assurances to the contrary. *Mitchell*, 690 F.3d at 142. Because implied bias deals in

categories prescribed by law, the question whether a juror's bias may be implied is a legal

question, not a matter of discretion for the trial court. *Id*. For instance, the Third Circuit

explained that a victim of a crime might insist that she can serve as an impartial juror in her own

assailant's trial, but the law imputes bias to her categorically because the average person in her

situation likely would harbor prejudice, consciously or unconsciously, which mandates her

excusal for cause. *Id*. Some other examples include a juror being an actual employee of the

prosecuting agency, the juror being a close relative of one of the participants in the trial or the

criminal transaction, or the juror being a witness or somehow involved in the criminal

transaction. *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). Notably, in

these instances the juror is put in a potentially compromising situation. *Id*. at 217. However, the

Supreme Court noted that due process does not require a new trial every time a juror has been

placed in a potentially compromising situation. *Id*. Due process means a jury capable and willing

to decide the case solely on the evidence before it, and a trial judge to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Id*.

The test for implied bias focuses on "whether an average person in the position of the juror in controversy would be prejudiced." *Mitchell*, 690 F. 3d at 142. Courts look to the facts underlying the alleged bias to determine if they would create in a juror an inherent risk of substantial emotional involvement. *Id*. at 143. The Third Circuit has affirmed that implied bias remains available, in appropriate circumstances, to disqualify jurors whose connection with the litigation makes it highly unlikely that they can remain impartial adjudicators. *Id*. at 144.

Next, actual bias, also known as bias in fact, is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Mitchell*, 690 F.3d at 142. To "rebut the presumption of a prospective juror's impartiality," it is not enough for a defendant to point to "the mere existence of any preconceived notion as to the guilt or innocence of the accused." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Rather, a juror is deemed impartial if he can set aside his impression or opinion and render a verdict based on the evidence presented in court. *Id*. A juror's expression of doubt about his own impartiality does not necessarily lead to a finding of actual bias. *United States v. Meehan*, 741 F. App'x 864, 872 (3rd Cir. 2018) (citing *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001)). For instance, the Supreme Court upheld the impaneling of jurors who, during voir dire, expressed doubts, or even disclaimed outright their ability to be impartial. *See Patton v. Yount*, 467 U.S. 1025, 1032 (1984). The Third Circuit gives broad latitude to the impaneling judge to determine whether to excuse a prospective juror based on actual bias because the impaneling judge "possesses a superior capacity to observe the demeanor of prospective jurors and to assess their credibility." *Mitchell*, 690 F.3d at 142. Now, the Court will address the specific individuals Robinson identified.

### i.   Lynn Furr's Colloquy

The colloquy of Lynn Furr is as follows:

[Q.  Defense Attorney:] Okay. Let's leave that. I'm satisfied with that. Now, with regards to what you had indicated to Judge Diefenderfer when he made his introductory remarks and questions, you had stated that you do have a fixed opinion as to Mr. Robinson's guilt or innocence.

[A:] I would not call it an opinion. I would call it an emotional response to the case because I was the parent-- I am still the parent, though the child is no longer a child and no longer delivering  the paper -- but I think that there is a reaction among people who have had children out on the streets delivering papers in the early morning hours. It makes one form an opinion.

. . . .

[Q:] With regards to your -- now, you have an emotional response. Does that emotional response in any way interfere with your ability to render a decision in Mr. Robinson's case regarding his guilt or innocence?

[A:] That is a very difficult question to answer.

[THE COURT:]  Well, I think she did answer that.

[A:]  I have tried to  answer it to the best of my ability.

[Defense Counsel:] Yes. I was confused regarding her answer to it because it seemed to me that she –

[THE COURT:]  Well, she said that she doesn't have a completely fixed opinion and it would be a difficult thing to surmise or conjecture, I guess. I don't know what word exactly Mrs. Furr used to answer that question, if she were put into that spot; but the point is, she doesn't have a completely fixed opinion relative to the guilt or innocence of the defendant because of that. I don't want to put words in your mouth.

[A.] That's correct. I think my reaction to this is much the same as any parents would be.

[THE COURT:] I think so.

[Defense Counsel:] Okay.

[A:] I don't think that I have reacted differently or with more of a fixed opinion than any other parent.

[THE COURT:] And that's not an abnormal reaction as to what occurred to the victim.

[A:] um-hum.

[THE COURT:] But as to an opinion as to the guilt or innocence of Mr. Robinson, you're not solid on that?

[A:] No.

[THE COURT:] I think she answered that.

N.T. 10/12/1994, at 881-83

Here, Lynn Furr exhibited neither implied bias or actual bias. As to implied bias, Furr was not the victim of one of the alleged crimes, not a witness, and did not have a family member or close friend testifying. She did not exhibit any category of implied bias. Moreover, Furr did not display actual bias. While Furr hesitated regarding the emotional factor of Robinson's crimes, she stated she had no opinion as to the guilt or innocence of Robinson. Thus, she would have been a juror with an open mind. Her "emotional response" was due to having a child with a newspaper route, similar to one of the victims in this case, but she stated numerous times she would have been a juror without a fixed opinion as to the guilt or innocence of Robinson. Furr's response passes muster under existing Third Circuit precedent. *See Meehan*, 741 F. App'x at 872. The trial court had the ability to analyze Furr's answers, tone, and body language at the time of the responses and felt Furr's answers were not worthy of an excusal. The trial court did not abuse its discretion in doing so as it has wide latitude in analyzing jurors for actual bias. This Court agrees as Furr stated she did not have an opinion as to the guilt or innocence of Robinson numerous times. Accordingly, the trial court did not abuse its discretion as it used its "superior capacity" to analyze Furr's remarks and this determination was not contrary to clearly established federal law.

75
090820

### ii.    Susan Rosen's Colloquy

Susan Rosen's colloquy is as follows:

[Q. Defense Counsel:] You indicated in question it would be difficult for you to be objective.

[A:] Um-hum.

[Q:]  And could you explain that and elaborate on that a little bit please?

[A:] Okay. I guess, just through my experiences of, you know, living in Philly, sometimes, you know, you hear all this stuff about murders, and my, I don't know, I believe in the death penalty. So I think that if someone is going to take someone else's life, then, I'm a strong believer in the death penalty. So I don't know if that would be a problem here.

. . . . .

[Q:] The Judge is going to instruct you regarding burden of proof, weight of the evidence, and he's going to say something to the effect that the Commonwealth has the burden of proof.

They have to prove their case beyond a reasonable doubt. And he's also going to -- he also may instruct you that the defendant, in a criminal case, does not have to take the witness stand. He doesn't have to say anything and he has no burden at all, meaning, he doesn't have to prove anything.

Will you be able to follow the Judge's instructions regarding the burden of proof?

[A:] Yes.

[Q:] Even though you already have a fixed opinion that Mr. Robinson is guilty?

[A:] (Nodded affirmatively.)

[Q:] Will you be able to put that out of your mind and follow what Judge Young will instruct you?

[A:] I think, until -- actually, I would be able to. I don't know if my subjectivity would come into it. I really can't answer that question.

. . . .

[Q:] If I confused you, let me put it to you-- let me try this way. Knowing that you'll have to deliberate on life or death if you find the individual guilty

[A:] Um-hum.

[Q:] -- will that in any way affect your ability to look at and weigh all of the facts and make a determination of guilt or innocence?

[A:] No.

. . . .

[Q:] Would you be able to put aside your fixed opinion as to Mr. Robinson's guilt and be able to fair and impartially judge the testimony that's coming in and render a fair and impartial verdict?

[A:] I think in listening to the media, everyone always has a fixed opinion listening to what's on the news. So when we do come in here, I think we would have to realize it would all be different You would be kind of starting fresh. But, so, see, I think I know what the right thing is to do. So I think I probably would do it. I would do it, I mean.

N.T. 10/18/1994, at 1967-89.

Here, Rosen exhibits no issues with implicit bias or actual bias. As to implicit bias, Rosen does not have a family member of close friend working with the Commonwealth or Robinson, did not witness the crime or otherwise be connected to the crimes. Furthermore, as to actual bias, Rosen's statement of Robinson's guilt is insufficient per Supreme Court precedent. Rosen stated, at trial, her views would be starting fresh because it is a different environment. She additionally stated her views would not affect the trial court's instructions to the guilt or innocence of Robinson. These statements are sufficient to rebut any implication of actual bias asserted by Robinson, notwithstanding the fact Rosen stated she is a "strong believer" in the death penalty. See *Irvin*, 366 U.S. at 723. The trial court had the ability to analyze the statements and demeanor of Rosen at the time, this Court does not have the luxury of doing so. Thus, the trial court did not abuse its discretion in this instance as Rosen stated her intention to start fresh and be a juror with an open mind.

## I. Issue Nine

In Issue Nine, Robinson alleges he was denied a jury pool that was representative of his community and that his trial counsel were ineffective for failing to object to this lack of representation. Robinson further alleges that PCRA counsel, when presenting this claim on collateral review, was ineffective for failing to obtain evidence showing the racial composition of Lehigh County and of the jury pool.

The Sixth Amendment to the United States Constitution provides criminal defendants with the right to a jury drawn from a fair cross section of the community: "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial [ ] by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. Amend. VI. "The American concept of the jury trial contemplates a jury drawn from a fair cross section of the community . . . It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (internal quotation marks omitted).

However, "[t]his requirement is not without substantial limits – it does not guarantee that juries be 'of any particular composition.'" *United States v. Weaver*, 267 F.3d 231, 236 (3d Cir. 2001) (citing *Taylor*, 419 U.S. at 538). What is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538. The purposes of the fair cross section requirement include avoiding "the possibility that the composition of the juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community" and avoiding the "appearance of unfairness" that would result from excluding "large groups of individuals, not on

the basis of their ability to serve as jurors, but on the basis of some immutable characteristic such as race, gender or ethnic background." *Weaver*, 267 F.2d at 236 (quoting *Lockhart v. McCree*, 476 U.S. 162, 175 (1986)).

The United States Supreme Court set forth the elements of a fair cross section claim in *Duren v. Missouri*, 439 U.S. 357 (1979). To establish such a claim, the defendant must demonstrate (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in jury venires is not "fair and reasonable" in relation to the number of such persons in the community; and (3) the under representation is caused by the "systematic exclusion of the group in the jury selection process." *Id*. at 364. A defendant need not establish discriminatory intent. *See id*. at 368 n. 26.  Once a defendant has made a prima facie showing of a fair cross section claim, the burden shifts to the government to justify "this infringement [of Sixth Amendment rights] by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id*. at 368.

The Court is mindful that the Pennsylvania Supreme Court has rejected various attacks on the basis that African–Americans were under-represented in the racial composition of a jury panel drawn from voter registrations lists. *See Commonwealth v. Bridges*, 757 A.2d 859, 868 (Pa. 2000); *Commonwealth v. Henry*, 569 A.2d 929, 933 (Pa. 1990); *See also Ramseur v. Beyer*, 983 F.2d 1215, 1235 (3d Cir. 1992) (holding that the defendant had not made a prima facie showing that the juror source lists, consisting of the names found on the Department of Motor Vehicles licensed driver list and the voter registration list, used in Essex County violated his rights under the Equal Protection Clause of the Fourteenth Amendment, nor his Sixth Amendment right to trial by a fair cross-section of the community). Likewise, the reasoning and holdings of those cases have been extended to approve the usage of driver's license lists for purposes of jury

selection. *See Commonwealth v. Johnson*, 815 A.2d 563, 575 (Pa. 2002) (plurality) ("Absent some showing that driver's license selection procedures are inherently biased, [the defendant] has failed to distinguish jury pool lists derived from voter registration records from those derived from driver's license registration lists."); *See also United States v. Weaver*, 267 F.3d 231, 237 (3d Cir. 2001) (rejecting the defendant's fair-cross section challenge to the plan approved by the Western District of Pennsylvania, which employs voter registration lists as the exclusive source from which it summons potential jurors for service).

The PSC addressed the issue as follows:

Appellant argues that his trial counsel was ineffective for failing to ask the trial court to modify the procedures employed in Lehigh County to select members of the pool of jurors available to try this case. He points out that in Lehigh County trial jurors are selected from lists purchased from the Pennsylvania Department of Transportation (PennDOT) that contain names of residents of the county, who are registered with PennDOT. Appellant maintains that this procedure is "unlawful, improper, and violates [his] legal and constitutional rights" because: (1) "it is likely to result in juries unrepresentative of a cross section of the community, and . . . ha[s] continuously failed to represent certain identifiable population groups over an extended period of time;" (2) "the process systematically excludes youthful, elderly and disabled citizens, because the percentages of youthful, elderly and disabled voters is substantially smaller than the percentages of youthful, elderly and disabled citizens in the population of the county;" (3) " the process systematically excludes large numbers of non-caucasian population from jury service, because the percentage of non-caucasians driving or otherwise registered with [PennDOT] is substantially smaller than the percentage of non-caucasians in the population of the county;" (4) "the process systematically excludes large numbers of youthful, elderly and disabled citizens from jury service, because the percentage of youthful, elderly and disabled citizens driving or otherwise registered with [PennDOT] is substantially smaller than the percentage of non-caucasians in the population of the county;" and (5) "[t]he system violates the statutory requirements for the selection of trial jurors." Brief for Appellant, pp. 18–19.

The applicable Pennsylvania statute, entitled "Selection of prospective jurors," provides in relevant part:

At least annually the jury selection commission shall prepare a master list of prospective jurors. The list shall contain all voter registration lists for the county, which lists may be incorporated by reference, or names from such other lists which in the opinion of the commission will provide a number of names of prospective

jurors which is equal to or greater than the number of names contained in the voter registration list.

42 Pa.C.S. § 4521(a). We have held on numerous occasions that to establish a prima facie violation of the requirement that a jury array fairly represent the community, the defendant must prove that: (1) the group allegedly excluded a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *See Commonwealth v. (Raymond) Johnson*, 838 A.2d 663, 682 (2003), *cert. denied*, 543 U.S. 1008 (2004); *Commonwealth v. (Roderick) Johnson*, 815 A.2d 563, 575 (2002). For purposes of this analysis, "'[s]ystematic' means caused by or inherent in the system by which juries were selected." *(Roderick) Johnson*, 815 A.2d at 575.

At the time of Appellant's trial, Lehigh County drew its jury pool from the list of licensed drivers in the county. See N.T., 10/19/1994, pp. 2329–58. Four years ago, in *Commonwealth v. Lopez*, 739 A.2d 485 (1999), *cert. denied*, 530 U.S. 1206 (2000), we addressed this method of jury selection in Lehigh County, finding it "statutorily permissible," *Lopez*, 739 A.2d at 494 n. 13, and see no reason to reconsider our decision. Additionally, despite his complicated argument, Appellant utterly fails to present even a semblance of statistical proof that the jury pool selection procedure utilized in Lehigh County unfairly misrepresents the number of non-caucasians, youthful, elderly, and disabled citizens in the community. Accordingly, Appellant has not established even a prima facie argument for purposes of this analysis, *see Lopez*, 739 A.2d at 495, and his ineffectiveness argument on this issue fails.

*Robinson I*, 581 Pa. at 198-200.

Robinson cites to cases from California, Arizona, and New York to support his theory that driver's license records systematically exclude African Americans and Latino Americans. However, as was explained to Robinson on appeal, the Pennsylvania Supreme Court has specifically found that Lehigh County's process of drawing its jury pool from the list of licensed drivers in the county does not unfairly misrepresent the community. *See Lopez*, 739 A.2d at 494. The court in *Robinson I* did not make an unreasonable application of state or federal law.

Moreover, Robinson's attempt to distinguish *Lopez* based on statistical evidence is unpersuasive. While Robinson correctly states African Americans and Latino Americans are

distinctive groups, he cannot establish the jury array unfairly represents the community.

Robinson complains that these groups were significantly underrepresented because African

Americans constituted only 1.3% of the panel and Latino Americans constituted less than 3%.[5]

However, Robinson ignores his own figures showing that African Americans represented only

2.3% of the total population in Lehigh County and Latino Americans represented 5.2% of the

total population.  When taking these percentages into account, there is an absolute disparity[6] of a

mere 1% for African Americans and only 1.9% for Latino Americans.  These percentages are

well below the absolute disparities deemed to show substantial underrepresentation.  *See*

*Ramseur*, 983 F.2d at 1232 ("Courts addressing the question of whether a given absolute

disparity constitutes 'substantial underrepresentation' have held that absolute disparities between

2.0% and 11.5% do not constitute substantial underrepresentation.").  Although the comparative

disparities,[7] 43.5% and 36.5% respectively, present a closer case, they are still below the

percentages courts have found impermissible.  *See id.* (determining that while the defendant's

evidence of a comparative disparity of about 40% was "borderline," is was "below the

percentage of 45.4% condemned in *Preston v. Mandeville* , 428 F.2d 1392 (5th Cir. 1970) and

close to the 42% comparative disparity found permissible in *Swain v. Alabama*, 380 U.S. 202 []

(1965)").

---

[5]     In reaching the percentage of Latino Americans, Robinson, counting four prospective
jurors, apparently does not count the one juror that was selected for another case.  In determining
whether Lehigh County systematically excluded this group, the prospective juror should not be
ignored.  Regardless, even if this prospective juror is not considered, the claim fails.

[6]     "Absolute disparity in the jury selection context is defined as the difference between the
percentage of a certain population group eligible for jury duty and the percentage of that group
who actually appear in the venire."  *Ramseur*, 983 F.2d at 1231.

[7]     "Comparative disparity is calculated by dividing the absolute disparity by the population
figure for a population group."  *Ramseur*, 983 F.2d at 1231.

Additionally, "[w]hen comparative disparity has been used, it has been emphasized that the significance of the figure is directly proportional to the size of the group relative to the general population, and thus is most useful when dealing with a group that comprises a large percentage of the population." *Weaver*, 267 F.3d at 242. Because the population percentages here, even when combined, represent only 7.5% of the population in Lehigh County and because absolute disparity is the "preferred method of analysis," Robinson has not shown that the jury selection process violated his constitutional rights. *See Weaver*, 267 F.3d at 242 (rejecting the defendant's fair cross section challenge despite the comparative disparities of 40.01% for African-Americans and 72.98% for Hispanics because they comprised such a small percentage of the population, and the absolute disparity figures of 1.23% and .71%, respectively, were low). The statistical evidence does not support Robinson's challenge to a fair cross-section of the jury and his claim is denied.

### iii. Ineffective assistance of trial and PCRA counsel

Robinson's trial counsel was not ineffective for failing to object to the lack of representation of African Americans and Latino Americans on the jury panel. For the reasons discussed in the preceding section, any objection by trial counsel would have been futile. *See Commonwealth v. Bryant*, 579 A.2d 726, 742 (Pa. 2004) (stating, "[t]rial counsel cannot be held to be ineffective for failing to take futile actions or raise a meritless claim"). Robinson's trial counsel cannot be held to be ineffective for failing to raise a futile objection. Accordingly, trial counsel were not ineffective for failing to raise an objection regarding the diversity of the jury panel.

Next, Robinson asserts his PCRA counsel was ineffective for failing to present statistical evidence to support the fair-cross section claim. However, because the statistical evidence does

not support the meritless claim, he was not prejudiced by PCRA counsel's allegedly deficient conduct.

**J. Issue Ten**

In Issue Ten, Robinson argues that the trial court improperly admitted evidence of prior bad acts. Specifically, Robinson alleges the evidence regarding his attack on Sam-Cali, and his subsequent arrest, was graphic, inflammatory, and unduly prejudicial constituting a violation of his constitutional rights. Robinson asserts this evidence prejudiced him not only at trial, but also at sentencing. He lastly asserts his trial court and PCRA counsel were ineffective.

To the extent that Robinson is raising a state-law evidentiary issue, his claim is not cognizable in a federal habeas proceeding. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001). "A federal habeas court is limited to deciding whether the admission of the evidence rose to the level of a due process violation." *Id*. In analyzing this, "a reviewing court must examine the relative probative and prejudicial value of evidence to determine whether its admission violated defendant's right to a fair trial." *Lesko v. Owens*, 881 F.2d 44, 51 (3d Cir. 1989). Robinson has not advanced any basis on which to conclude that the admission of evidence of a prior conviction amounted to a denial of due process. *See Allen v. Superintendent Waymart SCI*, 703 F. App'x 91, 97 (3d Cir. 2017) (citing *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) (recognizing that no clearly-established Supreme Court precedent establishes that admission of prior bad acts evidence violates due process)).[8]

Nonetheless, Pennsylvania state law governs the admissibility of prior bad acts as follows:

(b) Crimes, Wrongs, or Other Acts.

---

[8]      Similarly, in his brief to the PSC on direct appeal, Robinson raised only an allegation of error under state law.  *See* Petitioner's Brief at 57-61. Any attempt to present the claim as an allegation of error under the due process clause would be procedurally defaulted and unreviewable.

(1) Prohibited uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

With respect to Rule 404(b), courts in Pennsylvania have explained: "[E]vidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Melendez–Rodriguez*, 856 A.2d 1278, 1283 (Pa. Super. 2004). Nevertheless, "[e]vidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Id*. Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. *Commonwealth v. Chmiel*, 889 A.2d 501 (Pa. 2005). When offered for a legitimate purpose, evidence of prior crimes is admissible if its probative value outweighs its potential for unfair prejudice. *Commonwealth v. Hairston*, 84 A.3d 657 (Pa. 2014).

The PSC addressed the issue as follows:

On appeal, Appellant presents a number of claims relating to Denise Sam–Cali, who testified about her assault in the early morning hours of June 29, 1993, the subsequent break-ins at her house, and Appellant's apprehension. Initially, he argues that the trial court erred in allowing Sam–Cali to testify, because this allowed evidence of prior bad acts and uncharged criminal conduct to be introduced to the jury. Appellant maintains that Sam–Cali was not a witness to any of the charged offenses and, yet, provided "lurid and inflammatory" testimony, linking Appellant to these incidents. Brief for Appellant, p. 56. Appellant also claims that his counsel was ineffective for failing to: (1) object to this testimony; and (2) request a limiting instruction in relation to this evidence.

Initially, we note that Sam–Cali's testimony is admissible under the same principles supporting the joinder of the three homicides, i.e., to establish the identity of the perpetrator, his motive, intent, and a common criminal scheme. *See Elliott*, *supra*; *Miller*, *supra*; *Hughes*, *supra*. Furthermore, such testimony would be allowed under the "res gestae" exception to the rule against admission of evidence of prior crimes. As we explained in *Commonwealth v. Lark* (*Direct Appeal*), 518 Pa. 290 (1988)

Evidence of distinct crimes are not admissible against a defendant being prosecuted for another crime solely to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. . . . [One such] special circumstance where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. This special circumstance, sometimes referred to as the res gestae exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.

*Id*. at 497 (emphasis in original, internal citations omitted). In the present case, the incidents at the Sam–Cali residence are intricately interwoven with the three homicides in question. The initial assault on Sam–Cali took place approximately two weeks before the Fortney homicide and Sam–Cali's testimony provided the jury with a "complete story" of Appellant's criminal spree from the Burghardt homicide in August of 1992 to Appellant's capture in July of 1993. In sum, as the trial court explained, "Sam–Cali's testimony was not offered merely to indicate [Appellant]'s propensity to commit similar crimes . . . but to show he committed these crimes charged, how he committed them, why he committed them and the circumstances of his apprehension." Trial Court Opinion, p. 32.

We also reject the ineffectiveness arguments raised by Appellant in relation to this substantive claim. First, Appellant's counsel objected to Sam–Cali's testimony on several occasions, on the basis that it was prejudicial, because it allowed the jury to consider evidence of other crimes perpetrated by Appellant. *See* N.T., 11/3/1994, pp. 1918–21, 1965. Second, while counsel for Appellant did not ask for a limiting instruction in relation to Sam–Cali's testimony, such request would have been (at best) redundant, as it appears that the trial court asked if such an instruction was required and, after receiving an affirmative response from the prosecutor, in fact, instructed the jury as to the limited purpose of this evidence. *See* N.T., 11/3/1994, pp. 1919–21, 1965–66. The trial court again cautioned the jurors about the limited use of Sam–Cali's testimony during the final jury instructions. *See* N.T., 11/8/1994, pp. 2279–2280.

*Robinson I*, 581 Pa. at 215-16.

Here, to the extent Robinson argues the trial court improperly admitted his prior bad acts testimony, it is outside the analysis of this Court. However, if Robinson argues this admission violated his due process, there is no Third Circuit precedent which supports his proposition. Robinson addresses his argument on the prejudicial nature of this admission, focusing on the evidentiary issue rather than the due process issue. Assuming arguendo of the evidentiary issue, this Court must note the substantial similarities between prior bad act evidences at the federal and Pennsylvania level. Nonetheless, no due process violation occurred with the admission of this information. The testimony highlighted the similarity of the allegations against Robinson, such as the identity of Robinson, his motive, intent, and the common criminal scheme. This testimony was not so dissimilar as to be so prejudicial that it denied Robinson's right to a fair trial.

The cases Robinson cites are inapposite in light of Third Circuit precedent. *See*, *e.g.*, *Minett v. Hendricks*, 135 F. App'x 547, 553 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent); *see also Charlton v. Franklin*, 503 F.3d 1112, 1115 (10th Cir. 2007) (state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief). Robinsons case law fails to address this point. He fails to address this because there is no precedent to do so. Notwithstanding Robinson's failure, his claim cannot proceed as there was no due process violation.

### i. Ineffective assistance of counsel

Here, Robinson's trial counsel was not ineffective. Contrary to Robinson's argument, his trial counsel did object to the prior bad acts evidence. As the PSC noted, Robinson's trial counsel objected to the testimony numerous times. Therefore, Robinson's trial counsel performed its duty

by objecting to the testimony. Moreover, as the PSC correctly notes, the trial court inquired about an instruction regarding the testimony, thus making any request by trial counsel redundant. The request by trial counsel not only would have been redundant, but also futile in light of the trial court's request. Robinson attempts to argue what already occurred at his trial, an objection and a limiting instruction. Accordingly, Robinson's trial counsel was not ineffective during this portion of the trial.

Robinson's argument that appellate counsel was ineffective must also be rejected. As is discussed above, there is no merit to the claim presented here. The trial court admitted the evidence due to the similarities between the issues. As the state court concluded, this decision was in accord with state law. Further, the admission did not violate Robinson's due process rights. Accordingly, Robinson has not demonstrated that prior counsel were ineffective.

## K. Issue Eleven

In Issue Eleven, Robinson asserts a variety of statements he alleges are prosecutorial misconduct. He states the Commonwealth inflamed the passions of the jury during trial and sentencing by calling him a predator, the Commonwealth improperly placed the burden of proof on him in their argument, and the Commonwealth violated his Fifth Amendment right to remain silent in their argument.

The PSC addressed the issue as follows:

Appellant complains that during his opening statement to the jury, the prosecutor referred to Appellant as a "predator," N.T., 10/24/1994, p. 57, and asked the jury not "to lose sight of the ferocity of what was involved here, of the violence, of the intent to kill," N.T., 10/24/1994, p. 59.

The Webster's Third New International Dictionary defines "predator" as, inter alia, "one that prays, destroys, or devours" and "predatory" as, inter alia, "relating to, or practicing plunder, pillage, or rapine[;] using violence or robbery for aggrandizement[;] destructive, harmful, injurious." Webster's Third New International Dictionary of the English Language Unabridged, p. 1785. These

definitions are entirely consistent with the way the Commonwealth portrayed Appellant to the jury—a calculating attacker, who prowled the East Allentown area, and killed his victims with vicious ferocity.

Moreover, the intent of the perpetrator, which the prosecutor's statement emphasized, is an essential element that the Commonwealth must prove to establish first-degree murder. *See* 18 Pa.C.S. § 2502(a) (defining "murder of the first degree" as "[a] criminal homicide . . . committed by an intentional killing") (emphasis supplied); *also see* 18 Pa.C.S. § 2501(a) (stating that "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being") (emphasis supplied). Thus, it was entirely appropriate for the prosecutor to focus the jury's attention on this aspect of the case.

As reflected above, we believe that these statements were within the context of the evidence presented by the Commonwealth. Therefore, this Court finds no misconduct on the part of the prosecutor and rejects Appellant's claim that his counsel was ineffective for failing to object to these comments.

ii. Closing Statement

Appellant argues that the prosecutor's guilt phase summation was inflammatory because he: (1) referred to Appellant as a "territorial predator," N.T., 11/8/1994, p. 2246; (2) stated that "only four people have seen [Appellant's] behavior and action and only one of them is alive to tell you about her experiences with him," N.T., 11/8/1994, p. 2247; and (3) told the jury that "[i]t's time to put the nightmare on the east side to bed. It's time to do that by returning verdicts of guilty, guilty, guilty." N.T., 11/8/1994, p. 2272. Additionally, Appellant contends that the prosecutor improperly commented upon his failure to produce evidence, when, he stated as follows:

Do you think . . . if they had somebody who could refute the Commonwealth's witnesses, we would not have seen that witness from the witness stand?

N.T., 11/8/1994, p. 2248; *see also* N.T., 11/8/1994, p. 2265. Appellant asserts that, by way of this comment, the prosecutor suggested that the defense had some burden of proof in the case.

Again, the characterization of Appellant as a "territorial predator" is entirely consistent with the case presented by the prosecutor, who maintained that Appellant targeted a certain type of victims within a specific geographical area. Similarly, the comment that only one of Appellant's victims was still alive was appropriate, in light of the Commonwealth (1) providing testimony that Appellant attacked Burghardt, Schmoyer, Fortney, and Sam–Cali; (2) offering proof that Appellant was responsible for the killings of Burghardt, Schmoyer, and Fortney; and (3) presenting the testimony of Sam–Cali as the only victim who survived her encounter with Appellant. Furthermore, the prosecutor's reference to "the

nightmare on the east side," falls squarely within the gamut of permissible oratorical flare.

Finally, a reading of the entire guilt phase summation by the prosecutor does not disclose any unfair suggestion that Appellant bore some burden of proof in the case. Indeed, the statement cited by Appellant refers to the fact that the DNA evidence presented by the Commonwealth via testimony of several expert witnesses was uncontradicted by any defense witnesses, which is fully consistent with the case presented to the jurors. Furthermore, the trial court instructed the jury concerning not making an adverse inference because Appellant did not testify and that, as a matter of law, the defendant is not required to produce any evidence to establish his innocence. *See* N.T., 11/8/1994, pp. 2280–82, 2314. Accordingly, we reject the prosecutorial misconduct arguments and the corresponding counsel ineffectiveness claims asserted by Appellant concerning the prosecutor's guilt phase closing statement.

*Robinson I*, 581 Pa. at 250-53.

### i. Statements at trial and sentencing

Robinson asserts the Commonwealth's statements during the trial and guilt phase improperly inflamed the passions of the jurors and violated his due process. During the trial phase, the Commonwealth called Robinson a, "predator," NT 10/24/1994, at 57, instructed the jury to "never lose sight of the ferocity of what was involved here, of the violence. . . ," *id.* at 59, and called Robinson a "territorial predator" with "[w]ickedness, cruelty, evil. Wickedness of heart. Cruelty of disposition. Cruelty of mind. That was his intent. That was his motivation. It's difficult for us to fathom." NT 11/9/94, at 2246. Robinson further argues while the Commonwealth couched their argument in terms of intent, the message to the jury was that he was evil, cruel, and wicked, and was guilty because of his flawed character. He then asserts that the Commonwealth continued this argument by connecting the attack on Sam-Cali with his "predator" theme, with the Commonwealth stating, "[a]nd it also explains to you why, as a predatorial predator, he had to do away with Denise Sam-Cali." *Id.* at 2262.

Moreover, during the guilt phase, Robinson argues the Commonwealth told the jury that he had failed to express remorse, had failed to show sympathy and mercy, and was depraved. *Id.* at 2707-08. Lastly, Robinson asserts the Commonwealth also improperly suggested that he might be a danger to the members of the jury or the general public, stating, "Yes, within his household he may be fine, but when he gets out, ladies and gentlemen, watch out if you are not in his circle of friends, or his circle of family; watch out." *Id.* at 2710.

The prosecutor is entitled to considerable latitude to argue the evidence and reasonable inferences that can be drawn from that evidence. *See United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) (citing *United States v. Scarfo*, 685 F.2d 842, 849 (3d Cir. 1982)). Moreover, the prosecution "may employ oratorical flair arguing its version of the case to the jury." *Henry v. Horn*, 218 F. Supp. 2d 671, 705 (E.D. Pa. 2002).

The Supreme Court has held that federal habeas relief may be granted when the "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court further opined that for due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))). *See also Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992) (our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecutor's conduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." (quoting *Greer*, 483 U.S. at 765). This determination will, at times, require the Court to draw a fine line - distinguishing between ordinary trial error on one hand, and "that sort of

egregious misconduct which amounts to a denial of constitutional due process" on the other hand. *Ramseur*, 983 F.2d at 1239 (quoting *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 678 (3d Cir. 1976)).

In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, the Court is required to examine those remarks in the context of the whole trial. *Ramseur*, 983 F.2d at 1239 (citing *Greer*, 483 U.S. at 766). The remarks must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights. *Greer*, 483 U.S. at 766 (citing *Donnell*, 416 U.S. at 639). As the United States Supreme Court has held, "habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (internal quotations omitted).

Here, this Court finds no due process violations for the Commonwealth's remarks during the trial phase or guilt phase. During the trial phase, comments such as "predator" and "territorial predator" were consistent with the Commonwealth's theme. The theme of the Commonwealth's case was that Robinson preyed upon the victims, including Sam-Cali. The Commonwealth needed to prove all of the elements of first-degree murder and felt using words such as "predator" and "territorial predator" were tools to persuade the jury. These statements are within the bounds of permissible oratorical flair.

Assuming arguendo the Commonwealth's remarks were undesirable, habeas relief does not automatically attach as there was no due process violation. Robinson's trial counsel had an opportunity to counter these remarks. To demonstrate a due process violation, Robinson must demonstrate that the misconduct averred so infected the trial with unfairness as to make the resulting conviction a denial of due process. Where, as here, the state court has already reviewed and rejected the claim, the habeas petitioner bears an even higher burden – he must establish that

the state court's rejection of the claim was "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 47 (2012). Here the jurors were exposed to gruesome details of Robinson's actions, and the Commonwealth attempted to use the language to tie his behavior to oral persuasiveness. In the context of the entire trial, these remarks were not sufficiently prejudicial as to violate Robinson's due process. The evidence produced at trial was intense, and the language the Commonwealth utilized to attempt to persuade the jury matched the intensity.

### ii. Statements as to burden of proof

Next, Robinson asserts the Commonwealth committed misconduct when the Commonwealth accused him of failing to produce evidence at trial. The statements are as follows:

> Do you think, ladies and gentlemen, if they had somebody who could refute the Commonwealth's witnesses, we would not have seen that witness from the witness stand?

NT 11/8/94 at 2248.

> And again, do you think, if there was somebody else who would come in and refute Dr. Ferrell or Dr. Deadman we wouldn't have seen them from the witness stand? No.

*Id*. at 2265.

In delivering a closing argument, counsel "is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence," *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991)., "[T]he reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of

evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) ("[T]he prosecution is permitted to discuss a defendant's failure to refute its evidence, and defendant's cross–examining technique."); *United States v. Duronio*, No. 02–CR–0933, 2006 U.S. Dist. LEXIS 89303, at *1 (D.N.J. Dec. 8, 2006)

As to the first comment Robinson cites, the Commonwealth was discussing his failure to counter the witnesses the Commonwealth provided. This comment does not shift the burden of proof onto Robinson. The type of comment is permitted as the Commonwealth had wide latitude to argue its case in summation. Similarly, Robinson's second objection relates to the comment about his failure to refute the Commonwealth's expert. This type of statement is also permitted. This statement attacked Robinson's failure to refute, not his burden of proof, and the type of comment is permitted given the wide latitude in summation. *See Werme*, 939 F.2d at 117. Neither of the comments Robinson cites prejudiced him so substantially it violated his due process. These comments were permitted in summation and attacked Robinson's inability to refute the Commonwealth's evidence. Notwithstanding the comments, the trial court apprised the jurors on the burden of proof, thus alleviating any of Robinson's concerns. Accordingly, the Commonwealth's comments did not arise to a due process violation.

### iii. Right to silence during guilty phase

Robinson further asserts the Commonwealth attacked his right to remain silent during the penalty phase summation. The statements are as follows:[9]

---

[9]  Since trial counsel did not object to these comments about Robinson's lack of remorse, any direct challenge to the statement was clearly waived under state law and could only have been brought on direct appeal as a challenge that trial counsel was ineffective for failing to object to these statements.  As such, it would appear that the stand-alone prosecutorial misconduct challenge is procedurally defaulted.  However, Robinson has also presented an ineffectiveness challenge.  Since the Court concludes that the claim is meritless, the Court has reviewed it without discussing the issue of procedural default.  28 U.S.C. 2254(b)(2).

And as he sits there, ladies and gentlemen, we have not heard any remorse. We have not heard any calling for the victims. He sits there, to some degree like a sphinx and you have to decide whether to impose life or death in this particular case.

NT 11/8/94, at 2707.

Think about whether or not there was ever any mercy or sympathy shown for any of the victims in this case. Think about whether or not there is any remorse. And don't think as I said to you in my opening, as you would think as good people, because that's not the way this defendant thinks.

*Id*. The PSC addressed the issue as follows:

The PSC addressed the issue as follows:

Appellant did not testify during either the guilt phase or the penalty phase of the trial. Hence, the statement cited above appears to be an improper reference to Appellant's valid exercise of his federal constitutional right and should have been objected to by trial counsel. We are convinced, however, that Appellant suffered no prejudice as a result of the prosecutor's comment.

First, we note that at issue is a brief statement that did not contain a direct reference to the fact that Appellant did not testify during the trial. Second, the trial court specifically instructed the jury that "[i]t is entirely up to the defendant whether to testify and you must not draw any adverse inference from his silence."

N.T., 11/10/1994, p. 2740. We feel that this instruction more than adequately cured any ill effect of this fleeting comment that (as we stated before) did not even contain a direct reference to Appellant's exercise of his Fifth Amendment right. *See Baker*, *supra* (the jury is presumed to follow the instructions); *Freeman*, *supra*. For all of the above reasons, Appellant is not entitled to relief on this ground.

*Robinson I*, 581 Pa. 253-54.

The Fifth Amendment protects criminal defendants from self-incrimination by permitting them to choose not to testify at their trials. The Supreme Court gave further life to this guarantee by holding that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). This prohibition applies equally to both the guilt and penalty phases of capital proceedings. *See Estelle v. Smith*, 451 U.S. 454, 462–63 (1981) ("We

can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."). It does not mean, however, that prosecutorial comments should not be examined in the broader context of the complete trial. "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (1986) (internal citations omitted); *see also United States v. Hasting*, 461 U.S. 499, 507–09 (1983) (applying the harmless error doctrine to *Griffin*); *Lesko v. Lehman*, 925 F.2d 1527, 1544 (3d Cir. 1991) ("[W]e must examine the challenged prosecutorial remark in its trial context."). Consistent with this overarching fairness standard, the Court has permitted prosecutors to provide a "fair response" to comments made by or on behalf of a defendant regarding his decision not to testify. *United States v. Robinson*, 485 U.S. 25, 32 (1988) (finding that the prosecutor could mention defendant's failure to testify when defense counsel argued that his client had not been given an opportunity to explain himself to the jury).

For example, in *Holland v. Horn*, 150 F. Supp. 2d 706, 771 (E.D. Pa. 2001), *aff'd*, 519 F.3d 107 (3d Cir. 2008, the petitioner challenged the statements made by the prosecutor at the petitioner's capital sentencing proceeding, arguing that they violated the prohibition in *Griffin* against a prosecutor commenting on a defendant's Fifth Amendment decision not to testify. In the Commonwealth's closing argument, the prosecutor asked the jury "has any of you heard any remorse from [Petitioner] in this case? Has any of you seen a tear in his eye? Has he expressed the least bit of remorse for what he did to [the Victim]?" *Id*. The petitioner cited to *Lesko* in support of his argument. *Lesko* involved prosecutorial comments regarding a defendant's choice to testify only in support of mitigation at sentencing. In his closing argument, the prosecutor

criticized the defendant for not having the "common decency to say I'm sorry for what I did." *Lesko*, 925 F.2d at 1544. Further, the prosecutor in *Lesko* went on to represent the overall message of the defendant's testimony as "I don't want you to put me to death, but I'm not even going to say that I'm sorry." *Id*. The court determined that "the natural and necessary interpretation of these comments would be that Lesko had a moral or legal obligation to address the charges against him—indeed, to apologize for his crimes—during his penalty phase testimony, and that the jury could and should punish him for his failure to do so." *Id*. The *Lesko* court found the prosecutor's comments particularly damaging in light of the fact that had the defendant testified to those facts the prosecutor was suggesting should have been inferred from defendant's silence, "such testimony would have [clearly] been self-incriminating." *Id*.

The Court in *Holland* rejected this argument, relying upon the reasoning of the PSC. *See Holland I*, 543 A.2d 1068 (Pa. 1988). The PSC in the *Holland* case gave three separate reasons for denying the petitioner's claim. First, the trial court sustained defense counsel's immediate objection to the statements and provided a curative instruction at the end of the penalty phase. *See id*. at 1077. Second, the prosecutor's comments were intended to address the petitioner's general demeanor, a goal that is acceptable under Pennsylvania law and the Fifth Amendment. *See id*. (citing *Commonwealth v. Travaglia*, 502 Pa. 474 (Pa. 1983)). Finally, the Pennsylvania Supreme Court determined that prosecutor's comments constituted a "fair response" to defense counsel's arguments for the petitioner's remorse. *See id*.

Here, the Court agrees with the PSC about the Commonwealth's comments, but the comments do not rise to a due process violation. Nonetheless, Robinson's reliance upon *Lesko* is inapposite. In *Lesko*, the defendant testified in support of his mitigation during sentencing and the Commonwealth attacked that limited testimony by stating, "I don't want you to put me to

death, but I'm not even going to say that I'm sorry." *Lesko*, 925 F.2d at 1544. *Lesko* is distinguishable because Robinson did not testify and the Commonwealth's comments toward Robinson could not be interpreted that Robinson had an obligation to testify and apologize like the defendant in *Lesko*. Conversely, the Commonwealth's statements are similar to the Commonwealth's in *Holland*, in which the Commonwealth stated, "has any of you heard any remorse from [Petitioner] in this case? Has any of you seen a tear in his eye? Has he expressed the least bit of remorse for what he did to [the Victim]?" *See Holland*, 150 F. Supp. 2d at 771. Neither the defendant in *Holland* nor Robinson testified. Additionally, the Commonwealth was permitted to address the demeanor of Robinson, just like the Commonwealth in *Holland* was permitted to address the demeanor in that case. Accordingly, given the deferential standard of the AEDPA, the Court defers to the decision of the PSC, and finds the opinion of the PSC was not an unreasonable application of clearly established federal law. The Court issued an instruction, and the instruction cured any ill the Commonwealth's statement may have caused.

### iv.    Cumulative effect

The cumulative effect of the statements made at trial and sentencing, as to the burden of proof, and as to Robinson's right to remain silent do not warrant relief. In analyzing all of the statements, the Court believes the statements collectively did not so infect the trial as to render the proceeding a denial of due process. The Commonwealth has wide latitude to make and argue its case. Robinson's trial was no different. Nonetheless, as discussed previously, the trial court issued an instruction to the jury regarding Robinson's silence.

### v.    Ineffective assistance of counsel

At the trial phase, Robinson's trial counsel was not ineffective. As the Court has noted, comments such as predator and territorial predator are within the wide latitude attorneys are

granted during summation. If Robinson's trial counsel elected to, they could have countered this language. However, it was not ineffective to fail to counter. The comments the Commonwealth made were part of their theory of the case, and it did not prejudice Robinson.

With respect to the Commonwealth's statement as to why Robinson did not express remorse for his actions, as the PSC observed this is something that should have been objected to by trial counsel, but the failure to object did not result in prejudice. The comment constitutes a brief statement that did not contain a direct reference to the fact that Robinson did not testify during trial. Further, the court instructed the jury that "[i]t is entirely up to the defendant whether to testify and you must not draw any adverse inference from his silence." N.T. 11/10/1994, p. 2740. This instruction more than adequately cured any effect of the prosecutor's comment. Thus, the comments Robinson cites are distinguishable from *Lesko*, did not result in prejudice and do not rise to the level of a due process violation.

## L. Issue Twelve

In Issue Twelve, Robinson asserts the trial court improperly denied his request for a continuance to allow witness Robert Burns to testify on his behalf. The PSC addressed the issue as follows:

> The defense began its penalty phase presentation on November 9, 1994. However, because the last three defense witnesses, including Robert Burns (Burns), a principal of St. Gabriel's Hall, where Appellant was placed as a juvenile on prior charges, and a secretary from that facility, were out of town and subpoenaed for the next day, the proceedings ended early (at approximately 4:00 pm) and were continued to November 10, 1994. N.T., 11/10/1994, pp. 2630–31. On that day, starting at around 9:30 a.m., the defense resumed its case with the testimony of William Mocriski. N.T., 11/10/1994, pp. 2641–45. His testimony lasted approximately ten minutes and, at its conclusion, Appellant's counsel informed the trial court that the next witness—Burns—would not be arriving until 10:15 a.m. or 10:30 a.m. N.T., 11/10/1994, pp. 2636, 2649–2651. Later, Appellant's counsel acknowledged that this witness was originally subpoenaed for 9:00 a.m. N.T., 11/10/1994, pp. 2651–52. He also related that Burns and the secretary from St. Gabriel's Hall, who was apparently traveling with Burns, were the last witnesses to

testify on behalf of Appellant. N.T., 11/10/1994, pp. 2650–52. The trial court called for a thirty-minute recess and the jury was taken out of the courtroom at 9:44 a.m. N.T., 11/10/1994, p. 2653.

At 10:23 a.m., Appellant's counsel informed the trial court that: (1) Barbara Brown, Appellant's mother, agreed to testify for the defense; and (2) Burns and the secretary from St. Gabriel's Hall would be called to the witness stand after her testimony. N.T., 11/10/1994, p. 2676. The testimony of Barbara Brown concluded at around 10:45 a.m. N.T., 11/10/1994, p. 2695. However, by that time, although one of Appellant's counsels went to find Mr. Burns and the secretary from St. Gabriel's Hall, they were still not present in the courtroom. N.T., 11/10/1994, p. 2695. At that point, the trial court requested that defense counsel make an offer of proof as to the substance of the expected testimony, which he did, identifying the witnesses and stating that their testimony would reflect on Appellant's academic and personal development at St. Gabriel's Hall. N.T., 11/10/1994, pp. 2696–98. The prosecutor refused to stipulate to this testimony, pointing out that there was conflicting evidence as to the extent of Appellant's progress at that facility. N.T., 11/10/1994, p. 2698.

By 10:50 a.m., counsel for Appellant, who went to retrieve the two witnesses, returned to the courtroom and stated that they still did not arrive. N.T., 11/10/1994, p. 2700. The court then waited until 11:00 a.m., giving the defense another opportunity to locate and present the two remaining witnesses. N.T., 11/10/1994, pp. 2704–05. At that time, because the witnesses still could not be located, over several objections by Appellant's counsel, the trial court ordered the parties to proceed with oral argument, explained to the jury the cause of the delay, and gave them a brief synopsis of the expected testimony that the defense sought to present and the prosecutor's rebuttal to that testimony. N.T., 11/10/1994, pp. 2699, 2703–06. Following the jury charge, the trial court admonished Burns, who, according to Appellant's counsel, arrived at 11:00 a.m., found Burns in contempt, and ordered him to pay a fine in the amount of $500.00. N.T., 11/10/1994, pp. 2770–71.

Presently, Appellant argues that his sentence must be vacated because the trial court "unjustifiably" refused to grant a continuance to allow Burns to testify. He also argues that his counsel was ineffective for failing to obtain such continuance.

 "The grant or refusal of a request for a continuance is a matter vested in the sound discretion of the trial court, and its decision, to grant or deny the request, will not be reversed by an appellate court in the absence of an abuse of that authority." *Commonwealth v. Birdsong*, 538 Pa. 587, 650 A.2d 26, 34 (1994). The factors to be considered to determine whether the trial court's discretion was properly exercised are: (1) the necessity of the witness to strengthen the defendant's case; (2) the essentiality of the witness to defendant's defense; (3) the diligence exercised to procure his presence at trial; (4) the facts to which he would testify; and (5) the likelihood that he could be produced at the next term of court. *See id.* at 34;

*Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385, 395 (1987), *cert. denied*, 485 U.S. 929 (1988); *Commonwealth v. (Eddie) Smith*, 442 Pa. 265 (1971).

Appellant acknowledges that Burns "was scheduled to appear as the first witness of the day, but was delayed in his arrival." Brief for Appellant, p. 92 (emphasis supplied). Although there is conflicting evidence as to the true extent of the witness' absence, one thing is clear—Burns was inexcusably late for a trial where a man's life stood in jeopardy. Applying the criteria set forth above to the facts at hand, we cannot find that the trial court's actions constituted an abuse of judicial discretion.

Initially, we note that Burns was not an essential witness in that he could only testify about his familiarity with Appellant during a nine-month stay at a juvenile facility. Again, however, the jury ultimately found the presence of the "catch all" mitigator. Therefore, Burns' testimony would have been redundant. Moreover, it is highly doubtful that the testimony of Burns would have strengthened Appellant's case. In fact, it is more than likely that it would have engendered the opposite effect. As demonstrated during the post-sentencing proceedings, although Burns could testify about his experiences with Appellant while he was placed at St. Gabriel's Hall, Burns was not aware of the particulars of Appellant's stay and was thus easily undermined as a witness. More importantly, the testimony of Burns would have allowed the Commonwealth to introduce damning evidence concerning Appellant's juvenile placement at St. Gabriel's Hall. As the trial court observed:

[T]he records at St. Gabriel's Hall reflect that [Appellant]'s initial adjustment was poor and "there has not been a great deal of improvement since then, according to staff . . . he is usually manipulative and slow to cooperate. His peer relationships are typically unsatisfactory." In addition, [Appellant] absconded from the institution, stole a staff member's wallet with $200.00 in it, and violated a variety of rules and regulations.

Trial Court Opinion, pp. 56–57. We observe that the trial court went out of its way in repeatedly giving time to the defense to find its last two witnesses and, ultimately, when the witnesses could not be located, gave the jury the synopsis of their testimony. Ultimately, given the circumstances at hand, such as the length of the trial, the fact that Burns was the last witness to testify, and his unexcused lateness, we find that the trial court's action did not constitute an abuse of judicial discretion. We similarly reject Appellant's claim that his counsel was ineffective in failing to seek a continuance, in light of the transcript that indicates that counsel did everything they could to secure the testimony of Burns.

*Robinson I*, 581 Pa. at 235-38.

The Court finds the trial court did not abuse its discretion in not granting a continuance for the testimony of Burns. Burns was impermissibly late for such a case of importance. The trial

court had already attempted to accommodate the defense. Further, Burns was not merely absent, but defense counsel had been unable to reach the witness, despite efforts. The trial court has the discretion to control the flow of its courtroom, and the refusal to permit Burns to testify was not an abuse of its discretion.

Despite Robinson's argument, the trial court's decision to deny the open-ended continuance did not preclude the defense from considering mitigating factor. The PSC correctly noted this testimony would have been redundant because the jury eventually found the catch all provision. Furthermore, the PSC also correctly noted the potential harmful consequences of Burns' testimony. The decision to call Burns would have opened the door to Robinson's behavior while at St. Gabriel's Hall, which would have provided the Commonwealth with additional evidence that could have been considered as an aggravator. Therefore, the trial court's decision was not contrary to federal law. Accordingly, the trial court did not abuse its discretion.

**M. Issue Thirteen**

In Issue Thirteen, Robinson argues, the Commonwealth put his future dangerousness at issue during sentencing, and the trial court never instructed the jury that, under Pennsylvania law, Robinson was statutorily ineligible for parole if sentenced to life. Instead Robinson argues, the court erroneously instructed the jury so as to suggest that Robinson, if spared death, would not necessarily be imprisoned for life. Lastly, Robinson asserts his trial counsel were ineffective because they never asked for a life-without-parole instruction even though he was entitled to such an instruction under controlling law. The PSC addressed the issue as follows:

> At one point during the charge, the following exchange took place between the trial court and one of the jurors:
>
> Juror: On the life in prison, is that without parole, just so that we are sure? Would there be a chance of parole if it was life in prison?

Trial Court: I don't see how I can guarantee—that's the present law. But what if the legislature changes the law? I can't guarantee that. That's the way the law is now.

Juror: Just so we know, Your Honor.

Trial Court: Who knows two years from now if they'll change the law. I can't tell you.

N.T., 11/10/1994, pp. 2767–68. At that point, the prosecutor requested a sidebar conference. At the conclusion of the discussion, the trial court gave the jury the following answer: "I am to tell you, and it's accurate, 'Life is life.' There won't be any parole. Life is life." N.T., 11/10/1994, p. 2769.

Presently, Appellant argues that the trial court failed to mention that there was no possibility of parole if Appellant would receive a life sentence. Thus, Appellant maintains that the jury was confused by the instructions and the trial court further compounded their misunderstanding by giving an answer indicative that "life imprisonment" may include the possibility of parole. Ultimately, Appellant contends that "not informing the jury during the sentencing instructions that a life sentence means life without the possibility of parole offends the evolving standards of decency that underlie" the U.S. and Pennsylvania Constitutions. Brief for Appellant, p. 143.

Essentially, Appellant's contention is that the trial court should have provided the jury with the instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994), that a "life sentence" means "life without a possibility of parole." However, as this Court has repeatedly held, "a *Simmons* instruction is required only where the prosecution makes the future dangerousness of the defendant an issue in the case and the defendant specifically requests such an instruction." *Commonwealth v. Champney*, 574 Pa. 435 (2003); *see also Commonwealth v. Robinson*, 554 Pa. 293 (1998), *cert. denied*, 528 U.S. 1082 (2000). Here, the Commonwealth did not argue future dangerousness and defense counsel did not request a *Simmons* instruction. Therefore, no instruction was required.

As it relates to the statement made by the trial court in response to the question posed by the juror, it is similar to what this Court faced in *Commonwealth v. Clark*, 551 Pa. 258 (1998), *cert. denied*, 526 U.S. 1070 (1999). Just as in this case, the trial court in *Clark* responded to the jury's question as to the meaning of "life imprisonment" by acknowledging, inter alia, that, although the present state of the law does not allow parole in the circumstances at hand, it cannot predict whether the legislature will decide to change that in the future. *Id*. at 35. We found that this instruction was not erroneous, *id*. at 36, and believe that *Clark* is directly on point with the circumstances presently before us. Therefore, we find no error in the instruction given by the trial court.

*Robinson I*, 581 Pa. at 245-47.

In *Simmons*, a plurality of the Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994); *see also Robinson v. Beard*, 762 F.3d 316, 327 (3d Cir. 2014) ("The fundamental takeaway from *Simmons* is that a jury cannot be presented with generalized arguments regarding the defendant's future dangerousness while also being prevented from learning that the defendant will never be released on parole.") Thereafter, the PSC held that under *Simmons* "a jury must be informed that life means life without the possibility of parole only when the prosecutor injects concerns of the defendant's future dangerousness into the case." *Commonwealth v. Speight*, 677 A.2d 317, 326 (Pa. 1996) (emphasis added) (concluding the prosecutor had not made appellant's future dangerousness an issue, and the instruction would not have been required under Simmons).

The United States Supreme Court again addressed the issue in *Kelly v. South Carolina*, 534 U.S. 246 (2002), holding that introducing evidence that only bore "a tendency" to prove dangerousness in the future raised the specter of a defendant's "future dangerousness." *Id*. at 254 ("Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.").

While "[i]t is not per se error for a prosecutor to argue a defendant's future dangerousness," *Commonwealth v. Smith*, 606 Pa. 127 (Pa. 2010), where future dangerousness is at issue and a capital defendant requests a specific instruction that his first degree murder conviction precludes his eligibility for parole, it is a denial of due process to refuse that instruction. *Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96, 106 (Pa. 1996).

Here, the PSC did not unreasonably apply federal law in ruling on this issue as *Simmons* is distinguishable in this instance. Unlike in *Simmons*, the Commonwealth at Robinson's trial made no explicit mention of Robinson's ability to conform to society in the future. The comments made by the Commonwealth pertain to the deterrence factor of Robinson's sentencing. Robinson confuses this with "expressly" implicating the need for the *Simmons* instruction. *See Simmons*, 512 U.S. at 177, (O'Connor, J., concurring) (requiring the trial court to ask whether "the prosecution argues that the defendant will pose a threat to society in the future"). The trial court did not ask whether the defendant will pose a threat to society in the future, it did not need to as the Commonwealth focused on the deterrence factor with their statements. Ultimately, the trial court was clear in its statement to the jury: "'Life is life.' There won't be any parole. Life is life." Even if the prior statement was problematic, this clear, direct and accurate statement of the law, renders the instruction sufficient under *Simmons*. The PSC correctly interpreted *Simmons*; accordingly, it did not unreasonably apply federal law.

### i.  Ineffective assistance of counsel

Here, Robinson's trial counsel was not ineffective. As the Commonwealth's comments were not explicit enough to warrant a *Simmons* instruction, Robinson's trial counsel did not need to request the instruction. Robinson's trial counsel correctly understood the difference between comments based on deterrence versus comments on future dangerousness. As discussed, the PSC did not unreasonably apply federal law in not issuing a *Simmons* instruction, the Commonwealth's remarks did not warrant a Simmons instruction, and to compel Robinson's counsel to request a *Simmons* instruction would have been nonsensical. Robinson's theory relies upon a hypothetical, not what actually occurred in Court. The facts establish a *Simmons* instruction was not necessary, and this Court must rely upon the factual record, not hypotheticals. Since a *Simmons* instruction

was not warranted, a request by trial counsel would have been futile, and Robinson's ineffective assistance of counsel arguments are moot.

### N. Certificate of Appealability

To appeal a final order in a habeas corpus proceeding, a prisoner in state custody must first be issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A). To receive a certificate, the petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253((c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "That standard is met when 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner.'" *Welch v. United States*, 136 S. Ct. 1257, 1263 (quoting *Slack*, 529 U.S. at 484).

Having found that no claim raised by Robinson has any merit, the Court also finds that he has failed to make a substantial showing of the denial of a constitutional right and that no reasonable jurist would reach different conclusions. Accordingly, the Court declines to issue a certificate of appealability.

## IV. CONCLUSION

The Court finds that the federal habeas claims raised by Harvey Miguel Robinson attacking his sentence of death for the murder of Jessica Jean Fortney are meritless. Accordingly, the Petition for Writ of Habeas Corpus is denied. Because Robinson has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied under 28 U.S.C. § 2253(c)(1)(A) with regard to all issues.

A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

ELD-014

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

C.A. No. **21-9001**

HARVEY MIGUEL ROBINSON, Appellant

    VS.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS; ET AL.

    (E.D. Pa. Civ. No. 2:06-cv-00829)

Present:       HARDIMAN, GREENAWAY, JR. and BIBAS, <u>Circuit</u> <u>Judges</u>

         Submitted are:

         (1) Appellant's request for a certificate of appealability under 28 U.S.C. § 2253(c)(1);

         (2) Appellant's motion for leave to exceed the word limit imposed by 3d Cir. L.A.R. 22.1(a) and Fed. R. App. P. 27(d)(2)(A); and

         (3) Commonwealth's April 18, 2022 letter to the Court

         in the above-captioned case.

                   Respectfully,

                   Clerk

_____ORDER_____

     Harvey Miguel Robinson filed a counseled request for a certificate of appealability (COA) to appeal from the District Court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254 and the merged denial of his motion under Fed. R. Civ. P. 59(e). <u>See</u> <u>Banister v. Davis</u>, 140 S. Ct. 1698, 1703 (2020). Robinson's uncontested motion for leave to exceed the word-count prescribed for his COA request, <u>see</u> 3d Cir. L.A.R. 22.1(a); Fed. R. App. P. 27(d)(2)(A); <u>cf.</u> 3d Cir. L.A.R. 27.3 (2011), is granted.

To obtain a COA, Robinson was tasked with making "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), meaning that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Buck v. Davis</u>, 137 S. Ct. 759, 773 (2017) (citation omitted). Robinson satisfies that standard for his claim under the Due Process Clause of the Fourteenth Amendment: i.e., his claim that the Supreme Court of Pennsylvania's determination that the trial court was under no obligation to instruct the jury on Robinson's parole ineligibility was contrary to or an unreasonable application of <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994), and <u>Kelly v. South Carolina</u>, 534 U.S. 246 (2002), or reflected an unreasonable determination of the facts. <u>Cf.</u> 28 U.S.C. § 2254(d)(1)-(2). In particular, jurists of reason could debate whether the prosecutor placed Robinson's future dangerousness at issue, <u>see, e.g.</u>, Doc. 27-22 at 145-47, 153; Doc. 27-17 at 150, thereby triggering the need for the <u>Simmons</u> instruction. <u>See Simmons</u>, 512 U.S. at 176-77 (O'Connor, J., concurring in the judgment); <u>see also</u> <u>Bronshtein v. Horn</u>, 404 F.3d 700, 716, 719 (3d Cir. 2005). The COA request is granted to that extent. Notably, the claim we have certified for appeal is rooted in the Fourteenth Amendment; it does not concern the Sixth or Eighth Amendment, in the manner advocated by Robinson or otherwise. <u>Cf. Eizember v. Trammell</u>, 803 F.3d 1129, 1144 n.6 (10th Cir. 2015). The COA request is denied in all other respects, for substantially the reasons given in the District Court's memorandum opinion denying habeas relief.

In addition to any other issues the parties wish to pursue within the scope of the COA, they are directed to address in their briefs whether, if no deference to the Supreme Court of Pennsylvania's rejection of the <u>Simmons</u> claim is due under § 2254(d), and de novo review of the claim is thus appropriate, any failure by the trial court to provide a proper <u>Simmons</u> instruction constitutes harmless error under <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). <u>Compare</u> <u>Mollett v. Mullin</u>, 348 F.3d 902, 921 n.6 (10th Cir. 2003) <u>with Richmond v. Polk</u>, 375 F.3d 309, 334-35 (4th Cir. 2004). And, in addressing that issue, the parties may wish to discuss whether the trial court's reformulated response to a jury question ("I'm to tell you [the jury], and it's accurate, 'Life is life.' There won't be any parole. Life is life.") cured any prior lack of a <u>Simmons</u> instruction. Finally, we observe that, as Robinson is represented by counsel, a briefing schedule should issue forthwith.

By the Court,

s/ Thomas M. Hardiman
Circuit Judge

Dated: August 30, 2022
DWB/arr/cc: EJM; RE; HFG